UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | § | |
| COMMISSION | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-12-0563 |
| | § | |
| MARK A. JACKSON | § | |
| and JAMES J. RUEHLEN | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM AND ORDER

Pending before the Court are Defendant Mark A. Jackson's ("Jackson") Motion to Dismiss the Complaint Under Rule 12(b)(6) for Failure to State a Claim Upon Which Relief Can Be Granted (Doc. No. 35), and Defendant James J. Ruehlen's ("Ruehlen") Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim (Doc. No. 36). After considering the parties' filings, all responses and replies thereto, and the applicable law, the Court finds that the Defendants' Motions should be **GRANTED IN PART** and **DENIED IN PART**.

I.     BACKGROUND

The Securities and Exchange Commission ("SEC") filed this enforcement action against former and current officers of Noble Corporation ("Noble"). (Compl. ¶ 1.) Noble is an international provider of offshore drilling services and equipment. (Compl. ¶ 1.) Noble and its wholly owned subsidiary, Noble Drilling (Nigeria) Ltd. ("Noble-Nigeria"), operate in Nigeria. (Compl. ¶ 1.) Between January 2003 and May 2007, Noble-Nigeria had up to seven drilling rigs that operated offshore in Nigeria. (Compl. ¶ 18.) To operate drilling rigs offshore in Nigeria, the

1

Nigerian laws require the owner of the rig to either pay permanent import duties or obtain a Temporary Import Permit ("TIP"). (Compl. ¶¶ 18–20.)

TIPs allow drilling rigs to operate in Nigerian waters without payment of permanent import duties. (Compl. ¶ 18.)  Under Nigerian law, the Nigeria Customs Service ("NCS") grants TIPs for rigs that will be in the country for only one year. (Compl. ¶ 19.)  NCS may, in its discretion, grant up to three six-month extensions to a TIP. (Compl. ¶ 20.)  Upon the expiration of a TIP and any TIP extensions, NCS requires the rig to be exported from Nigeria. (Compl. ¶ 20.)  If the owner of the rig wishes to continue using the rig after the expiration of a TIP and any applicable extensions, he can either convert the rig to permanent import status and pay the appropriate permanent import duties, or he can export the rig and seek a new rig TIP to re-import the rig. (Compl. ¶ 20.)   In order to obtain a TIP or an extension, the rig owner must submit an application through a licensed customs agent; NCS does not deal directly with rig owners. (Compl. ¶ 21.)

Noble's standard procedure in applying for TIPs and TIP extensions would involve obtaining a price proposal from a customs agent detailing the costs associated with obtaining the new TIP or extension. (Compl. ¶ 23.)  The proposals would indicate those charges that did not have any supporting documentation by labeling them as "special handling" or "procurement." (Compl. ¶ 23.)  Noble's FCPA policy required such unreceipted payments to foreign government officials to be pre-approved in writing by the CFO. (Compl. ¶ 24.)  Once the CFO approved the unreceipted payments, the customs agent would be authorized to pay the Nigerian government officials in accordance with the price proposal. (Compl. ¶ 24.)  The customs agent would then submit an invoice to Noble reimbursing him for the money paid to the Nigerian government officials. (Compl. ¶ 25.)

The SEC alleges that Noble and Noble-Nigeria authorized a customs agent to pay bribes to Nigerian government officials in order to obtain false documentation Noble-Nigeria needed to obtain TIPs.  (Compl. ¶¶ 18, 19, 22–27.)  Additionally, the SEC alleges, Noble and Noble-Nigeria, through a customs agent, paid bribes to Nigerian government officials for TIP extensions.  (Compl. ¶ 31.)  In this action, the SEC charges Jackson and Ruehlen with multiple violations of the Foreign Corrupt Practices Act ("FCPA"), and other federal securities laws in connection with actions they allegedly took to obtain TIPs and TIP extensions in order to avoid paying permanent import duties.  (Compl. ¶¶ 2–4, 150–177.)

Specifically, Jackson and Ruehlen are alleged to have approved numerous "special handling" and "procurement" payments to Nigerian government, understanding that all "special handling" and "procurement" payments were bribes to government officials to obtain false paperwork necessary to secure TIPs or to obtain discretionary TIP extensions.[1]  (Compl. ¶ 24.)  Consequently, the SEC avers Jackson and Ruehlen both violated Section 30A of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78dd-1.  (Compl. ¶¶ 151–152.)  Furthermore, through this conduct, Jackson and Ruehlen also aided and abetted Noble's violation of Section 30A of the Exchange Act, in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).  (Compl. ¶¶ 155–156.)  Moreover, the SEC contends, Jackson and Ruehlen allowed these payments repeatedly to be posted on Noble's books as legitimate operating expenses.  (Compl. ¶¶ 95, 111, 113, 119.)  In so doing, Jackson and Ruehlen aided and abetted Noble's violation of Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A), which requires Noble to keep books and records that accurately reflect its transactions, and Noble's violation of Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B), which requires

---

[1] Ruehlen, when discussing these charges with Jackson, referred to both "procurement" and "special handling" fees as "special handling" fees, regardless of the label used by the customs agent.  (Compl. ¶ 24.)

Noble to devise and maintain a system of internal controls that provides reasonable assurances that transactions are executed in accordance with management's general or specific authorizations, in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).  (Compl. ¶¶ 158–163.)  Additionally, because Jackson and Ruehlen knew these actions violated an Audit Committee resolution, and because Ruehlen frequently authorized these unreceipted TIP-related payments to government officials without pre-approval from the CFO, Jackson and Ruehlen's actions amounted to a knowing circumvention of Noble's internal accounting controls, in violation of Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), or, at a minimum, Jackson and Ruehlen, at least indirectly, caused Noble's books and accounts to be false, in violation of Exchange Act Rule 13b2-1, 17 C.F.R. § 240.13b2-1.  (Compl. ¶¶ 165–167.)

The SEC also alleges several violations against Jackson alone.  (Compl. ¶¶ 168–177.)  In representing to auditors that he was unaware of any FCPA violations or violations of law, Jackson violated Exchange Act Rule 13b2-2, 17 C.F.R. § 240.13b2-2.  (Compl. ¶¶ 169–170.)  In personally certifying that he had disclosed all significant deficiencies and material weaknesses in the design or operation of internal controls, as required by the Sarbanes-Oxley Act of 2002, Jackson violated Exchange Act Rule 13a-14, 17 C.F.R. § 240.13a-14.  (Compl. ¶¶ 172–173.)  Finally, because Jackson controlled Noble and Ruehlen, the SEC seeks to hold Jackson liable as a control person under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for Noble, Ruehlen's and unnamed others' violations of Sections 30A, 13(b)(2)(A and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78dd-1, 15 U.S.C. §§ 78m(b)(2)(A) and (B).  (Compl. ¶¶ 174–177.)

During the relevant time periods, Jackson held numerous, executive-level positions at Noble.  (Compl. ¶ 8.)  From September 2000 to October 2005, he was the CFO of Noble.  (Compl. ¶ 31.)  In March 2005, Jackson became the COO of Noble, but continued to act as the

CFO until October 2005, when a replacement was found.   (Compl. ¶ 101.)  In about March of 2006, the CFO stepped down, and Jackson assumed the role of Acting CFO from March 2006 to November 2006, until a new CFO was hired.  (Compl. ¶ 8, 114.)  In addition to these roles, Jackson also became the president of Noble in February 2006, a Director in July 2006, and CEO in October of 2006.  (Compl. ¶ 8.)  Jackson resigned from Noble in September 2007.  (Compl. ¶ 12.)

As CFO and Acting CFO, Jackson was responsible for Noble's compliance with the FCPA.  (Compl. ¶ 9.)  The SEC alleges that several events that transpired in 2003 and 2004 put Jackson on notice that Noble was violating the FCPA.  (Compl. ¶ 33.)  During Jackson's tenure as CFO, in February of 2003, the Nigerian government assessed a penalty against Noble-Nigeria for, among other things, preparing false documents to obtain TIPs.  (Compl. ¶ 36.)  Additionally, in January of 2004, Jackson also received a company-wide internal audit report regarding FCPA compliance ("FCPA Audit").  (Compl. ¶ 37.)  The FCPA Audit indicated that employees did not understand the FCPA, did not comply with Noble's FCPA procedures, and did not get proper approvals before making unreceipted payments to foreign officials.  (Compl. ¶ 38.)

The SEC similarly alleges that events that transpired in 2003 and 2004 put Ruehlen on notice that Noble was violating the FCPA.  (Compl. ¶ 33.)  In 2003 and 2004, Ruehlen worked in Noble's operations and corporate internal audit groups.  (Compl. ¶ 15.)  During that period, he worked on an audit of the West Africa Division ("West Africa Audit"), which revealed Noble-Nigeria's use of false paperwork and payments of approximately $75,000 every two years in order to obtain improper TIPs.  (Compl. ¶ 15, 47.)  Ruehlen summarized in writing the penalty Noble-Nigeria had previously paid to the Nigerian government for violation of the TIP laws, Noble-Nigeria's continued use of false pretenses and payments of approximately $75,000 bi-

annually to customs agents to obtain TIPs, and the risks associated with continued improper use of the TIP system.  (Compl. ¶ 47.)  However, the final West Africa Division Audit Report, completed by Ruehlen and others in April of 2004, described the use of false paperwork to obtain a TIP as a one-time occurrence and did not mention the biannual payments.  (Compl. ¶ 48.)  Nonetheless, the report highlighted the finding about a false paperwork TIP as an area for control and process improvement.  (Compl. ¶ 50.)  The Audit Committee of Noble's Board of Directors, at a meeting at which Jackson was present, indicated its concern about the use of false paperwork.  (Compl. ¶ 51.)

In September 2004, Ruehlen became Division Manager of Noble-Nigeria.  (Compl. ¶ 14.) In this position, he signed Division representation letters certifying his division's compliance with the FCPA, certifying the accuracy of Noble's books, records and accounts, and certifying the division's adherence to internal controls.  (Compl. ¶ 14.)  From about May 2005 to the first quarter of 2007, Ruehlen reported directly to Jackson.  (Compl. ¶ 14.)  The Complaint further provides that Ruehlen is the highest-level Noble executive in Nigeria and continues to be responsible for all of Noble-Nigeria's operations.  (Compl. ¶ 13.)[2]

When Ruehlen began working in Nigeria, Noble-Nigeria was looking into obtaining third extensions for two rigs.  (Compl. ¶ 14.)  On July 29, 2004, Ruehlen received the customs agent's proposals indicating that the third extension would require 5,000,000 Naira in "special handling" charges.  (Compl. ¶ 55.)[3]  Ruehlen had reservations about the size of the fee, but nonetheless

---

[2] At oral argument, Ruehlen's counsel represented that he is currently stationed in Mexico, suggesting the Ruehlen is no longer responsible for Noble-Nigeria's operations.

[3] The SEC provides the total dollar amounts paid by Noble to obtain TIP extensions and new TIPs between January 2003 and May 2007, but does not specify, in dollars, the amount paid for any single TIP or TIP extension.  (*See* Compl. ¶¶ 28–31.)  Nor does it provide the exchange rate between the Nigerian Naira and the US Dollar during the relevant time period.  According to the United States Department of Treasury, presently, $1 is the equivalent of 157.2000 Naira.  *Treasury Reporting Rates of Exchange as of September 30, 2012*, Financial Management Service, http://www.fms.treas.gov/intn.html#rates (last visited December 4, 2012).  Under the present exchange rate, 5,000,000 Naira is the equivalent of $31,806.62.

directed the agent to get the third extensions.  (Compl. ¶ 56.)  In August 2004, Noble-Nigeria's Operations Manager discussed the matter with Ruehlen, noting that he did not have a good feeling about the customs agent and stating that "the way the[y] work is not sound and above the table;" he recommended no further involvement with the agent.  (Compl. ¶ 58.)  Nonetheless, Noble-Nigeria sought approval from Jackson to pay the unreceipted 5,000,000 Naira, indicating that the payment was a "high but necessary cost" to obtaining the extensions.  (Compl. ¶ 59.) Jackson approved the payment.  (Compl. ¶ 60.)  In September 2004, Ruehlen received copies of the third extensions, which explicitly stated that NCS would grant no more extensions and that the rigs must be exported in the end of February 2005.  (Compl. ¶ 62.)  Nonetheless, toward the end of 2004, Ruehlen sought two fourth extensions for these rigs, and a third extension for another rig.  (Compl. ¶ 65.)  The customs agent advised Ruehlen that NCS would not grant a fourth extension.  (Compl. ¶ 66.)  The third extension was also denied because the rig was operating under a different contract than the contract used to get a TIP, in contravention of the TIP's terms.  (Compl. ¶ 67.)

In February 2005, Ruehlen unilaterally decided to resume the use of false paperwork to obtain three new TIPs.  (Compl. ¶ 68.)  He obtained a price proposal from a customs agent indicating the "procurement" cost would be 5,000,000 Naira and there would be an additional 1,900,000 Naira in "special handling" charges for each rig associated with showing movement of the rig on paper, when in fact the rigs would not leave Nigerian waters.  (Compl. ¶ 69.)  The proposal specifically indicated that payments would be made to the Nigerian Port Authority ("NPA") and the National Maritime Authority ("NMA"), as well as husbandry charges at Cameroon offshore, all presumably to obtain paperwork showing the fictitious movement of the rigs.  (Compl. ¶ 69.)  Between February 21 and 28, 2005, Ruehlen prepared TIP applications

representing that the rigs were outside Nigeria and authorized the customs agent to use these applications and proceed in accordance with the price proposal.  (Compl. ¶ 70.)  In late March of 2005, when the fraudulent applications were already being processed by NCS, Ruehlen informed the head of internal audit that he resumed the use of false paperwork and payments to obtain TIPs.  (Compl. ¶ 75.)

On May 9, 2005, NCS granted Noble-Nigeria new TIPs for the three rigs.  (Compl. ¶ 81.)  Only after receiving the TIPs did Ruehlen seek approval from Jackson to pay the 1,900,000 Naira in "special handling" fees for each rig.  (Compl. ¶ 82.)  These fees corresponded with the "export" portion of the false paperwork.  (Compl. ¶ 82.)  Jackson indicated he was "OK with approving," but asked for clarification from the head of internal audit about the West Africa Audit's findings.  (Compl. ¶ 83.)  The head of internal audit summarized the report and the resolution presented to the audit committee, which provided that Noble-Nigeria would not use false paperwork and would physically export the rigs to obtain new TIPs.  (Compl. ¶ 84.)  The head of internal audit asked Ruehlen to explain why he decided to revert to using false paperwork.  (Compl. ¶ 84.)

Ruehlen responded to both the head of internal audit and Jackson, explaining that physically exporting the rigs would require them to be off-contract for four to six weeks, which would be costly and could potentially lead to cancellation of contracts.  (Compl. ¶ 85.)  He claimed that the only way to keep the rigs on contract and get new TIPs was to indicate, through false paperwork, that the rigs had been exported and re-imported when in fact they did not move.  (Compl. ¶ 85.)  On May 25, 2005, Jackson approved the "special handling" charges.  (Compl. ¶ 88.)  By this time, Ruehlen had already signed a check paying the customs agent's invoice for

the "special handling" fees.  (Compl. ¶ 86.)  That same day, Noble-Nigeria posted the "special handling" charges to accounts for legitimate operating expenses.  (Compl. ¶ 88.)

Around this same time, in May of 2005, Jackson and Ruehlen agreed to implement a pre-approval process for the numerous small payments Noble-Nigeria made to government officials. (Compl. ¶ 91.)  Under the plan, Ruehlen would send Jackson a quarterly report detailing the prior quarter's payments to government officials and also requesting blanket pre-approval of payments for the current quarter based on a projected cumulative total.  (Compl. ¶ 91.)  Although TIP-related payments were included in the report for prior quarter payments, they were not subject to pre-approval.  (Compl. ¶ 91.)

In September 2005, Ruehlen received the invoice for the remaining "procurement" fee of 5,000,000 Naira.  (Compl. ¶ 92.)  Ruehlen requested approval of the 5,000,000 Naira fee, which he described as a "special handling" fee, from Jackson on September, 16, 2005, and Jackson approved the payment that same day.  (Compl. ¶¶ 93–94.)  These fees were subsequently booked as legitimate operating expenses.  (Compl. ¶¶ 95.)

Earlier that year, in May 2005, Ruehlen also sought a third extension fee on a rig. (Compl. ¶ 96.)  Upon receiving the price proposal from the customs agent, which indicated a 5,000,000 Naira "special handling" fee, Ruehlen authorized the customs agent to seek a third extension without Jackson's approval.  (Compl. ¶ 96.)  The TIP extension was granted by NCS on June 13, 2005.  (Compl. ¶ 97.)  Like the previously issued third TIP extensions, the extension indicated that it was the final extension and, at its expiration, Noble-Nigeria either had to export the rig or pay permanent import duties.  (Compl. ¶ 92.)  Ruehlen sought Jackson's approval of the 5,000,000 Naira "special handling" fee only after receiving the customs agent's invoice. (Compl. ¶ 98.)  Jackson approved the payment.  (Compl. ¶ 98.)

9

After Jackson became COO, Ruehlen continued to seek TIPs based on false paperwork. (Compl. ¶¶ 103–109.)   Ruehlen represented that the "special handling" and "procurement" charges associated with these TIPs were "the same as we have paid in the past for this process." (Compl. ¶ 103.)   Neither Ruehlen nor Jackson informed the new CFO that these payments were for obtaining and processing paperwork that would document fictitious export and re-import of the rigs, that they violated Nigeria's protocol for obtaining a TIP, or that the procedure used to obtain the TIPs would contravene the Audit Committee's instructions after the West Africa Audit.   (Compl. ¶ 104.)   The new CFO approved two such payments in December 2005 and January 2006.  (Compl. ¶¶ 104, 107.)  Ruehlen then authorized the customs agent to obtain the new TIPs.  (Compl. ¶¶ 105, 108.)  Both TIPs were granted.  (Compl. ¶¶ 106, 109.)

In May 2006, Ruehlen received the customs agent's invoices for the export portion of the two TIPs.  (Compl. ¶ 110.)  The invoices documented inward and outward movement of the rigs when, in fact, the rigs never moved.  (Compl. ¶ 110.)  Like the invoice for the previous TIPs based on false paperwork, this invoice listed payments made to the NPA and the NMA, specifically indicating that these fees were associated with "outwards" movement.   (Compl. ¶ 110.)   Ruehlen approved payment of these invoices, and they were booked as legitimate operating expenses.  (Compl. ¶ 111.)  In June 2006, the customs agent provided invoices for the import portion of the two TIPs.  (Compl. ¶ 112.)  This invoice indicated charges for towing the rigs inward and outward and NPA and NMA charges for "inwards" processing.  (Compl. ¶ 112.) Ruehlen again approved payment of these invoices, and they were recorded as legitimate operating expenses on Noble's books.  (Compl. ¶ 113.)

In March 2006, the new Noble CFO resigned and Jackson again became acting CFO. (Compl. ¶ 114.)  While Jackson was acting CFO, several TIP payment-related events transpired.

(Compl. ¶¶ 115–119.)  On or about May 16, 2006, Jackson approved 3,000,000 Naira in "special handling" fees to obtain a second TIP extension.  (Compl. ¶ 115.)  In July 2006, Jackson received Ruehlen's quarterly request for blanket pre-approval of non-TIP related payments to government officials.  (Compl. ¶ 116.)  Instead of responding to the request, Jackson allowed another Noble executive to approve the request.  (Compl. ¶ 116.)  On or about October 19, 2006, Ruehlen received a price proposal from the customs agent for a third TIP extension, which included a "special handling" charge of 1,750,000 Naira.  (Compl. ¶ 117.)  Instead of seeking pre-approval from Jackson to pay the fee, Ruehlen sent the request to the executive who had approved Ruehlen's last quarterly blanket pre-approval.  (Compl. ¶ 117.)  Ruehlen told the executive that the payment was "in line with payments made in the past for handling of temporary imports for this unit."  (Compl. ¶ 117.)  Subsequently, Ruehlen learned the "special handling" charges had been nearly doubled to 3,000,000 Naira, and sought approval for the revised "special handling" charges.  (Compl. ¶ 117.)  The executive did not respond to Ruehlen or approve the payment.  (Compl. ¶ 117.)  Ruehlen nonetheless told the customs agent to secure the third TIP.  (Compl. ¶ 118.)  NCS granted the third extension, and, as it had done with all prior third extensions, indicated that it would be the final extension.  (Compl. ¶ 118.)  On November 1, 2006, Ruehlen received the invoice from the customs agent for the third TIP extension.  (Compl. ¶ 119.)  Still lacking any approval from the CFO or any other executive, Ruehlen had Noble-Nigeria process and pay the invoice, including the 3,000,000 Naira in "special handling" fees.  (Compl. ¶ 119.)  The 3,000,000 Naira payment was posted as a legitimate operating expense on Noble's books.  (Compl. ¶ 119.)

      In early 2006, Noble hired a new CFO.  (Compl. ¶ 120.)  Shortly thereafter, Ruehlen sent the new CFO a request to approve "special handling" charges to obtain second extensions for

three rigs in the amount of 1,600,000 Naira.  (Compl. ¶ 120.)  Ruehlen stated that the payments were the same as what had been paid in the past.  (Compl. ¶ 120.)  Ruehlen also requested approval of "special handling" charges for the third TIP extension that Ruehlen had already authorized in October.  (Compl. ¶ 121.)  However, Ruehlen sought approval for only 1,750,000 Naira in fees, not the 3,000,000 that he had previously authorized.  (Compl. ¶ 121.)

The new CFO was concerned about his qualifications to approve these payments, and reached out to Jackson, who was then Noble's CEO, President and COO, a member of the Board of Directors, and Noble's former CFO.  (Compl. ¶ 122.)  He continued to raise concerns about the approval process for several months.  (Compl. ¶ 122.)  Jackson simply told the new CFO to rely on the advice of Noble's then-Controller, but did not tell him that the Controller knew that Noble-Nigeria used false paperwork and large, unreceipted payments to obtain TIPs and extensions.  (Compl. ¶ 123.)  Nor did he mention anything about his own prior approval of such payments.  (Compl. ¶ 123.)  The Controller approved the payments, and the CFO relied on that approval to give his own approval.  (Compl. ¶ 124.)  In late January or early February of 2007, Ruehlen requested and received approval for "special handling" charges of 1,600,000 Naira for two first TIP extensions.  (Compl. ¶ 125.)

In February 2007, the head of internal audit emailed Ruehlen expressing concern about a news report about prosecutions of other oil companies for violating the FCPA by paying Nigerian officials for fast customs clearance.  (Compl. ¶ 138.)  He informed Ruehlen that the Audit Committee wanted an FCPA update each quarter, and was concerned that the West Africa Audit resolution concerning the use of false paperwork had not been recently reviewed.  (Compl. ¶ 138.)  He also asked Ruehlen if the customs agent had signed an agreement to comply with the FCPA and granted Noble-Nigeria audit rights.  (Compl. ¶ 138.)  Ruehlen attempted to locate an

agreement with the customs agent but could not find one.  (Compl. ¶ 139.)  He obtained a draft, unexecuted copy from Noble's corporate offices.  (Compl. ¶ 139.)  According to the agreement, the customs agent was required to sign annual certifications of compliance with the FCPA. (Compl. ¶ 139.)  Ruehlen had never obtained these annual certifications from the customs agent. (Compl. ¶ 139.)  Upon obtaining the draft agreement, Ruehlen sent the customs agent the annual certification form and asked him to certify compliance for 2004 and 2005.  (Compl. ¶ 140.)  On February 22, 2007, Ruehlen received the customs agent's signed certifications, which were backdated to July 13, 2005 and July 20, 2006.  (Compl. ¶ 140.)  Ruehlen did not tell anyone that the certifications were backdated.  (Compl. ¶ 140.)

Also in February 2007, Ruehlen decided again to try to seek a fourth TIP extension for a rig, despite the terms of third TIP extensions.  (Compl. ¶ 126.)[4]  He hired a new customs agent to attempt to obtain the fourth extension, and the customs agent told Ruehlen the fourth extension would require a "procurement" fee of 7,000,000 Naira.  (Compl. ¶ 126.)  On April 11, 2007, Ruehlen asked the new CFO to approve the "procurement" charges.  (Compl. ¶ 127.)  He explained that Noble-Nigeria had never received a fourth extension, so he had no historical cost comparison, but he did state that 7,000,000 Naira was comparable to the cost of obtaining a new TIP for one of the rigs.  (Compl. ¶¶ 127–128.)  Ruehlen did not explain that TIP extensions typically cost less than new TIPs, nor did he mention that NCS did not grant fourth extensions. (Compl. ¶ 128.)  The CFO approved the payment that same day.  (Compl. ¶ 127.)

In March 2007, Ruehlen began the process of obtaining false paperwork TIPs for three rigs.  (Compl. ¶ 131.)  The customs agent sent Ruehlen price proposals, including 2,000,000 Naira in "special handling" fees and 5,000,000 Naira in "procurement" fees for each rig.

---

[4] It is not clear from the face of the Complaint whether the SEC claims that Ruehlen decided to initiate the process for a fourth TIP extension before or after the head of internal audit emailed Ruehlen and expressed concern about possible FCPA violations.  (Compl. ¶¶ 126, 138.)

(Compl. ¶ 132.)  On April 16, 2007, Ruehlen requested approval for these fees.  (Compl. ¶ 133.)
He also authorized the customs agent to begin obtaining the false paperwork TIPs.  (Compl. ¶
134.)[5]

In May 2007, the customs agent sent Ruehlen invoices for the export portion of the three
false paperwork TIPs and the invoice for the fourth TIP extension.  (Compl. ¶¶ 130, 136.)
However, because Noble's Audit Committee, in or about May 2007, had begun an internal
investigation into payments to Nigerian officials for TIPs and TIP extensions, these invoices
were ultimately unpaid.  (Compl. ¶¶ 130, 137.)

Between 2005 and 2007, Ruehlen and Jackson signed various representation letters and
personal certifications.   (Compl. ¶¶ 141–146.)   Ruehlen prepared and signed quarterly
representation letters, dated from April 13, 2005 to May 3, 2007, to Noble's upper management
stating that Noble-Nigeria had: (1) complied with all Internal Audit action items and resolutions;
(2) complied with Noble's Code of Business Conduct; (3) not violated any laws or regulations;
and  (4)  not  violated  the  FCPA.    (Compl. ¶ 141.)    Jackson  signed  annual  and  quarterly
management representation letters to Noble's independent auditors, dated from August 5, 2005
to May 9, 2007, stating that: (1) he was unaware of any FCPA violations by Noble or its
subsidiaries; (2) he was unaware of any other violations of law; (3) he had maintained effective
internal controls; (4) there were no material weaknesses in internal control over financial
reporting; and (5) he was unaware of any fraud or suspect fraud affecting Noble.   (Compl. ¶
145.)  Jackson also signed personal certifications as CFO and CEO that were attached to Noble's
public quarterly and annual filings, dated from August 8, 2005 to May 9, 2007, stating that he

---

[5] The Complaint does not specify whether the CFO approved these fees before Ruehlen authorized the agent to
obtain the false paperwork TIPs.

had disclosed to Noble's auditors and Audit Committee all significant deficiencies and material weaknesses in the design or operation of internal controls and any fraud.  (Compl. ¶ 146.)

Finally, although Jackson had regular contact with the Audit Committee and the board of directors, he did not inform the Audit Committee or any member of the board of directors that he had authorized the use of false paperwork, or that he had authorized the payments made to obtain TIPs and TIP extensions, before May 2007.  (Compl. ¶ 143.)   From May 2007 through June 2008, when the Audit Committee conducted an internal investigation into Noble-Nigeria's TIP-related payments to government officials, Jackson refused to give information to investigators. (Compl. ¶ 144.)

## II.    LEGAL STANDARD

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'"  *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Twombly*, 550 U.S. at 556 n.3 ("Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief.").  That is, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570.  A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility that a

defendant has acted unlawfully. *Id.* A pleading need not contain detailed factual allegations, but must set forth more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 678.

Ultimately, the question for the court to decide is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. The court must accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal*, 129 S. Ct. at 1950 (citation omitted). The court should not "'strain to find inferences favorable to the plaintiffs'" or "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'" *R2 Investments LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004)). A district court can consider the contents of the pleadings, including attachments thereto, as well as documents attached to the motion, if they are referenced in the plaintiff's complaint and are central to the claims. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 499 (5th Cir. 2000). Importantly, the court should not evaluate the merits of the allegation, but must satisfy itself only that plaintiff has adequately pled a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). "Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citation omitted); *Duke Energy Intern., L.L.C. v. Napoli*, 748 F. Supp. 2d 656 (S.D. Tex. 2010).

The Federal Rules of Civil Procedure provide that "leave (to amend the complaint) shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). "[G]ranting leave to amend is

especially appropriate . . . when the trial court has dismissed the complaint for failure to state a claim." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) (citation omitted).   The Court should generally "afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Id*.

## III.   ANALYSIS

### A.     The FCPA[6]

The FCPA provides in relevant part:

(a) Prohibition

It shall be unlawful for any issuer [of a certain class of securities] . . . , or for any officer, director, employee, or agent of such an issuer . . . , to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of . . . anything of value to--

. . .

> (3) any person, while knowing that all or a portion of such money ... will be offered, given, or promised, directly or indirectly, to any foreign official ... for purposes of-
>
> > (A)(i) influencing any act or decision of such foreign official . . . in his . . . official capacity . . . , (ii) inducing such foreign official . . . to do or omit to do any act in violation of the lawful duty of such foreign official . . . , or (iii) securing any improper advantage . . .
> >
> > in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person.

(b) Exception for routine governmental action

---

[6] In this section, the Court addresses all of Defendants' FCPA-specific arguments.  Defendants also argue that the FCPA claims, as well as all of the other claims, must be dismissed because the statute of limitations has passed. (Jackson Mot., at 19–22, 23–25; Ruehlen Mot., at 23–25.)  The Court addresses the statute of limitations *infra* in Part III.F.

Subsection[] (a) . . . of this section shall not apply to any facilitating or expediting payment to a foreign official, political party, or party official the purpose of which is to expedite or to secure the performance of a routine governmental action by a foreign official, political party, or party official.
. . .

(f) Definitions

. . .

(3)(A) The term "routine governmental action" means only an action which is ordinarily and commonly performed by a foreign official in--

(i) obtaining permits, licenses, or other official documents to qualify a person to do business in a foreign country;

(ii) processing governmental papers, such as visas and work orders;

(iii) providing police protection, mail pick-up and delivery, or scheduling inspections associated with contract performance or inspections related to transit of goods across country;

(iv) providing phone service, power and water supply, loading and unloading cargo, or protecting perishable products or commodities from deterioration; or

(v) actions of a similar nature.

(B) The term "routine governmental action" does not include any decision by a foreign official whether, or on what terms, to award new business to or to continue business with a particular party, or any action taken by a foreign official involved in the decision-making process to encourage a decision to award new business to or continue business with a particular party.

15 U.S.C. § 78dd-1.  Defendants contend that the Complaint fails to adequately plead: (1) the

involvement of a foreign official, (2) that the payments were not facilitating payments, and (3)

that the Defendants acted corruptly.  (Jackson Mot. 9–19; Ruehlen Mot. 7–17.)  Ruehlen also

argues that the facilitating payments exception is unconstitutionally vague.  (Ruehlen Mot. 17–

21.

Statutory interpretation begins with the language of the statute.  *Kosak v. United States*,

465 U.S. 848, 853 (1984).  "A term not defined in a statute must be construed in accordance

with its ordinary and natural meaning, as well as the overall policies and objectives of the statute." *United States v. Lowe*, 118 F.3d 399, 402 (5th Cir. 1997) (citations omitted).  If the statute is "susceptible to more than one reasonable interpretation," courts may consider legislative history to discern the meaning of the statute.  *United States v. Kay*, 359 F.3d 738, 743 (5th Cir. 2004) (citations omitted) ("*Kay I*").

        1.        **"any foreign official"**

Defendants contend that the FCPA requires a plaintiff to allege the identity of the foreign official whose authority a defendant sought to misuse.  (Jackson Mot. 10–13; Ruehlen Mot. 7–11.)  They suggest that the SEC must allege by name, or at minimum by role and job responsibility, the foreign official who was sought to be influenced.  (Jackson Mot. 11; Ruehlen Mot. 8.)  The SEC contends that there is nothing in the FCPA that requires pleading the identity of the foreign official involved with the level of detail Defendants advocate.  (Doc. No. 37, Pl.'s Consolidated Resp. in Opp'n to Defs. Jackson's and Ruehlen's Mot. to Dismiss, 12–14.)  Furthermore, it argues that Defendants' interpretation of the FCPA would run counter to congressional intent.  (Resp., at 14–18.)

The language of the statute does not appear to require that the identity of the foreign official involved be pled with specificity.  Indeed, the terms of the FCPA make it unlawful corruptly to authorize payments to any person, knowing that any portion of those payments would be offered to *any* foreign official.  15 U.S.C. § 78dd-1(a)(3).  It is possible that the requirement that the payment be made or authorized with the purpose of "influencing any act or decision of such foreign official . . . in his . . . official capacity . . . , (ii) inducing such foreign official . . . to do or omit to do any act in violation of the lawful duty of such foreign official . . . , or (iii) securing any improper advantage . . . ", 15 U.S.C. § 78dd-1(a)(3)(A), would, at times,

require the government to plead details about the foreign official's identity, duties and responsibilities.  For instance, the Court can imagine cases where, in order to show that the payment was intended to influence the official to neglect some particular duty, the government would have to plead that the official had that duty in the first place.  However, the Court can similarly imagine situations where the purpose element could be satisfied without pleading details about a foreign official's particular duties.  Where the government alleges that payments made were intended to influence a foreign official to violate the very laws he is charged with implementing, it hardly seems necessary to require the government to identify the day-to-day duties of that foreign official; that foreign official, irrespective of whether he is the most junior staff member or the official who name appears at the top of the organizational chart, surely has a duty, like every government official, not to violate the laws he is charged with implementing.  Furthermore, 15 U.S.C. § 78dd-1(a)(3)(A)(iii) provides that the purpose element can be satisfied by factual allegations that a payment was made with the purpose that *some* foreign official would be paid money to secure *some* improper advantage, which also does not appear to require allegations about that individual's job responsibilities.  The Court cannot see why the purpose requirement in 15 U.S.C. § 78dd-1(a)(3)(A) should mandate a bright-line rule of detailed pleadings about a foreign official's particular duties.

Nothing in the legislative history of the FCPA suggests that Congress intended to limit the application of 15 U.S.C. § 78dd-1 to those cases where the government could show that a defendant knew, either by name or job description, precisely which foreign officials would be receiving the illicit payments he had authorized.  The Fifth Circuit has recognized that, subject to the narrow exception for facilitation payments, Congress intended, with the FCPA, to "cast an otherwise wide net over foreign bribery."  *Kay I*, 359 F.3d at 749.  Indeed, in explaining the

requirement that a defendant act knowingly, Congress specified that the statute is intended to cover "both prohibited actions that are taken with 'actual knowledge' of intended results as well as other actions that, while falling short of what the law terms 'positive knowledge,' nevertheless evidence a conscious disregard or deliberate ignorance of known circumstances that should reasonably alert one to the high probability of violations of the Act."  H.R. Conf. Rep. 100-576 (1988).

In light of this legislative history, it would be perverse to read into the statute a requirement that a defendant know precisely which government official, or which level of government official, would be targeted by his agent; a defendant could simply avoid liability by ensuring that his agent never told him which official was being targeted and what precise action the official took in exchange for the bribe.  Yet, Defendants contend that the Complaint must allege this level of detail.  (Jackson Mot., at 13 ("Did Jackson believe these officials were the intake officials at the Customs office who took the TIP application and passed it on to superiors? Were these officials in charge of checking the accuracy of information on applications?  Were these officials in charge of visiting rigs to inspect them before a TIP was granted?  Were these officials the final decision-maker regarding granting TIPs?"); Ruehlen Mot., at 10 ("To which particular officials were the allegedly improper payments made or authorized?  What were their duties or responsibilities as a matter of law?  What unlawful actions were they asked to take based on their particular duties?").)  The Court seriously doubts that Congress intended to hold an individual liable under 15 U.S.C. § 78dd-1(a)(3)(A) only if he took great care to know exactly whom his agent would be bribing and what precise steps that official would be taking.  Congress intended to address the problem of domestic entities bribing foreign officials to accomplish certain proscribed ends, *see Kay I*, 359 F.3d at 747, not domestic entities carefully monitoring

the execution of that bribery.  And, if the FCPA does not require a defendant to know precisely which government official was being bribed, a plaintiff bears no burden to allege such facts.

Finally, the Court finds it instructive that, in the domestic bribery sphere, courts have not required the government to allege or prove details about the domestic official's position to state a claim.[7]  *See, e.g.*, *United States v. Jennings*, 471 F.2d 1310, 1311–12 (2d Cir. 1973) (holding that, in a prosecution under 18 U.S.C. § 201, trial court correctly denied an instruction that would require the government to show the defendant knew that the officials in question were FBI agents); *Castro v. United States*, 248 F. Supp. 2d 1170, 1183–1184 (S.D. Fla. 2003) (holding that "the government was not required to prove the identity of the [Metropolitan Dade County] agent whom Movant intended to influence", in violation of 18 U.S.C. § 666).  The Court recognizes that 18 U.S.C. § 201 prohibits bribes intended to influence *any* official action, while the FCPA applies only to a much more limited subset of bribes.  *See* 15 U.S.C. § 78dd-1(a)–(b).  Yet, as explained above, the limitations set out in 15 U.S.C. § 78dd-1(a)(3)(A) do not require the government in every case to plead details about the particular duties of the government official involved; sometimes, the nature of the benefit sought would inherently fall into the class of prohibited acts.  Similarly, as discussed *infra*, pleading the non-applicability of the "facilitating" payments exception will not always require pleading details about the foreign official's duties.  Finally, that the offer or payment must be made in order to assist a defendant in obtaining or retaining business also does not require pleading anything about the foreign officials' particular

---

[7] 18 U.S.C. § 201 makes liable any person who "directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent . . . to influence any official act. . . ."  18 U.S.C. § 666 makes criminally liable any person who "corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more," so long as the "organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program."

responsibilities.[8]  Accordingly, the Court's conclusion is bolstered by the fact that interpretations of the domestic bribery statutes have not required the level of specificity Defendants seek.

The authorities cited by the Defendants do not convince this Court.  It is true that, in *Kay I*, the Fifth Circuit noted, in a parenthetical, that among the elements of a violation of the FCPA, are "the identity of the foreign country and of the officials to whom the suspect payments were made, and the sought-after unlawful actions taken or not taken by the foreign officials in consideration of the bribes."  *Kay I*, 359 F.3d at 760.  This, of course, says nothing about the level of detail with which these elements must be alleged.  It is telling that, in *Kay I* itself, the government alleged only that payments were made to "customs officials in the Republic of Haiti" and "officials of other Haitian agencies" to accept documents that understated the true amount of rice being imported by the defendants in that case.  *Kay I*, 359 F.3d at 762.[9]  The indictment does not specify the job responsibilities of the customs officials and entirely unidentified "other" officials, or what precise actions they took to accept the false documents at issue in *Kay I*.  If the Fifth Circuit intended for the foreign officials' identities and specific

_____

[8] In his argument that the identities of the foreign officials were not adequately pled, Ruehlen also argues that the SEC has not pled that the government officials took any sought-after actions "to assist Noble in obtaining or retaining business."  (Ruehlen Mot., at 11–12, 12 n.11; Ruehlen Reply, at 9 n.10.)   The Court does not read the statute to require that the foreign officials take actions specifically to help Noble obtain or retain business, and Ruehlen cites no support for such a construction.  Rather, the structure of the statute suggests that it is the stock issuer or its officer, director, agent or employee, who must have in mind the end goal of these payments; the proviso is located at the end of subsection (a), and not at the end of subsection (a)(3)(A), where it would more naturally be understood to qualify the actions of the foreign officials.  To the extent that Ruehlen argues that the SEC has failed to allege Defendants made these payments in order to obtain or retain business Noble had in Nigeria, the Court disagrees.  The Complaint alleges that Ruehlen believed, and told Jackson and the head of internal audit, that failure to keep rigs on Nigerian waters for longer than the two and a half years allowed with all permissible TIP extensions, could jeopardize Noble's drilling contracts, which were typically two to five years.  (Compl. ¶¶ 78, 85.)  This factual allegation supports the conclusory allegation that Ruehlen identifies.  (*See* Ruehlen Mot., at 12 n.11 (citing Compl. ¶ 32 (alleging that Defendants acted this way to "retain business under drilling contracts in Nigeria" and to "avoid possible breaches of drilling contracts")).)

[9] In claiming that all known contested FCPA bribery enforcement actions that resulted in liability specifically identified the foreign official, Ruehlen cites not to the indictment in *Kay I*, but to a brief by the government filed almost five years after the indictment.  (*See* Ruehlen Mot., Ex. B.)  Similarly, Jackson appears to ignore the indictment in the only Fifth Circuit case on point when he claims that "in all other litigated FCPA cases, the government provided that specific information in the charging documents."  (Jackson Reply, at 7.)  That the government eventually identified the specific foreign official in *Kay* does not mandate that foreign officials be named in the Complaint.

misdeeds to be alleged in the great level of detail that Defendants propose, the Court thinks it would have made mention of the woefully inadequate allegations in the case before it.  The SEC here has alleged that payments were made to "Nigerian government officials" to "process eleven illegitimate TIPs with false paperwork" and "to obtain discretionary or unlawful extensions of these TIPs."  (Compl. ¶¶ 27, 31.)  The SEC also specifically alleges that among the agencies that received such payments were the NMA and NPA.  (Compl. ¶ 69.)  The Court finds that these allegations are no less detailed than the allegations in *Kay I*'s indictment.

Several other cases cited by Defendants are entirely inapposite.  For instance, the Court does not disagree that foreign officials are a "necessary part[y]" to an FCPA in the sense that a violation of the FCPA "necessarily involve[s]" them.  *See United States v. Blondek*, 741 F. Supp. 116, 117, 117 n.1 (N.D. Tex. 1990).  It does not follow, however, that their identity must be alleged with great detail in the early stages of litigation.  *Chavers*, a RICO action involving allegations of domestic bribery, failed to allege which of the *defendants* were involved in the bribery.  *Chavers v. Morrow*, No. 08-3286, 2010 U.S. Dist. LEXIS 89432, at *12 (S.D. Tex. Aug. 30, 2010).  *Chavers* does not compel the conclusion that the identities of foreign government officials, nonparties to a FCPA suit, must be alleged with particular detail under the FCPA.  Finally, a dismissal of a private FCPA counterclaim that failed to offer factual support and only conclusorilly pled that a defendant "knowing and intentionally" made "unauthorized payments to officials of foreign governments in violation of [the FCPA]", *see Citicorp International Trading Co. v. Western Oil & Refining Co.*, No. 88-5377, 1991 WL 4502, at *6 (S.D.N.Y. Jan. 16, 1991), is irrelevant, as the SEC has pled pages upon pages of factual support for its allegations.  Nor does the subsequent finding in *Citicorp* that the amended counterclaim satisfied Rule 12 because it identified, *inter alia*, "the person to whom the bribes were offered,"

*see Citicorp International Trading Co. v. Western Oil & Refining Co.*, 771 F. Supp. 600, 606 (S.D.N.Y. 1991), imply that the only way to survive a Rule 12(b)(6) motion is to identify the foreign official involved with the level of detail Defendants propose.[10]

None of the above should be understood to remove the plaintiff's burden of pleading sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.  Legal conclusions about what Jackson and Ruehlen knew or understood "must be supported by factual allegations" before they can be entitled to the presumption of truth. *Id.*

Here, the SEC pleads ample facts to support the conclusion that Jackson and Ruehlen both knew some portion of the "special handling" and "procurement" charges in connection with obtaining new TIPs was to be used to bribe government officials.  While Jackson was CFO, Noble had been sanctioned by the Nigerian government for using false paperwork to obtain TIPs. (Compl. ¶ 36.)  Ruehlen worked on a subsequent internal audit, the West Africa Audit, which revealed that Noble-Nigeria continued to use false paperwork to obtain TIPs, and this practice placed it at risk of additional fines.  (Compl. ¶¶ 47, 48.)  If true, these facts make plausible the allegation that obtaining TIPs in this manner was illegal.  Yet, by May 2005, Ruehlen sought authorization for a payment to Noble's customs agent for obtaining a TIP based on false paperwork, and unambiguously acknowledged to Jackson that the TIP was obtained through false paperwork.  (Compl. ¶¶ 82–85.)  The payment he sought approval for was cryptically titled a "special handling" or "procurement" charge.  (Compl. ¶¶ 69, 82.)  Furthermore, Ruehlen had,

---

[10] For all of the reasons discussed above, the Court must disagree with Judge Hughes's oral statements in a recent criminal FCPA prosecution.  Trial Tr. 227:19–23, *United States v. O'Shea*, No. 09-629 (S.D. Tex. Jan. 16, 2012) ("You can't convict a man promising to pay unless you have a particular promise to a particular person for a particular benefit. If you call up the Basurtos and say, look, I'm going to send you 50 grand, bribe somebody, that does not meet the statute.").  This Court holds that asking a third party to bribe *a* government official, in order to induce that official to act in one of the proscribed ways detailed in 15 U.S.C. § 78dd-1(a)(3)(A), would meet the statute.  The government does not have to "connect the payment to a particular official." Trial Tr. 248:20–21.

by that point, seen the customs agent's invoice with "receipts" from NMA and NPA evidencing "export" when the rig had never moved.  (Compl. ¶ 80.)  These facts, taken together, plausibly support the inference that Jackson and Ruehlen understood that false paperwork TIPs were improper and these payments to the customs agent were to be used, at least in part, to bribe Nigerian government officials to take or fail to take some action they were legally required to take, which, if taken, would have resulted in the denial of the false paperwork TIPs.  15 U.S.C. § 78dd-1(a)(3)(A)(ii).   Specifically, the facts alleged support the conclusion that payments were made to foreign officials in order to obtain TIPs based on paperwork known to be false or to obtain official validation of the false paperwork by some foreign official that would, in turn, disguise the false nature from those foreign officials that ultimately would grant the TIP, or some combination.

The allegation that Jackson and Ruehlen understood that the "special handling" or "procurement" fees associated with TIP extensions were to be used to bribe government officials is also plausible.  As to Ruehlen, the allegation is plausible even with regard to the earliest payment he authorized, in August 2004.  This is because Noble-Nigeria's Operations Manager warned Ruehlen that he did not have a good feeling about the fee the customs agent sought and even explicitly stated that he believed the customs agent may not be operating "above the table." (Compl. ¶ 58.)  Yet, Ruehlen nonetheless sought Jackson's approval, indicating that the cost was "high but necessary."  (Compl. ¶ 59.)  If true, this is enough to make plausible the allegation that Ruehlen knew that at least some of the money going to the customs agent would be used to bribe government officials to influence their decision with regard to an official act, the granting of a TIP extension.  However, as to these allegations, the Court doubts that Jackson understood, by this time, that this payment would be used to bribe government officials.  There are no facts pled

to suggest that Jackson was aware of the Operations Manager's warning, or that he understood that a "special handling" fee generally corresponded with a bribe; Jackson may have reasonably believed this was just the cost of a TIP extension.

By the time Jackson approved the next TIP extension-related payment, however, the facts had become materially different.  By then, Ruehlen had openly admitted that he has resumed the use of false paperwork.  (Compl. ¶¶ 82–85.)  Jackson and Ruehlen had developed a system whereby Jackson pre-approved all routine payments to government officials in a blanket manner, but did not so pre-approve TIP-related payments.  (Compl. ¶ 91.)  Jackson knew that the TIP extension-related payment was similarly dubbed a "special handling" fee and could see that it was comparable in amount to the "special handling" fee he previously approved for a false paperwork TIP.  (Compl. ¶¶ 82, 89, 98.)  This is sufficient plausibly to charge Jackson with knowing that the purpose of the payment was to bribe a government official to perform an official act.  The allegation that Jackson knew the payments would be going to bribe foreign officials became even more plausible after Ruehlen submitted a blanket pre-approval request for non-TIP routine payments to government officials for the quarter, and the total amount turned out to be comparable to the amount in "special handling" fees for one TIP extension.  (*Compare* Compl. ¶¶ 82, 100 *with* Compl. ¶ 98.)

The Court finds these allegations sufficient.  The SEC contends, however, that it does actually identify the foreign officials by country, government agency, and action sought.  (Resp., at 13.)  The Court cannot agree.  The SEC undoubtedly alleges that the foreign officials are Nigerian government officials, but, save one place in the Complaint, the Court cannot find an allegation as to which governmental agency was to be offered payment and what specific action it was expected to take in exchange for this payment.  (*See* Compl. ¶ 69 (alleging that the

customs agent's price proposal showed that payments would be made to NPA and NMA).)  Even in Paragraph 69, the Complaint does not actually allege that the payments are made to these agencies in exchange for their "creating" the false evidence of export and import, as the SEC claims.  (Resp., at 13.)  The Court does not doubt that to be the implication of the allegations, as the Complaint subsequently alleges that such false papers were in fact provided "from" the NMA and NPA.  (Compl. ¶ 80.)  But the allegations as written do not actually say the payment is made to those agencies "in exchange" for "creating" false paperwork.  (Resp., at 13; *see also* Compl. ¶ 27 (alleging that bribes were made to Nigerian government officials to "process" illegitimate TIPs with false paperwork).)  Furthermore, the Court cannot find in the Complaint an allegation that "NCS officials" received payments "in exchange" "for approving and granting TIPs and TIP extensions."  (Resp., at 13.)  Throughout the Complaint, the SEC discusses actions the NCS took with regard to Noble's rigs, but concludes only that those actions would not have been taken but for payments to "government officials."  (*See* Compl. ¶¶ 73, 96, 129.)  In places, the Complaint even indicates that NCS would not have taken certain actions but for the provision of certain false paperwork, which may well have been obtained through payments to NPA and NMA.  (*See* Compl. ¶¶ 81, 109.)  As discussed in detail above, the Court finds the SEC's allegations that payments were made to Nigerian government officials sufficient.  However, if the SEC wishes to amend its Complaint to plead the allegations its Response purports it to have pled, it has leave to do so.

### 2. "facilitating" payments and "corruptly"[11]

Defendants argue that the FCPA charges must be dismissed because the SEC bears the burden of pleading the inapplicability of the "facilitating" payments exception, 15 U.S.C. §

---

[11] Because Defendants' argument that the SEC did not plead corrupt intent is heavily dependent on their argument that they had a good faith belief that the payments were facilitation payments, (Jackson Mot., at 15–19; Ruehlen Mot., at 17), and because the Court finds these provisions to be intertwined, these provisions are analyzed together.

78dd-1(b), and it has failed to do so.  (Jackson Mot., at 13–19; Ruehlen Mot., at 7, 13–17.)

Defendants also argue that the SEC has failed to plead sufficient facts that would support the

inference that Defendants acted "corruptly" because the facts pled by the SEC are equally

consistent with Defendants' belief that the payments were permissible facilitating payments, and

because, in any event, the SEC has not alleged sufficient facts to indicate that the payments were

made with the requisite intent.  (Jackson Mot., at 13–19; Ruehlen Mot., at 13–17.)  Finally,

Ruehlen argues that the "facilitating" payments exception is unconstitutionally vague.  (Ruehlen

Mot., at 17–21.)

        The SEC contends that Defendants bear the burden of pleading the inapplicability of the

"facilitating" payments exception, but claims that, in any event, it has negated the "facilitating"

payments exception.  (Resp., at 22–27.)  The SEC further argues that it has adequately pled

corrupt intent because it has pled sufficient facts to support the inference that Defendants knew

their actions did not fall under the "facilitating" payments exception and were, in fact, taken with

the requisite evil motive.  (Resp., at 29–35.)    Finally, the SEC argues that the "facilitating"

payments exemption is not unconstitutionally vague because a man of common intelligence

would have understood what would constitute a permissible payment under the exception and

what would not.  (Resp., at 27–29.)

### a.      "facilitating" payments exception

        Ruehlen argues that the SEC must plead the inapplicability of the facilitating payments

exception.  (Ruehlen Mot., at 7.)  Ruehlen contends that, because the FCPA contains affirmative

defenses and because Congress deliberately created an exception, not an affirmative defense, for

"facilitating" payments, the SEC must bear the burden of pleading its inapplicability.  (Ruehlen

Reply, at 5–6.)  The SEC contends that, as a default rule, plaintiffs are not required to negate an

exception to a statute in order to state a claim, and that only in rare instances, when an exception is so essential to defining the crime that the crime cannot be understood without it, do plaintiffs bear the burden of proof.  (Resp., at 22–24.)

The Supreme Court has held that it is a "settled rule" that a "pleading founded on a general provision defining the elements of an offense . . . need not negative the matter of an exception made by a proviso or other distinct clause . . . and that it is incumbent on one who relies on such an exception to set it up and establish it."  *McKelvey v. United States*, 260 U.S. 353, 357 (1922).  "In rare instances, an exception can be so necessary to a true definition of the offense that the elements of the crime are not fully stated without the exception."  *United States v. Outler*, 659 F.2d 1306, 1310 (5th Cir. 1981).  Just because a statute has both affirmative defenses and exceptions does not automatically mean the plaintiff is understood to bear the burden of pleading and proving the inapplicability of an exception.  *See Emote Site PRP Committee v. Self*, 932 F. Supp. 1319, 1322–23 (D. Utah 1996) (finding that defendants bear the burden of proving an exception applied even though Comprehensive Environmental Response, Compensation, and Liability Act had a separate section that codified affirmative defenses).

Contrary to Ruehlen's contention, the Court cannot, in every instance, divine, from the sheer fact that Congress chose to exempt "facilitating" payments from liability through an exception instead of an affirmative defense, that it intended for plaintiffs to bear the burden of pleading and proving the exception.[12]  Instead, the Court starts from the presumption that Defendants bear the burden of raising and proving the applicability of an affirmative defense.

_____

[12] Ruehlen cites to a single case that stands for the proposition that, when an exclusion does not appear as one of the affirmative defenses in a statutory scheme, Plaintiff bears the burden of negating the exception.  *See United States v. Poly-Carb, Inc.*, 951 F. Supp. 1518, 1526 n.6 (D. Nev. 1996).  The SEC rightly notes that other district courts have not so interpreted the statutory scheme at issue in *Poly-Carb*, and, in fact, *Poly-Carb* is alone in so holding.  *See United States v. Iron Mountain Mines, Inc.*, 987 F. Supp. 1244, 1248–49 n.6 (E.D. Cal. 1997) (noting that *Poly-Carb* is "contrary to all other authority" on this point).

*McKelvey*, 260 U.S. at 357.  The Court then considers whether this statute is one of those rare instances where the true definition of the offense cannot be discerned unless the exception is negated.

      *Outler* is instructive as an example.  There, the Fifth Circuit found that, in charging a doctor with unlawfully dispensing or distributing a controlled substance under 21 U.S.C. § 841(a), the government is required to plead that the physician lacked a legitimate medical purpose in issuing the prescription; to hold otherwise and place the burden on the defendant would essentially create a "presumption that every physician who prescribes a drug does so without a legitimate medical reason." *Outler*, 659 F.2d at 1310 n.3.  The *Outler* court expressed skepticism that Congress would have intended such a result. *Id.*  This Court cannot say, however, that a comparably outrageous presumption would result here if a defendant were to bear the burden of raising and proving the inapplicability of the "facilitating" payments exception.  It is also worth noting that the Supreme Court has previously held that, in light of "the broadly remedial purposes of federal securities legislation, imposition of the burden of proof on an issuer who would plead the exemption seems to us fair and reasonable." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953).[13]

      However, strongly weighing in favor of the contrary position are the particular circumstances that led up to the addition of the "facilitating" payments exception, which neither

---

[13] The Court fails to understand the significance Ruehlen imports into the Supreme Court's statement that the scope of the exemption at issue in *Ralston* was "nowhere defined" in the Exchange Act.  (Ruehlen Reply, at 6 n.5.) *Ralston* was simply explaining that, because the statute did not define the scope of the exception, it would look to comparable laws in other jurisdictions to interpret the exception.  *See Ralston*, 346 U.S. at 122–23.   Nor does the Court imply that, in *Ralston*, the Supreme Court created new rules of pleading exceptions under the securities laws. (Ruehlen Reply, at 6 n.5.)  *McKelvey* and *Outler* dictate who must plead the exception, but it is certainly relevant that the Supreme Court has previously recognized that the remedial purpose of federal securities litigation makes it all the more fair to place the burden of pleading an exception on a defendant.

party addresses.[14]  When the FCPA was first enacted in 1977, there was no such explicit

exception, but the legislative history indicated that by using the word "corruptly," Congress

intended to exempt such payments from the purview of the statute. For instance, the House

Committee on interstate and foreign commerce provided as follows in its report:

> The language of the bill is deliberately cast in terms which differentiate between
> such payments and facilitating payments, sometimes referred to as "grease
> payments."  In using the word "corruptly," the committee intends to distinguish
> between payments which cause an official to exercise other than his free will in
> acting or deciding or influencing and act or decision and those payments which
> merely move a particular matter toward an eventual act or decision or which do
> not involve any discretionary action.

H.R. Rep. No. 95-640, at 4 (1977).  Similarly, the Senate Committee on Banking, Housing and

Urban Affairs wrote: "The statute does not . . . cover so-called 'grease payments' such as

payments for expediting shipments through customs or placing a transatlantic telephone call,

securing required permits, or obtaining adequate police protection, transactions which may

involve even the proper performance of duties."  S. Rep. No. 95-114, at 10 (1977).  In adding an

explicit exception for "facilitating" payments in 1988, both houses explained that the amendment

was meant "only to clarify ambiguities 'without changing the basic intent . . . of the law.'"  *Kay

I*, 359 F.3d at 750 (citing S. Rep. No. 100-85, at 54 (1987); H.R. Rep. No. 100-40, pt. 2, at 77

(1987)).  The legislative history reveals that Congress intended, by using the word "corruptly," to

except facilitating payments from the ambit of the FCPA, and the addition of the "facilitating"

payments exception into the language of the statute was intended only to clarify that intent.  No

one disputes that the SEC must bear the burden of proving that Defendants acted corruptly.

Accordingly, the Court finds that the evolution of the statute in this case strongly supports the

conclusion that the SEC must bear the burden of negating the "facilitating" payments exception.

---

[14] The SEC discusses legislative history in other portions of its briefing, but not in its discussion of whether it must
negate the "facilitating" payments exception.

The facilitating payments exception is best understood as a threshold requirement to pleading that a defendant acted "corruptly."

The "facilitating" payments exception was intended to provide a "very limited exception[] to the kinds of bribes to which the FCPA does not apply."  *Kay I*, 359 F.3d at 750. The exception allows for payments to foreign officials the purpose of which is to "expedite or secure the performance of a routine government action," 15 U.S.C. § 78dd-1(b), which refers to a "very narrow categor[y] of largely non-discretionary, ministerial activities performed by mid- or low-level foreign functionaries."  *Kay I*, 359 F.3d at 751.  While the statute specifically includes "obtaining permits" as an example of the type of action that typically qualifies as routine, the Court interprets the example to refer to obtaining permits to which one is properly entitled.  *See* H.R. Rep. No. 95-640, at 8 (explaining that Congress intended to exclude from the FCPA's reach "those payments which merely move a particular matter toward an eventual act or decision or which do not involve any discretionary action").

The SEC alleges that Defendants authorized payments to foreign officials in order to obtain TIPs based on false paperwork, in contravention of what Defendants knew was the proper process for obtaining TIPs.  (Compl. ¶¶ 28, 35, 36, 47, 48.)  As discussed *supra* in Part III.A.1, the SEC pled sufficient facts to support the allegation that Defendants knew these payments would be going to Nigerian government officials to obtain TIPs in a manner that violated Nigerian law.  The grant of permits by government officials that have no authority to grant permits on the basis sought is in no way a ministerial act nor can it be characterized as "speeding the proper performance of a foreign official's duties."  H.R. Rep. No. 95-640, at 8.  Similarly, if payments were made to induce officials to validate the paperwork while knowing it to be false, that too would not qualify as simply expediting a ministerial act.  Accordingly, the SEC's

pleadings easily negate the "facilitating" payments exception with regard to payments made to acquire false paperwork TIPs.

The SEC also alleges that Defendants authorized payments to foreign officials in order to obtain discretionary TIP extensions.  Although the Court found *supra* in Part III.A.1, that the SEC has alleged sufficient facts to support the inference that Ruehlen, and for the most part Jackson as well, knew that the payments they authorized would be going to bribe foreign officials, the Court cannot conclude that the Complaint pleads sufficient facts to support the allegation that Ruehlen or Jackson knew that these payments would be used to influence a discretionary decision of a foreign official.  In fact, the SEC fails to plead sufficient facts to support the allegation that granting of TIP extensions is a discretionary action.  The SEC repeatedly alleges that the granting of extensions is a discretionary action.  (Compl. ¶¶ 2, 20, 24, 31, 54, 67, 96, 101, 117–19, 121.)  However, repeated incantations that NCS may grant an extension in its discretion do not satisfy the SEC's obligations under *Iqbal* and *Twombly* to plead facts that render plausible such conclusory allegations.  *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.[15]  The SEC alleges sufficient facts to support the conclusion that fourth extensions

---

[15] At oral argument, the SEC raised, for the first time, the argument that, under Federal Rule of Civil Procedure 44.1, when foreign law is at issue, a plaintiff need only provide notice that foreign law may be implicated, but need not spell out what the law is.  The Court agrees that the SEC's requirement to provide notice that foreign law is at issue is satisfied simply by identifying that Nigerian law may be at issue in the case.  *See Waveling, Inc. v. JDS Lightwave Products Group, Inc.*, 289 Fed. App'x 755, 767 (5th Cir. 2008).  The Court also does not doubt that, in light of Rule 44.1, parties are not obliged to plead the relevant foreign law in cases where foreign law supplies the substantive, decisional law.  *See, e.g.*, *In re Griffin Trading Co.*, 683 F.3d 819, 822–23 (7th Cir. 2012); *Phoenix Four, Inc. v. Strategic Res. Corp.*, No. 05 Civ. 4837(HB), 2006 WL 399396, at *7–8 (S.D.N.Y. Feb. 21, 2006).  This makes logical sense.  Just as parties do not need to delineate the details of United States law in their pleadings, they are not obliged to plead the specifics of governing foreign law.  Rule 44.1's requirement of notice is designed simply to provide courts and litigants "adequate notice of the need to research the foreign rules."  *Eagle Paper Int'l, Inc. v. Expolink, Ltd.*, No. 2:07cv160, 2008 WL 170506, at *6 (E.D. Va. Jan 17, 2008); *see also* 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2443 ("The function of the [Rule 44.1] notice is not to spell out the precise contents of foreign law but rather to inform the district court and the litigants that it is relevant to the lawsuit.").

Here, however, Nigerian law is not the decisional law.  Rather, the contents of Nigerian law are relevant as *facts*; whether granting TIP extensions is discretionary under Nigerian law is a fact relevant to determining if a violation of the FCPA has been pled.  The SEC cannot escape the requirement of pleading sufficient facts to state a claim under the FCPA simply because among the pertinent facts is the substance of a foreign law.  As explained *infra* Part

were illegal, including that grants of third extensions routinely indicated that the extension was the final extension that would be granted for that rig, as well as Noble's own failed attempt to obtain a fourth extension.  (Compl. ¶¶ 62, 66, 92, 118.)  It also alleges that NCS had previously denied a third extension because the rig was operating under a different drilling contract.  (Compl. ¶ 67.)  However, these allegations are insufficient to make plausible the conclusion that granting TIP extensions is discretionary.  These allegations are just as consistent with a regime where up to three TIP extensions are granted as a matter of routine for rigs that continue to operate on the same contract as they were operating when the initial TIP was granted.  And if NCS does grant up to three TIPs routinely, any bribes offered to speed along or assure that action would fall squarely into the "facilitating" payments exception.

Because leave to amend should be freely granted unless it is clear the defects in the pleadings are incurable, *Great Plains*, 313 F.3d at 329, the SEC has leave to amend the Complaint to allege facts that would support the allegation that granting TIP extensions is a matter of discretion.  The SEC can satisfy this burden in a number of ways.  The simplest way to do so would be to plead the Nigerian law or policy that so provides.  However, the Court does not discount other means.  After all, the SEC has plausibly pled that granting TIPs based on false paperwork is a violation of Nigerian law by relying on the fact of a prior Nigerian prosecution and the opinion of a legal expert.  (Compl. ¶¶ 35, 64.)  Therefore, the Court does not rule out the possibility that the SEC may be able adequately to plead facts that would support the conclusion that grants of TIP extensions are a matter of discretion without pleading the provisions of Nigerian law.  However, should the SEC not rely on Nigerian law, it must do more than just

---

III.A.2.a, the SEC may be able to render plausible the allegation that grants of TIP extensions are discretionary under Nigerian law without pleading the actual relevant provision of Nigerian law.  However, the SEC must plead some facts that would render plausible its allegation that grants of TIP extensions are discretionary.

plead facts that would be equally consistent with a protocol under which where TIP extensions are routinely granted if they satisfy certain threshold requirements.

### b.    "corruptly"

Although the Court finds that the SEC has pled sufficient facts to support the conclusion that the payments made to obtain new TIPs based on false paperwork were not "facilitating" payments, the SEC must also plead that these payments were made "corruptly."[16]   The FCPA does not define the term "corruptly," nor can its meaning be determined "simply by reading it in context."  *Stichting Ter Behartiging Van de Belangen Van Oudaandeel-huoders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173, 181 (2d Cir. 2003).[17]   Accordingly, the Court turns again to the legislative history of the statute.   The House Committee on Interstate and Foreign Commerce provided the following explanation of its use of the word "corruptly":

> The word "corruptly" is used in order to make clear that the offer, payment, promise, or gift, must be intended to induce the recipient to misuse his official position; for example, . . . to induce a foreign official to fail to perform an official function.  The word "corruptly" connotes an evil motive or purpose such as that required under 18 U.S.C. 201(b) which prohibits domestic bribery.  As in 18 U.S.C. 201(b), the word "corruptly" indicates an intent or desire to wrongfully influence the recipient.

H.R. Rep. No. 95-640, at 7–8.  The Senate Committee on Banking, Housing and Urban Affairs provided a substantially similar definition.  S. Rep. No. 95-114, at 10 (noting that the offer must

---

[16] As discussed above, negating the applicability of the "facilitating" payments exception is a necessary step to pleading that a defendant acted "corruptly."   No one contends, and this Court does not hold, that negating the "facilitating" payments exception is all that is required to plead that a Defendant acted corruptly.

[17] Nor has the Fifth Circuit defined the term.  Defendants cite *United States v. Kay*, 513 F.3d 432, 448–49 (5th Cir. 2007) ("*Kay II*") for their definition of "corruptly."  In *Kay II*, the trial court had instructed the jury that a "corrupt" act is one that is "done voluntarily and intentionally, and with a bad purpose or evil motive of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means."  *Id.* at 446.  The adequacy of that instruction was not at issue on appeal; rather, the case concerned whether the trial court had adequately instructed on willfulness, a required element in a criminal FCPA action.  *Id.* at 446–51.  In that analysis, the Fifth Circuit noted that the trial court's aforementioned instruction on "corrupt" and its additional instruction on "knowing" sufficiently indicated to the jury that it must find "willfulness."  *Id.* at 449–50.  It also noted in passing that the trial court's instruction regarding a "corrupt" act "substantially covered the requested instruction that Defendants acted 'corruptly.'"  *Id.* at 550.  None of this can be characterized as a holding by the Fifth Circuit on the meaning of "corruptly."

"be intended to induce the recipient to misuse his official position" and that the word "'corruptly' connotes an evil motive or purpose, an intent to wrongfully influence the recipient"). Accordingly, the Court interprets the word "corruptly" as an act done with an evil motive or wrongful purpose of influencing a foreign official to misuse his position.  *See also Stichting*, 327 F.3d at 183.

In pleading that Defendants acted corruptly, the SEC need not proffer facts that would show that they knew their actions would constitute a violation of the FCPA.  *See id.* at 183 (noting that nothing about the word "corruptly" suggests that the government must prove that a defendant knew he was violating the FCPA; *Kay II*, 513 F.3d at 450–51 (holding that even the willfulness requirement in a criminal prosecution does not require the government to prove that a defendant knew he was violating a particular statute).[18]  Indeed, this Court seriously doubts that the SEC even needs to prove that Defendants knew that their actions violated *any* specific law. Because *Kay II* interpreted the willfulness requirement as requiring only a showing that a defendant knew that his actions were in some way unlawful, *Kay II*, 513 F.3d at 447–48, 450–51, to interpret the word "corruptly" to require such knowledge would eliminate the distinction between a criminal and civil violation of the FCPA.  *Compare* 15 U.S.C. § 78ff(c)(2)(A) (criminal actions require a showing of willfulness) *with* 15 U.S.C. § 78ff(c)(2)(B) (civil actions do not require a showing of willfulness).

Defendants argue that the SEC has not pled that they acted corruptly because it had failed to plead any violations of Nigerian law, and because both defendants had a good faith belief that they were acting lawfully.  (Jackson Mot., at 15–19; Ruehlen Mot., at 13–17.)  Specifically, Jackson argues that he had a good faith belief in the legality of the payments as facilitating

---

[18] To the extent the SEC relies on 15 U.S.C. § 78dd-1(a)(3)(A)(ii), which requires inducing a foreign official to act in violation of his lawful duty, it does have to show that Defendants knew they would be inducing a foreign official to act unlawfully.  However, is this distinct from showing that Defendants knew their own actions were unlawful.

payments, and Ruehlen argues that he relied in good faith on the approval of the payments by supervisors, including Jackson.  (Jackson Mot., at 15–19; Ruehlen Mot., at 15–17.)

As the Court has already discussed, the SEC has alleged sufficient facts that support the inference that obtaining TIPs through the use of false paperwork violated Nigerian law. However, as explained, the SEC has no obligation to plead that Defendants knew that they were violating a law, or even that they were seeking an illegal result to state a civil FCPA violation. Instead, it must plead only that Defendants acted with the wrongful purpose of influencing a foreign official to misuse his official position.  As explained *supra* in Parts III.A.1 and III.A.2.a, the SEC has adequately alleged that Defendants authorized payments to foreign officials to obtain TIPs based on false paperwork, in contravention of what Defendants knew to be the proper protocol.  Seeking to obtain governmentally-issued benefits through payments intended to ensure Nigerian officials ignore the proper protocols plainly satisfies the requirement of having the wrongful purpose of influencing a foreign official to misuse his position.

Defendants' representations of their good-faith belief that the payments were "facilitating" payments, and therefore legal, are unavailing.  First, as explained *supra* in Parts III.A.1 and III.A.2.a, the SEC's allegations support the inference that Defendants knew they were seeking to obtain TIPs in an illegal manner, thereby pleading facts that, if true, would negative any claim of good faith belief that the payments were made to ensure routine government actions.  At the motion to dismiss stage, representations to the contrary are irrelevant.  Second, the Court is not certain that the SEC is obliged to plead that Defendants did not have a good-faith belief that their payments fell under the "facilitating" payments exception. As a practical matter, the Court has difficulty imagining how the SEC could plead that Defendants acted "corruptly" without, at the same time, pleading facts that, if true, would render

implausible any claim that Defendants had a good-faith belief that the payments fell into the "facilitating" payments exception.  After all, it is hard to see how one could have the evil motive or wrongful purpose of influencing an official to misuse his official position while, at the same time, believing, in good faith, that he was simply ensuring or expediting a routine government action.  The Court need not resolve the question, however, because, in any event, the facts alleged by the SEC support the inference that Defendants knew use of false paperwork to obtain TIPs was illegal.

Finally, Ruehlen argues that the SEC has not pled adequate facts that he acted corruptly because he authorized payments with the knowledge and consent of Noble's senior management. *See United States v. Liebo*, 923 F.2d 1308, 1314 (8th Cir. 1991) (granting new trial based on newly discovered evidence that defendant's superior had authorized the improper payments defendant made, "strong evidence from which the jury could have found that Liebo . . . did not act 'corruptly').  The factfinder may certainly consider whether Jackson's approval of the payments negates corrupt intent.[19]  However, for the purposes of Rule 12(b)(6) motion, the Court finds that the facts pled regarding Ruehlen's intimate involvement with the West Africa Audit make plausible the allegation that he did act "corruptly."

Because the Court finds that the SEC has failed adequately to plead that the payments to obtain TIP extensions were not facilitating payments, it does not address whether the SEC has adequately pled that Defendants acted corruptly in making those payments.  However, the Court notes, that should the SEC amend its complaint to plead sufficient facts to support the inference that the grant of TIP extensions is a discretionary act, it will need also to plead facts that support

---

[19] Furthermore, Ruehlen's claim that the Complaint reveals that he authorized charges to Noble's customs agent "only with full knowledge and consent of Noble's senior management" is inaccurate.  (Ruehlen Mot., at 15–16.) The SEC also alleges that Ruehlen had approved numerous payments without seeking Jackson's approval.  (Compl. ¶¶ 82, 96.)

the inference that, in making these payments, Jackson and Ruehlen had the evil motive or wrongful purpose of influencing an official to misuse his position.[20]

### c.   Unconstitutional vagueness

Ruehlen also argues that the FCPA claim against him must be dismissed because the "facilitating" payments exception is unconstitutionally vague as applied to him.  (Ruehlen Mot., at 17–20.)  "The vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application."  *United States v. Lanier*, 520 U.S. 259, 266 (1997).  "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  *Id.* at 267.  However, "no more than a reasonable degree of certainty can be demanded [in a criminal statute].  Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."  *Kay II*, 513 F.3d at 442 (*citing Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340 (1952)) (brackets in original).

Here, a person of common intelligence should have no difficulty understanding that routine government actions do not include the granting of permits based on fraudulent documents.  He would not fail to understand that the statutory example of "obtaining permits" as a routine governmental action presupposes that those permits are obtained based on some valid entitlement.  Furthermore, even if a man of common intelligence might be somewhat uncertain about whether payments to secure TIPs through a known illegal method would be covered by the "facilitating" payments exception, the exception is but one of numerous elements of a civil

---

[20] As previously explained, while the Court finds no explicit statutory obligation to plead facts that would tend to show that Defendants did not have a good faith belief that their payments fell within the "facilitating" payments exception, the Court has difficulty imagining that the SEC will be able to plead that Defendants had the bad purpose of influencing an official to misuse his position if it does not first plead that Defendants knew they were not entitled to extensions as a matter of right upon satisfying certain basic threshold requirements.

FCPA violation; some ambiguity in the scope of this one part of the statute does not draw an impermissibly vague line.  *See id.* at 441 ("Imprecise general language in one of seven requirements for a bribery conviction under the FCPA does not draw a line so vague that defendants were not reasonably aware of their potential for engaging in illegal activity under the FCPA.").

Similarly, should the SEC amend its Complaint adequately to plead that the granting of TIP extensions is a discretionary action, any argument that enforcement actions could not be initiated on the basis of payments to obtain favorable exercises of discretion in obtaining permits would also fail.  In analyzing the FCPA, the Fifth Circuit made it unambiguously clear that the FCPA was enacted in substantial part to "prohibit the type of bribery that . . . prompts officials to misuse their discretionary authority."  *Kay I*, 359 F.3d at 747, 749–51.  Even if the language of the "facilitating" payments exception failed adequately to put persons of common intelligence on alert that bribery to influence discretionary decisions was prohibited under the FCPA, *Kay I*, a decision from February 2004, established the point as a matter of law.  It is, of course, a "common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally."  *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, --- U.S. ---, 130 S. Ct. 1605, 1611 (2010).

**B.      Aiding and abetting Noble's FCPA violation**

In addition to the allegations of individual FCPA violations, the SEC also charges Jackson and Ruehlen with aiding and abetting Noble's violations of the FCPA.  (Compl. ¶¶ 155–156.)  15 U.S.C. § 78t(e) provides that:

> [A]ny person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

41

Defendants argue this claim should be dismissed because no plausible allegations have been made that a primary violation was committed.  (Jackson Mot., at 22–23; Ruehlen Mot., at 12.) Jackson also argues that no facts are alleged that Jackson substantially assisted in the violation. (Jackson Mot., at 23.)

"Aiding and abetting liability consists of (1) existence of a securities violation by a primary wrongdoer; (2) knowledge of the violation by the aider and abettor; and (3) proof that the aider and abettor substantially assisted in the primary violation."  *SEC v. Treadway*, 430 F. Supp. 2d 293, 336 (S.D.N.Y. 2006).  In order to plead substantial assistance, the plaintiff must allege facts sufficient to show that a defendant "in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed."  *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012). "[A] high degree of knowledge may lessen the SEC's burden in proving substantial assistance." *Id.* at 215.

As explained above, the SEC has stated a primary FCPA violation on the basis of the payments made to obtain TIPs based on false paperwork.  Ruehlen has offered no other argument as to why the SEC has not stated an aiding and abetting claim against him, and the Court can see none.   Accordingly, the claim against Ruehlen survives.   The facts alleged also support the inference that Jackson had a reasonably high degree of knowledge of the primary violation.  He was unambiguously told that Ruehlen had resumed the use of false paperwork to obtain TIPs, an illegal and sanctionable practice, and sought approval for unreceipted "special handling" fees to obtain these TIPs.  (Compl. ¶¶ 36, 82–85.)  On these facts, Jackson could certainly be charged with understanding that the "special handling" fees were bribes to induce Nigerian officials to grant TIPs based on false paperwork.  (Compl. ¶¶ 69, 82–85.)  By repeatedly approving the

"special handling" fees to the customs agent despite knowing that the fees were associated with false paperwork TIPs, Jackson ensured that the customs agent was paid his fee, which in turn, ensured that the bribes reached the appropriate foreign official. Thus, Jackson associated himself with the FCPA violation in a manner that constitutes substantial assistance.

### C.   Jackson and Ruehlen's direct violations of 15 U.S.C. § 78m(b)(5) and 17 C.F.R. § 240.13b2-1 and aiding and abetting of Noble's violations of 15 U.S.C. § 78m(b)(2)(A) and (B)

The SEC also alleges that Jackson and Ruehlen violated 15 U.S.C. § 78m(b)(5) and 17 C.F.R. § 240.13b2-1. 15 U.S.C. § 78m(b)(5) provides: "No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2)." 17 C.F.R. § 240.13b2-1 provides: "No person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Securities Exchange Act." Additionally, it charges that Jackson and Ruehlen violated 15 U.S.C. § 78t(e) by aiding and abetting Noble's violations of 15 U.S.C. § 78m(b)(2)(A) and (B). 15 U.S.C. § 78m(b)(2)(A) provides that an issuer shall "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C. § 78m(b)(2)(B) requires an issuer to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances" that, among other things, "transactions are executed in accordance with management's general or specific authorization."

Defendants' argument that the accurate bookkeeping and adequate system of internal controls requirements were not violated because no underlying FCPA violation has been alleged must be rejected. (Jackson Mot., 23–24; Ruehlen Mot., 21–22.) As discussed above, the SEC has alleged enough facts to suggest that Jackson and Ruehlen, in initiating and approving

payments to Noble-Nigeria's customs agent to obtain TIPs based on false paperwork, knew these payments were not legal "facilitating" payments.  Accordingly, sufficient facts have been alleged to support the inference that Noble's books were, in fact, false because they recorded illegal bribes as legitimate expenses.[21]

Defendants also argue that neither of them can be charged with either directly violating the accounting provisions or with aiding and abetting Noble's violations because they were not personally involved in deciding how transactions were recorded in Noble's books.  (Jackson Mot., 24; Ruehlen Mot., 22.)  Neither party cites any case law suggesting that involvement with the details of how payments are recorded is required to allege an aiding and abetting violation, and the Court found none.  Here, the SEC has alleged sufficient facts, which, if true, would show that Noble's books recorded as legitimate operating expenses payments that were, in fact, made in violation of the FCPA.  Ruehlen was the one who authorized the customs agent to seek new TIPs based on price proposals that contained fees he understood to be bribes of Nigerian officials to grant fees based on false paperwork, a practice he, Jackson and others at Noble knew to be impermissible.  (Compl. ¶¶ 36, 70, 82–85, 105, 108, 134.)  At times, Ruehlen violated Noble policy by authorizing the agent's price proposal before obtaining approval from the CFO.  (Compl. ¶ 70.)  Ruehlen also eventually sought approval for these payments from the CFO.  (Compl. ¶¶ 82, 103.)  These payments could not actually have been made to the customs agent without the CFO's approval.  (Compl. ¶ 24.)  For at least some of the relevant time, that CFO was Jackson.  (Compl. ¶ 82.)  By taking unilateral steps to initiate payments that are illegal under the FCPA and by seeking the CFO's approval of these payments, Ruehlen knowingly

---

[21] The only other argument Defendants make regarding failure to state a claim of the accounting violations is a statute of limitations argument.  The Court addresses the statute of limitations for all claims in this case together *infra* in Part III.F.

44

circumvented internal controls.  By knowingly approving of such payments, Jackson knowingly circumvented, and failed to implement, an adequate system of internal accounting controls.

Furthermore, 17 C.F.R. § 240.13b2-1 requires only that a person "directly or indirectly, falsify or cause to be falsified, any book, record or account."  But for Ruehlen and Jackson approving these payments, there would not have been a resulting recordkeeping violation to speak of.  Jackson and Ruehlen also prepared and signed numerous representation letters that stated, *inter alia*, neither was aware of any FCPA violations.  (Compl. ¶¶ 141, 145.)  These letters surely contributed, at least in part, to concealing the inappropriate payments and allowing them to continue to be recorded as legitimate operating expenses.

The SEC also states a claim against Ruehlen and Jackson for aiding and abetting Noble's violations of 15 U.S.C. § 78m(b)(2)(A) and (B).  As explained, by sanctioning these payments, Jackson and Ruehlen enabled the illegal payments to occur in the first place and to remain undetected, thereby providing substantial assistance to Noble's violation of its recordkeeping duties.  Common sense also dictates that, by initiating and approving these payments, both Defendants understood that Noble would record them as legitimate operating expenses.  *Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

### D.      Jackson's violation of 17 C.F.R. § 240.13b2-2 and 17 C.F.R. § 240.13a-14

17 C.F.R. § 240.13b2-2 prohibits a director or officer of an issuer to "[m]ake or cause to be made a materially false or misleading statement to an accountant in connection with" an audit, review or examination of financial statements or the preparation or filing of any document required to be filed with the SEC.  17 C.F.R. § 240.13a-14 requires certain certifications to be

filed with public securities filings.  Jackson's argument that the SEC fails to state a claim under either of these theories is premised on his argument that the SEC fails to allege facts that support an underlying FCPA violation.[22]  Because the Court finds that the SEC did state a claim against Jackson for violating the FCPA, Jackson's argument must be rejected.

### E.   Jackson's liability under 15 U.S.C. § 78t(a) for others' violations of 15 U.S.C. § 78dd-1, 15 U.S.C. §§ 78m(b)(2)(A) and (B)

Finally, the SEC seeks to hold Jackson liable as a control person under 15 U.S.C. § 78t(a), for Noble, Ruehlen's and unnamed others' violations of 15 U.S.C. § 78dd-1, and 15 U.S.C. §§ 78m(b)(2)(A) and (B).  (Compl. ¶¶ 174–177.)  15 U.S.C. § 78t(a) makes "[e]very person who, directly or indirectly, controls any person liable" under the Exchange Act also "liable jointly and severally with and to the same extent as such controlled person."  To hold an individual liable under 15 U.S.C. § 78t(a), a plaintiff must show that the controlling person had "actual power or influence over the controlled person." *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 620 (5th Cir. 1990).  What else, if anything, is required remains an open question.  The Eighth Circuit in *Metge v. Baehler* announced a two-prong test for liability under 15 U.S.C. § 78t(a). *Metge v. Baehler*, 762 F.2d 621, 630–31 (8th Cir. 1985) (approving of the test announced by the district court "that the defendant [ ] actually participated in (*i.e. exercised* control over) the operations of the corporation in general" and "that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated, but [plaintiff] need not prove that this later power was exercised").  The Fifth Circuit has not adopted this test, however. *See Abbott*, 2 F.3d at 619 (noting that Fifth Circuit law is unsettled as to whether "effective day-to-day control" of the entity is required and that the Fifth Circuit has never adopted the *Metge* test).  However, the Fifth Circuit has made clear that, like the Eighth Circuit,

---

[22] Jackson also argues the claims are barred by the statute of limitations.  The Court addresses the statute of limitations for all claims in this case together *infra* in Part III.F.

it does not require the plaintiff to show that the control person actually participated in the primary violation. *See G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981) ("Lack of participation and good faith constitute an affirmative defense for a controlling person."); *Abbott*, 2 F.3d at 620 n.18 (noting that *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990), in requiring a showing that each individual induced or participated in the alleged violation, did "not accurately reflect our rejection in *Thompson* of a 'culpable participation' requirement").

This Court need not resolve the intricacies of determining the precise standard for liability under 15 U.S.C. § 78t(a) ought to be. The SEC's Complaint contains sufficient facts to show that Jackson had actual knowledge of at least some of the FCPA violations and, indeed, facilitated them. (*See* Compl. ¶¶ 82–85, 88.) As CFO, he was responsible for approving payments to government officials, and in fact, did approve payments for TIPs based on false paperwork that Ruehlen requested. (Compl. ¶¶ 24, 88, 93, 94.) Accordingly, he not only had the power to exercise control over Ruehlen, but actually did so. Furthermore, even when Jackson was no longer CFO, when the new CFO consulted Jackson about payments to foreign officials, Jackson referred him to the head of internal audit, knowing that the head of internal audit had previously acquiesced in the approval of payments to obtain TIPs based on false paperwork. (Compl. ¶¶ 82–85, 122–124.) Thus, even when Jackson was no longer CFO, he had the power to control transactions upon which some of the alleged FCPA violations are predicated. Finally, as CFO, COO, President and CEO of Noble, Jackson, at all times, had the power to reveal what he knew of Ruehlen's actions to the Audit Committee, thereby initiating an investigation that would have put a stop to the primary violation. (Compl. ¶ 143.) Together, these facts indicate that Jackson could have prevented not only Ruehlen's and Noble's bribery violations under the

FCPA but Noble's bookkeeping and internal control violations as well.  Accordingly, the SEC has adequately pled that Jackson can be held liable as a control person under 15 U.S.C. § 78t(a) for Ruehlen's and Noble's violations of 15 U.S.C. § 78dd-1 and Noble's violations of 15 U.S.C. §§ 78m(b)(2)(A) and (B).[23]

###    F.    Statute of limitations

Finally, Jackson and Ruehlen argue that the SEC's Complaint should be dismissed because all of the events giving rise to the claims occurred outside of the limitations period and the SEC's Complaint has failed to raise any basis for tolling.  (Jackson Mot., at 19–25; Ruehlen Mot., at 23–25.)  The SEC does not dispute that the Complaint, on its face, raises no basis for tolling, but it argues that the statute of limitations should be tolled because of tolling agreements between the parties, because the fraudulent concealment doctrine applies, and because the continuing violations doctrine applies.  (Resp., at 43–48.)  Additionally, the SEC contends that the statute of limitations does not apply to equitable relief such as injunctions.  (Resp., at 48.)  Finally, the SEC requests leave to amend its Complaint to plead any additional facts necessary for statute of limitations purposes.  (Resp., at 47.)

The governing statute of limitations, 28 U.S.C. § 2462, provides that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued."  Under 28 U.S.C. § 2462, a claim accrues on the date of the violation.  *United States v. Core Labs., Inc.*, 759 F.2d 480, 482–83 (5th Cir. 1985).  "A statute of limitations may support

---

[23] The SEC's Complaint contains the ambiguous allegation that Jackson should also be liable as a control person under 15 U.S.C. § 78t(a) for unidentified "others'" violations of the FCPA and 15 U.S.C. §§ 78m(b)(2)(A) and (B). (Compl. ¶¶ 175–177.)  At oral argument, the SEC indicated that the "others" referred to in Paragraphs 175 through 177 of the Complaint were Noble-Nigeria and several individuals at Noble who had previously settled with the SEC. Because they have not been properly identified in the pleadings, the Court cannot assess whether Noble-Nigeria and these individuals are liable under the Exchange Act and whether Jackson had the power to control or influence them. Accordingly, any claims of control person liability premised on conduct of unidentified others are dismissed, with the right to re-plead.

dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like." *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003).

The Complaint in this case was filed on February 24, 2012. Accordingly, absent some reason the statute of limitations should not apply, claims that accrued before February 24, 2007 should be barred. Here, the vast majority of the misconduct alleged occurred before February 24, 2007.[24] Although the Complaint does not plead any basis for tolling, the Court examines the arguments as to why the statute of limitations should be tolled or is inapplicable, to determine whether any of the claims predicated on conduct prior to February 24, 2007 survive, and also to determine whether leave to amend would be futile. *Great Plains*, 313 F.3d at 329 (noting that courts should give plaintiffs at least one opportunity to cure defects in their pleadings "unless it is clear that the defects are incurable").

### 1.    Tolling agreements

Defendants do not dispute that they each signed tolling agreements with the SEC that would suspend the running of the statute of limitations for a total of 290 days. (Resp., at 43–44; Jackson Mot., at 20 n.22; Ruehlen Mot., at 24 n.17.) These tolling agreements would make timely any claims based on conduct occurring after May 10, 2006.

"[A] failure to meet the specific pleading requirements should not automatically or inflexibility [sic] result in dismissal of the complaint with prejudice to re-filing." *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000). Nor do Defendants provide any circumstances that would caution against granting the SEC leave to amend. *See Cates v. Int'l Tel. & Tel. Corp.*, 756

---

[24] Indeed, no claims can be stated against Jackson based on conduct after February 24, 2007 because there are no allegations that he was aware of or in any way facilitated efforts to obtain TIPs based on false paperwork after February 24, 2007. A claim has been stated against Ruehlen based on actions he took to obtain false paperwork TIPs In March and April of 2007. (Compl. ¶¶ 131–134.)

F.2d 1161, 1180 (5th Cir. 1985) ("[S]uch deficiencies do not normally justify dismissal of the suit on the merits and without leave to amend, at least not in the absence of special circumstances."). Thus, although the SEC should have pled the existence of these tolling agreements, the Court finds it appropriate to grant the SEC leave to amend.

### 2. Fraudulent concealment

Defendants also argue that the Complaint has failed to raise any basis for tolling. They argue that the SEC has failed to plead facts that would give rise to tolling based on the doctrine of fraudulent concealment. (Jackson Mot., at 20–22; Ruehlen Mot., 24 n.17.) The SEC contends that it has pled the elements of fraudulent concealment that it is required to plead, and that Defendants actually bear some of the burden because the statute of limitations is an affirmative defense. (Resp., at 46–47.)

The doctrine of fraudulent concealment is read into every federal statute of limitations. *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1947). Allegations of fraudulent concealment must satisfy Federal Rule of Civil Procedure 9(b). *In re Energy Transfer Partners Natural Gas Litigation*, No. 07-cv-3349, 2009 WL 2633781, at *13 (S.D. Tex. Aug. 26, 2009). In the Fifth Circuit, the plaintiff must prove two elements to invoke the fraudulent concealment doctrine: "first, that the defendants concealed the conduct complained of, and second, that [the plaintiff] failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim." *Texas v. Allan Construction Co.*, 851 F.2d 1526, 1529 (5th Cir. 1988) (*citing In re Beef Industry Antitrust Litigation,* 600 F.2d 1148, 1169 (5th Cir. 1979) (quotations omitted). "Concealment by defendant only by silence is not enough. He must be guilty of some trick or contrivance tending to exclude suspicion and prevent inquiry." *Crummer Co. v. Du Pont*, 255 F.2d 425, 432 (5th Cir. 1958). However, "[e]ven where a defendant has concealed wrongful

conduct, the statute of limitations is tolled only until such time as the plaintiff, exercising reasonable diligence, could have discovered the facts forming the basis for the claim." *Allan*, 851 F.2d at 1533. This means the statute is not automatically tolled until such a time that plaintiff actually had all of the knowledge necessary to state a claim; rather, a plaintiff must show that he acted diligently upon learning any facts that should have "excite[d] inquiry." *In re Beef Industry*, 600 F.2d at 1171. At the same time, "even though a plaintiff might have inquiry notice of a potential claim, it does not necessarily follow that reasonable diligence will discover sufficient facts to support legal action." *Allan*, 851 F.2d at 1533.

The Court rejects the SEC's contention that it is Defendants who must bear the burden of proving that the Commission should have discovered the fraud earlier. (Resp., at 47 n.27.) It appears that other circuits have found, in analogous circumstances, that defendants should bear the burden of proving that plaintiffs acted diligently to discover their claim. *See SEC v. Gabelli*, 653 F.3d 49, 60–61 (2d Cir. 2011) (noting that, in the context of the discovery rule, defendants bear the burden of proving that a "reasonably diligent plaintiff would have discovered this fraud" earlier); *Marks v. CDW Computer Ctrs., Inc.,* 122 F.3d 363, 368 n.2 (7th Cir. 1997) (requiring a plaintiff to plead why it did not discover a fraud sooner would be "nonsensical" as it would require the plaintiff to "prove a negative" in the complaint); *Smith v. Duff and Phelps, Inc.*, 5 F.3d 488, 492 n.9 (11th Cir. 1993). The Court recognizes the logic of placing the burden of disproving diligence on the defendants. However, the Fifth Circuit has unambiguously held that plaintiffs would "ultimately bear the burden of persuasion on the question of diligence." *Allan*, 851 F.2d at 1533. This Court is bound by that precedent.

The Court also rejects Defendants' argument that a different test should apply to claims of fraudulent concealment than that adopted in *Allan*. (Jackson Mot. at 20–21; Jackson Reply, at

9–10; Ruehlen Mot., at 10.)  Defendants argue that fraudulent concealment requires the plaintiff

to establish:

> 1) [T]he defendant's wrongdoing was concealed from the plaintiff, either through
> active concealment by the defendant or because the nature of the wrongdoing was
> such that it was self-concealing; 2) the plaintiff acted diligently once he had
> inquiry notice, i.e., once he knew of or should have known of the facts giving rise
> to his claim, and 3) the plaintiff did not have inquiry notice within the limitations
> period.

*SEC v. Microtune, Inc.*, 783 F. Supp. 2d 867, 874 (N.D. Tex 2011), *aff'd on other grounds sub*

*nom.*, *SEC v. Bartek*, --- Fed. App'x ---, No. 11-10594, 2012 WL 3205446 (5th Cir. Aug. 7,

2012).  The difference between this test and the test set out by the Fifth Circuit in *Allan* is the

additional requirement that the plaintiff must not have inquiry notice within the statute of

limitations.[25]   The *Microtune* court explained its deviation from *Allan* by pointing to an

unpublished Fifth Circuit opinion, *Liddell v. First Family Fin. Servs., Inc.*, 146 Fed. App'x 748,

750 n.9 (5th Cir. 2005).  In *Liddell*, the court was faced with interpreting a Mississippi statute

that codified the doctrine of fraudulent concealment.  *Liddell*, 146 Fed. App'x at 750.

Accordingly, the Fifth Circuit expressed doubt that *Allan*, which addresses the applicability of

the fraudulent concealment doctrine to the federal statute of limitations governing violations of

the Sherman Anti-Trust Act, 15 U.S.C. § 15b, *Allan*, 851 F.2d at 1528, was binding on its

analysis of Mississippi law.  *Liddell*, 146 Fed. App'x at 750.  Somewhat confusingly, the Fifth

Circuit characterized *Allan* as interpreting the doctrine of fraudulent concealment under Texas

law, rather than under federal law.  *Id.* at 750 n.9.  The *Microtune* court took *Liddell*'s

characterization to stand for the proposition that *Allan* is "not binding precedent for fraud claims

not subject to the Texas fraudulent concealment doctrine."  *Microtune*, 783 F. Supp. 2d at 881.

---

[25] As discussed above, the diligence prong of *Allan* also recognizes that "[t]hose who have learned of facts
calculated to excite inquiry must inquire."  *Allan*, 851 F.2d at 1533 (citations omitted) (brackets in original).
Furthermore, *Allan* recognizes the concept of a self-concealing wrong.  *Id.* at 1528–32.

This Court must respectfully disagree with *Microtune*'s conclusion and the apparently incorrect characterization of *Allan* in the Fifth Circuit's unpublished *Liddell* opinion.[26]   As explained, *Allan* did not deal with a Texas law claim, but a federal anti-trust claim and a federal statute of limitations.  *Allan*, 851 F.2d at 1528.  While good reason existed for the Fifth Circuit not to find *Allan* dispositive in interpreting Mississippi law in *Liddell*, the Court can see no reason why *Allan* would not supply the applicable federal law on fraudulent concealment.  *Allan* nowhere requires that the plaintiff must not have had inquiry notice within the limitations period, and this Court declines to demand this additional element.

The Court recognizes, however, that many circuits have just such a requirement.  *See Microtune*, 783 F. Supp. 2d at 881–82 (collecting numerous cases from other circuits that all apply the three-part test).  While the Court is bound by Fifth Circuit precedent, it also finds that the Fifth Circuit, while in the minority, has chosen the better route.  To impose the requirement that a plaintiff must not have had inquiry notice within the limitations period would lead to claims being barred when a plaintiff obtained inquiry notice toward the end of a limitations period; the Court simply cannot discern any desirable policy such an outcome might be serving.  To the extent that this requirement is meant to prevent plaintiffs who had inquiry notice early on in the limitations period from delaying bringing their claim, the diligence prong already accomplishes this goal.  Indeed, even circuits that have adopted the third prong have noted that "such a rule literally applied would lead to an untenable result such as the situation in which the plaintiff discovers or should discover his cause of action just before the period of limitations expires."  *Norton-Children's Hosps., Inc. v. James E. Smith & Sons, Inc.*, 658 F.2d 440, 444 (6th Cir. 1981).  Rather than accepting the "untenable result" or creating some carve-out for those

---

[26] Unpublished opinions are "persuasive, but not binding, precedent."  *Broussard v. Tex. Dep't of Criminal Justice*, No. Civ. A. H-04-1059, 2006 WL 1517532, at *7 n.3 (S.D. Tex. May 30, 2006).

cases where the plaintiff gets inquiry notice close to the close of the limitations period, the Fifth Circuit test avoids the problem altogether, while adequately preventing plaintiffs from unduly delaying bringing their claims through proper application of the diligence prong.  Accordingly, the Court declines to adopt the entirely extraneous requirement that the plaintiff must not have had inquiry notice within the limitations period.[27]

Under the applicable Fifth Circuit standard, the SEC has pled enough facts to suggest that Defendants concealed their wrongdoing.  Specifically, the SEC has pled that each time a payment for false paperwork TIPs was approved, it was logged as a legitimate operating expense, as Defendants knew and intended.   (Compl. ¶¶ 88, 95, 111, 113, 147–149.) Furthermore, the SEC has alleged that Jackson signed personal certifications as CFO and CEO that were attached to Noble's public quarterly and annual filings, dated from August 8, 2005 to May 9, 2007, stating that he had disclosed to Noble's auditors and Audit Committee all significant deficiencies and material weaknesses in the design or operation of internal controls and any fraud.  (Compl. ¶ 146.)   These acts are pled with adequate specificity and can, theoretically, be enough to support a claim of concealment.  However, the Court notes that, if these assertions by Defendants that their actions are legal are to be the sole basis of the fraudulent concealment allegations, the SEC will eventually have to show that its reliance on these representations was reasonable.  This is because "generally speaking, denial of wrongdoing is no more an act of concealment than is silence" and such a denial may constitute concealment only "where the parties are in a fiduciary relationship, or where the circumstances indicate that it was reasonable for the plaintiff to rely on defendant's denial."  *Allan*, 851 F.2d at 1532–33.

---

[27] The Court recognizes that *Microtune* was affirmed by the Fifth Circuit in its unpublished opinion in *Bartek*. However, the SEC did not appeal the fraudulent concealment analysis in *Microtune*, and accordingly, the Fifth Circuit did not consider it.  *Bartek*, 2012 WL 3205446, at *1 n.2.  As such, this Court is not bound by *Microtune*'s fraudulent concealment analysis.

However, the SEC has not pled any facts that support the inference that it acted diligently in bringing this Complaint. The SEC argues that, because it did not learn of the misconduct until June 2007, and because it brought its complaint within five years of that date, it has pled all it needs to plead. (Resp., at 47.) However, as explained above, the SEC must plead facts that show that it acted diligently in gathering the facts that form the basis of its claims. It concedes that, by June 2007, when Noble disclosed its internal investigation to the SEC, it had inquiry notice of potential misconduct. (Resp., at 47.) The SEC has leave to amend its Complaint to plead facts that would support the inference that it acted diligently in gathering the facts that form the basis of this Complaint.

### 3.    Continuing violation

The SEC also argues that, at least with respect to its claim that Defendants aided and abetted Noble in its failure to keep accurate books and to devise and maintain a system of internal controls, and its claim that Defendants knowingly circumvented or failed to implement a system of internal controls, the continuing violation doctrine tolls the statute of limitations. (Resp., at 45–46.)[28] It claims that such conduct is "inherently continuing in nature". (Resp., at 45–46.) Under that doctrine, if a violation begins outside the limitations period but continues into the limitations period, the complaint is timely if filed within the required limitations period as measured from the last occurrence of the practice. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 380–81 (1982).

---

[28] The SEC does not specify, which, if any, of the other claims are continuing violations. (Resp., at 45–46.) It is possible that the continuing violations argument could be made with regard to the FCPA claims against Defendants as well. However, because the SEC does not make the argument, the Court does not assess it. The SEC may, of course, decide to argue the issue at a later phase in the proceeding. *See SEC v. Kovzan*, 807 F. Supp. 2d 1024, 1036 (D. Kan. 2011) (noting that it is more appropriate to decide whether the continuing violations doctrine applies upon consideration of the facts rather than as a matter of law); *SEC v. Brown*, 740 F. Supp. 2d 148, 159 (D.D.C. 2010) (same).

In response to this argument, Jackson argues that the SEC has not explained how Jackson had any involvement in the bookkeeping and internal controls violations after the start of the limitations period.  (Jackson Reply, at 10.)  As noted *supra* in Part III.F.1, Jackson is correct that, as pled, the Complaint fails to state a claim against him.  Additionally, the SEC has not pled that any payments were improperly recorded after February 24, 2007 as a result of actions Ruehlen took.  Accordingly, the SEC does not state violations of 15 U.S.C. § 78m(b)(5) or aiding and abetting of Noble's violations of 15 U.S.C. § 78m(b)(2)(A) and (B) against either Defendant within the limitations period.  However, the Court notes that, even assuming that all the SEC is able to plead upon amendment is the existence of prior tolling agreements, the limitations period will now include Jackson's advice to the new CFO regarding TIP-related payment requests.  (Compl. ¶¶ 122–123.)  Although the Court does not decide the issue now, that conduct may well be sufficient to state a claim against Jackson for aiding and abetting Noble in its failure to keep accurate books and to devise and maintain a system of internal controls, and for knowingly circumventing or failing to implement a system of internal controls.  As for Ruehlen, if the SEC alleges the existence of the tolling agreements, the posting of a payment in June 2006 to Noble's books for a TIP based on false paperwork that Ruehlen authorized would be within the limitations period (Compl. ¶ 113), thereby stating a claim against Ruehlen within the limitations period for violating 15 U.S.C. § 78m(b)(5) and aiding and abetting Noble's violations of 15 U.S.C. § 78m(b)(2)(A) and (B) claims against him.

Because the Court anticipates that the SEC will plead the existence of the tolling agreements in its amended complaint, the Court addresses the remainder of Defendants' arguments regarding the continuing violations doctrine.  Jackson also notes that many courts have expressed skepticism about whether the continuing violations doctrine applies in securities

cases.  (Jackson Reply, at 10.)  While this may be true, *see SEC v. Brown*, 740 F. Supp. 2d 148, 158–59 (D.D.C. 2010) (noting that some district courts in the Second and Third Circuits have declined to apply the doctrine to securities violations), other district courts have applied the doctrine to securities claims.  One such court, after reviewing the purposes of the securities laws, explained its reasoning as follows:

> In view of *Havens Realty*'s example in applying the "continuing violations" doctrine to effectuate congressional intent, this Court concludes that not applying the doctrine in the SEC enforcement context could frustrate congressional purpose in enacting the Securities Act and the Exchange Act in that the nature of certain types of securities violations is such that they necessarily take time to detect.  While time passes, however, such violations can inflict significant harm on the investing public.  If wrongdoers may continue to reap the benefit of their continuing violations with no threat of punitive enforcement actions, then, for some, the possibility that they may eventually merely have to return what may be left of their ill-gotten gains may become simply a cost of doing business.  Such an outcome conflicts with congressional intent to prevent securities fraud.  Consequently, this Court finds that the "continuing violations" doctrine may apply where the appropriate facts exist.

*SEC v. Huff,* 758 F. Supp. 2d 1288, 1340–41 (S.D. Fla. 2010).  *See also SEC v. Ogle,* No. 99 C 609, 2000 WL 45260, at *4 (N.D. Ill. Jan. 11, 2000) (noting that, just as with employment discrimination, with certain kinds of securities violations, a plaintiff "suffer[s] from a similar inability to detect discrete violations until the alleged scheme was well underway").  The Court agrees that potential difficulty in detection and the need to ensure that defendants are adequately disincentivized from violating the securities laws provide compelling rationales for applying the continuing violations doctrine to the area of securities law.  Nor do Defendants provide this Court with any reason why the continuing violation doctrine should not apply to violations of the securities laws.  Accordingly, the Court declines, at this stage, to hold that the continuing violations doctrine does not apply to the securities violations at issue here.  *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 155 (E.D.N.Y. 2008) (foregoing deciding whether to

extend the continuing violations doctrine to securities cases until a complete factual record was before the court).

Finally, Jackson also argues that the SEC's conclusory statement in its Response that "such conduct is inherently continuing in nature" does not meet the pleading standards announced in *Twombly* and *Iqbal*. (Jackson Reply, at 10.)  If the Complaint is not filed within the applicable limitations period, "the plaintiff has the burden of demonstrating a factual basis to toll the period. *Blumberg v. HCA Mgmt. Co., Inc.*, 848 F.2d 642, 644 (5th Cir. 1988). Accordingly, the SEC must plead facts in its complaint that would support the inference that the violations here were continuing.  However, the Court understands the doctrine simply to require pleading continuous, unlawful acts, with at least one violation that is within the statute of limitations. *See Havens,* 455 U.S. at 380 (explaining that a continuing violation tolls a statute of limitations because statutes of limitations are meant only to prevent stale claims, but where violations continue into the limitations period, "the staleness concern disappears"); *McGregor v. La. State Univ. Bd. of Supervisors*, 3 F.3d 850, 867 (5th Cir. 1993) (explaining that continuing violation doctrine requires repeated violations, the last of which occurs within the limitations period).  As the Court has explained, the SEC has not pled that Defendants violated 15 U.S.C. § 78m(b)(5), or that they aided and abetted Noble in violating 15 U.S.C. § 78m(b)(2)(A) and (B) after February 24, 2007.  However, if the Court determines that the continuing violations doctrine applies to securities cases, if the SEC pleads a violation within the limitation period by extending the limitations period through tolling agreements, the SEC must plead nothing more.[29]

### 4.    Equitable remedies

---

[29] The Court does not understand the point the SEC is making when it claims, without support, that certain violations are "inherently continuing in nature."  In fact, the Court's research specifically cautions that the continuing violations doctrine cannot be premised on the continuing effects of a violation that occurred outside the limitations period. *McGregor,* 3 F.3d at 867.  Accordingly, the Court finds this characterization irrelevant.

Finally, the SEC seeks an injunction against Defendants permanently restraining them from committing the violations they have been charged with.[30]   The SEC argues that actions for injunctive relief are not subject to a limitations period.  (Resp., at 48.)  Defendants point out that the Fifth Circuit, in its unpublished opinion in *Bartek*, recently rejected this very argument. (Doc. No. 46, Defendants' Notice of Supplemental Authority, at 1–2.)  Ruehlen also argues that the SEC has failed to plead facts suggesting that injunctive relief is necessary because of a reasonable likelihood that Ruehlen is engaged in or about to engage in practices that violate the law.  (Ruehlen Mot., at 24.)

28 U.S.C. § 2462 provides a limitations period for bringing suit for "the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise."  In *Bartek*, the Fifth Circuit held that the term "penalty" as used in the statute was not strictly limited to monetary and property sanctions.  *Bartek*, 2012 WL 3205446, at *6.  Whether an injunction constitutes a "penalty" under 28 U.S.C. § 2462 depends on an objective evaluation of "the degree and extent of the consequences to the subject of the sanction."  *Id.*; *see also Johnson v. SEC*, 87 F.3d 484, 488 (D.C. Cir. 1996).

The Court does not disagree with the test set out in *Bartek*.  However, *Bartek* affirmed a district court's summary judgment finding that injunctive relief in that case would constitute a penalty.  *Bartek*, 2012 WL 3205446, at *6; *Microtune*, 783 F. Supp. 2d at 884–86.  *Microtune* considered the collateral consequences to the Defendants as well the degree to which the remedy sought addressed past harm and focused on preventing future harm.  *Microtune*, 783 F. Supp. 2d at 885.  Finding that the collateral consequences of permanent injunctions and officer and director bars were severe, and that the facts indicated that the likelihood of future harm was low,

---

[30] The SEC des not seek to enjoin Jackson and Ruehlen from aiding and abetting FCPA violations.  (Compl. Prayer for Relief.)  The Court believes this may be inadvertent.  The SEC has leave to amend to amend its Complaint to add a request to enjoin Defendants from aiding and abetting violations of 15 U.S.C. § 78dd-1.

the court held the permanent injunctions and officer and director bars punitive in nature. *Id.* at 885–86. Perhaps after reviewing the factual record in this case, this Court will find the same. However, parties have cited no cases that suggest that dismissal of claims for injunctive relief is appropriate at the Rule 12(b)(6) stage. *See Gabelli*, 653 F.3d at 61 ("[I]t is most unusual to dismiss a prayer for injunctive relief at this preliminary stage of the litigation, since determining the likelihood of future violations is almost always a fact-specific inquiry.").

The SEC, of course, ultimately will bear the burden of showing that an injunction is warranted. *See SEC v. Jones*, 476 F. Supp. 2d 374, 383–84 (S.D.N.Y. 2007). In determining whether an injunction is warranted, "the critical question is whether there is a reasonable likelihood that the wrong will be repeated." *Gabelli*, 653 F.3d at 61. This fact-specific inquiry may properly consider the fraudulent nature of the past conduct, whether the violations were willful or blatant, and whether defendants maintained throughout the blamelessness of their actions. *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100–01 (2d Cir. 1972); *SEC v. MacElvain*, 417 F.2d 1134, 1137 (5th Cir. 1969). Even a cursory review of these factors makes apparent the impossibility of determining the likelihood of a future violation at the outset of the litigation. Facts pled about Ruehlen's decision to ignore the Audit Committee's resolution and book payments related to false paperwork TIPs as legitimate operating expenses, if true, may well give rise to an inference that Ruehlen might violate the securities laws again.[31] The SEC may, if it wishes, allege additional facts that would lend further support for the propriety of an injunction.

---

[31] While Ruehlen argues that the likelihood of future violations is low because these alleged violations occurred many years ago and that, as a current Noble employee, he is subject to Noble's consent decree (Ruehlen Mot., at 24–25), the Court cannot properly consider these assertions at the motion to dismiss stage.

## IV.    CONCLUSION

Based on the foregoing, Defendants' Motions to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, Jackson's Motion to Dismiss is **GRANTED** as to all claims insofar as the SEC seeks monetary penalties and **DENIED** as to all claims insofar as the SEC seeks injunctive relief.  Ruehlen's Motion to Dismiss is **GRANTED** as to all claims insofar as the SEC seeks monetary penalties based on violations that occurred prior to February 24, 2007, **DENIED** as to all claims insofar as the SEC seeks monetary penalties based on those violations that occurred after February 24, 2007, and **DENIED** as to all claims insofar as the SEC seeks injunctive relief.  All claims are **DISMISSED WITHOUT PREJUDICE** to filing an amended complaint within 30 days that will cure the deficiencies identified in this Order.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 11th day of December, 2012.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE