UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 4:12-CV-00563 |
| v. | ) ) ) | **SECOND AMENDED COMPLAINT** |
| MARK A. JACKSON and JAMES J. RUEHLEN, | ) ) ) | |
| Defendants. | ) ) ) | |

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges:

<u>SUMMARY</u>

1.      This action arises from violations of the Foreign Corrupt Practices Act (the "FCPA") by Mark A. Jackson ("Jackson") and James J. Ruehlen ("Ruehlen") (collectively "Defendants"), who are a former and a current employee of Noble Corporation ("Noble"), an international provider of offshore drilling services and equipment to oil companies throughout the world, including Nigeria.

2.      Noble and its wholly owned subsidiary, Noble Drilling (Nigeria) Ltd. ("Noble-Nigeria"), authorized its customs agent to pay bribes on Noble's and Noble-Nigeria's behalf to Nigerian government officials to influence or induce them to (1) favorably process false paperwork, (2) grant temporary import permits ("TIPs") based on the false paperwork, and (3) favorably exercise or abuse their discretion in granting extensions to these illicit TIPs. Defendants approved payment of the bribes. Defendant Ruehlen also assisted the customs agent in preparing false documents, processed the customs agent's invoices for the bribes, and signed

the checks reimbursing the customs agent for the bribes he paid to Nigerian government officials.  Defendants acted in this way to obtain TIPs and TIP extensions and retain business under drilling contracts in Nigeria.  As a consequence, Defendants violated the anti-bribery provisions of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78dd-1].

3.     Defendants also took steps to circumvent Noble's internal controls and to falsely record these bribes as legitimate operating expenses on Noble's books.  Defendant Jackson failed to implement internal accounting controls to prevent the bribery and false recording of the bribes.  As a consequence, Defendants violated the records falsification and internal control provisions of the Exchange Act [15 U.S.C. §78m(b)(5) and 17 C.F.R. §240.13b2-1], and aided and abetted Noble's violation of the books and records and internal control provisions of the Exchange Act [15 U.S.C. §§78m(b)(2)(A) and (B)].

4.     Defendant Jackson misled Noble's auditors about the bribes and signed certifications required by the Sarbanes-Oxley Act of 2002 falsely stating that he had created and maintained effective internal controls, and that there were no internal control weaknesses, fraud, or FCPA violations.  As a consequence, Jackson violated Rules 13b2-2 and 13a-14 of the Exchange Act [17 C.F.R. §§240.13b2-2 and 240.13a-14].

5.     During the violations, Jackson was Noble's Chief Financial Officer ("CFO"), Chief Operating Officer ("COO"), and ultimately President, Chief Executive Officer ("CEO"), and Chairman of the Board of Directors.  Jackson directly or indirectly controlled Noble and Defendant Ruehlen, and therefore is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. §78t(a)] for all of their violations.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction under Sections 21(d), 21(e), and 27 of the Exchange

Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].  Noble, Jackson, and Ruehlen, directly or indirectly,

made use of the means or instrumentalities of interstate commerce, including electronic mail, of

the mails, or of the facilities of a national securities exchange in connection with the transactions,

acts, practices, and courses of business alleged in this Complaint.

7.      Venue is appropriate in this Court under Section 27 of the Exchange Act [15

U.S.C. § 78aa] or 28 U.S.C. § 1391(d) because, among other reasons, certain acts or transactions

constituting the violations by Defendants occurred in this district.

## DEFENDANTS AND OTHER ENTITIES

8.      Jackson was Noble's CFO from September 2000 to about October 2005, and

Acting CFO from about March 2006 to about November 2006.  Jackson became COO in March

2005, became the President and COO in February 2006, became a Director in July 2006, and

became CEO in late October 2006.  When Jackson resigned in September 2007, he was

President, CEO, and Chairman of the Board.

9.      As CFO and Acting CFO, Jackson was responsible for Noble's compliance with

the FCPA.  He received regular reports of payments made to government officials, and he

reviewed and approved such payments, including those for TIPs and TIP extensions.  As CFO

and Acting CFO, Jackson supervised Noble's internal audit, finance, and accounting functions.

The head of internal audit reported directly to Jackson, and Jackson received both drafts and final

versions of audit reports.  Jackson was responsible for the accuracy of Noble's books, including

the accurate recording of payments to government officials.

10.     From about May 2005 through early 2007, Jackson directly supervised Ruehlen, oversaw Noble-Nigeria's operations, and regularly communicated with Ruehlen about the status of drilling rigs in Nigeria and other issues facing Noble-Nigeria.

11.     As CEO, Jackson also oversaw FCPA compliance and the accuracy of Noble's financial statements.

12.     On September 20, 2007, Jackson resigned from Noble.  At the time of his resignation, Noble was in the middle of an internal investigation into allegations that Noble had violated the FCPA by authorizing and making payments to Nigerian government officials to obtain TIPs and TIP extensions.  Jackson did not cooperate with the investigation and refused to be interviewed by Noble's counsel conducting the investigation.  During the Commission's investigation of Noble that led to the filing of this action, Jackson produced documents but asserted his Fifth Amendment right against self-incrimination during testimony.

13.     After Jackson's resignation from Noble, Jackson became President of Mark Jackson Investments, LLC.  From about August 2011 to about February 2012, Jackson was the Managing Director and CEO of another public company in the oil industry.  Jackson markets himself as an independent oil and energy professional interested in new ventures, consulting offers, business deals and career opportunities.  Before joining Noble, Jackson served as CFO of another company in the oil industry.

14.     From September 2004 through June 2011, Ruehlen was the highest Noble executive based in Nigeria, responsible for all of Noble-Nigeria's operations.  In July 2011, Ruehlen became the Vice President and General Manager of Noble's Mexico Division, a position he continues to hold.  As such, Ruehlen is today the highest Noble executive in Mexico, responsible for all of Noble's operations there and having the same level of executive duties and

responsibility in Mexico that he held with Noble during his period of time in Nigeria.  Ruehlen's permanent residence is in Houston, Texas.

15.     On or about September 15, 2004, Ruehlen became the Division Manager of Noble-Nigeria and a member of its Board of Directors.  He reported to Noble's Vice President of Eastern Hemisphere Operations from about September 2004 to about May 2005 and directly to Jackson from about May 2005 to about the first quarter of 2007.  Throughout the relevant time, Ruehlen signed Division representation letters certifying his division's compliance with Noble's policies, the FCPA, and other governmental laws, certifying the accuracy of Noble's books, records and accounts, and certifying its adherence to internal controls, among other things.

16.      In the two years before becoming the Division Manager, Ruehlen worked in Noble's operations and corporate internal audit groups in Sugar Land, Texas.  He worked on an audit of the West Africa Division during which he learned of the unlawful use of false paperwork and unreceipted payments to Nigerian government officials to obtain TIPs and TIP extensions.

17.     During the relevant period, Noble Corporation ("Noble") was a Cayman Islands corporation whose common stock was registered under Section 12(b) of the Exchange Act and traded on the New York Stock Exchange under the symbol "NE".  Noble's headquarters and principal executive offices were in Sugar Land, Texas.  In March 2009, Noble incorporated in Switzerland, and its corporate and principal executive offices moved overseas.  Noble retained the Sugar Land office as its main U.S. office for the Noble group of companies operating in the U.S., and its common stock continues to be registered under Section 12(b) of the Exchange Act and to trade on the New York Stock Exchange.  "Noble" herein refers to the current Swiss parent company or to the former Cayman Islands parent.  Noble, through its subsidiaries, performs contract oil drilling services with a fleet of mobile offshore drilling units located worldwide.

18.     Noble Drilling (Nigeria) Ltd., ("Noble-Nigeria" or "West Africa Division") is a wholly-owned Noble subsidiary, incorporated in Nigeria in September 1990 as an oil industry service company.  Noble-Nigeria was the primary Noble operating company in Nigeria.  Its financial results are consolidated into the financial statements of Noble.

## FACTUAL ALLEGATIONS

## I.     The Temporary Import Regime in Nigeria and False Paperwork

19.     Noble earns revenue by contracting with oil and gas companies to drill oil and gas wells offshore in locations around the world, including Nigeria.  Noble's operations in Nigeria are conducted by Noble-Nigeria.  Between January 2003 and May 2007, Noble-Nigeria had up to seven drilling rigs that operated offshore in Nigeria.  Nigeria allowed these rigs to operate in its waters without the payment of permanent import duties associated with the rig on the basis of temporary import permits ("TIPs") obtained from the Nigeria Customs Service ("NCS").

20.     NCS is the Nigerian government agency that controls, and did control at all relevant times, the issuance of TIPs and TIP extensions.  The Customs & Excise Management Act, Cap C45, Laws of the Federation of Nigeria, 2004 (CEMA) (also known as the Customs and Excise Management Act of 1958) vests legal authority in the NCS to act on behalf of the federal government of Nigeria in all customs matters.  CEMA is, and was at all relevant times, the principal law guiding the administration of customs and excise in Nigeria.

21.     At all relevant times, CEMA set up the legal framework for TIPs.  Under CEMA, TIPs obtained by Noble from NCS were customs duty exemptions that secured the temporary and conditional avoidance of the payment of permanent import duties.

22.     Under Nigerian law, customs duties generally were required to be paid for goods imported into Nigeria, such as rigs brought into Nigerian water.  CEMA provides, for example:

"Except as permitted by or under the customs laws no imported goods shall be delivered or removed on importation until the importer has paid to the proper officer any duty chargeable thereon."   CEMA §§ 37(1).  During the relevant time, customs duties assessed to permanently import a rig were significant, a substantial percentage of the rig's total value.

23.   CEMA vests discretion in NCS to grant or deny TIPs and TIP extensions that avoid (temporarily and conditionally) import duties chargeable on goods such as rigs.  The Nigerian law gives NCS discretion to decide whether or not conditions are met to qualify an importer for a TIP or TIP extension.  It also gives NCS the discretion to deny TIPs and TIP extensions even if conditions are met.  CEMA states, for example, that "where the … [NCS] is *satisfied* that goods are imported only temporarily and are intended to be re-exported …, it *may permit* the goods to be delivered on importation … *subject to such conditions as it sees fit to impose*, without payment of duty."  CEMA § 42(1) (emphasis added).

24.   Under Nigerian law, the Comptroller General of Customs had the ultimate authority to decide on the application for a TIP.  That authority was often delegated to a unit deputy Comptroller who signed a TIP or TIP extension for the Comptroller General of Customs.

25.   Under Nigerian law, a TIP did not qualify its holder to do business in Nigeria.  A TIP did not register its holder as a company in Nigeria.  A TIP did not incorporate its holder in Nigeria.  Nor did a TIP secure for its holder a work permit or license in Nigeria.  A TIP also did not license its holder to undertake any particular form of business.  Under CEMA, a TIP merely allowed its holder to avoid (temporarily and conditionally) costly permanent importation duties.

26.   CEMA denied discretion to the importer on how goods imported without payment of duty are to be used.  Items imported under a TIP (and TIP extensions) could not remain in Nigeria longer than the period allowed for by the TIP and extensions.  Nigerian law states that

such goods imported without payment of duty "*shall not* be used or dealt with in any way

contrary to the use, purpose or condition for or subject to which such goods were delivered …

except with the permission of the [NCS] and after payment of the full duty thereon or such

proportion thereof as it may direct."  CEMA § 43(1). (emphasis added).

27.     Nigerian law under CEMA also sets forth that it is an offense to make untrue

declarations or statements, to counterfeit or falsify documents required by the customs and excise

laws, or to fraudulently evade any duty chargeable on goods imported.  *E.g.,* CEMA §§ 161, 162.

28.     As to the method of obtaining a TIP, Customs and Excise Notice No. 14, which

was issued by the customs authorities in implementing CEMA and in use during the relevant

time period, provided: "Prior written application must be made … for permission to import

temporarily any goods (other than commercial samples, advertising materials and motor vehicles

which are dealt with in Parts I and II of this notice) without payment of import duty."  Notice

No. 14, § 27 (Part III—Other Goods, A.—Temporary Importation).  The Notice further states,

"The conditions, and [NCS's] requirements will be advised to the importer."  *Id*.

29.     Pursuant to Nigerian law, NCS required as part of the prior written application a

valid contract of limited and specific duration, among other things.   If NCS was satisfied that the

good to be imported was only going to be in Nigeria temporarily, and for a specific project

pursuant to a valid contract, NCS could approve the importer's application.   One element of

NCS's discretion in either approving or denying the application rested in its judgment and

determination that the good truly was going to be in Nigeria only temporarily.

30.     NCS's approval to temporarily import a good stated that it was valid only for 12

months and was subject to as many as eleven conditions, including notification of the date of

actual import, procurement of a bank bond for the full value of permanent import duties, and

8

exportation of the good within 12 months of the date of importation.  NCS also prohibited the importer from selling or using the goods in any way "for hire or reward" while in Nigeria without prior permission from NCS.  NCS also required the completion and submission to customs within three months of the grant date a Form Sale 33.  The Form Sale 33 is a government form detailing the name and address of the importer, the particulars of the goods to be imported without payment of duty, the purpose of the temporarily imported goods in Nigeria, the importer's intention to re-export the goods, the date an official of the Nigerian government examined and authorized the release of goods for importation, the particulars of the bond and conditions for importing the goods without payment of duty.

31.     Pursuant to Nigerian law and as indicated in the Form Sale 33, NCS had discretion to extend the time period of the TIP by six months upon proper written application made at least 14 days prior to the expiration of a valid and properly obtained TIP.  NCS required the written application materials to include a copy of the original TIP, a copy of the Form Sale 33 further evidencing the import, conditions and 12-month duration of the original TIP, a copy of the contract with the term or duration of the specific project, and documentation that the bond covering the full amount of duties was still in effect.  If NCS granted the extension, Section V of the Form Sale 33 would be completed by a proper Nigerian government official, showing the grant of the extension and the effective period of the extension.  The Form Sale 33 provided space for only one extension.

32.     If application for an extension was not made within the valid period of the TIP or at least 14 days prior to the expiration of a TIP or valid extension, NCS policy required the rejection of the application and the immediate exportation of the rig.  Also, any violation of the terms of a TIP rendered the importer ineligible for future TIPs or extensions.

33.     If the importer needed another extension to complete work on its contract, the importer would complete and submit a written application within the 14 days preceding the expiration of the current extension.  As with the original TIP and initial TIP extension, and pursuant to Nigerian law, NCS may or may not grant the extension in its discretion and judgment of whether the good truly was in Nigerian temporarily and intended to be re-exported.  Upon proper application, and if satisfied that the goods were in the country only temporarily and intended to be re-exported, NCS had discretion to grant additional six-month extensions.  It was against NCS policy and impermissible to grant more than three six-month extensions.

34.     Except as may have been required to obtain the necessary bank bond, no government or legally-authorized fee was required to be paid to NCS to apply for or procure a TIP or TIP extension, yet in connection with applying for and procuring TIPs and TIP extensions, Noble authorized large sums of money to be paid to NCS officials.

35.     At the expiration of a TIP and any TIP extensions, NCS required that the rig be exported from Nigeria.  If a rig was needed in Nigeria to complete work on a drilling contract past the expiration of a TIP and any extensions, NCS required that the rig be exported and that the rig owner seek a new TIP in order to re-import the rig.  Alternatively, the rig owner could apply to convert the rig to permanent import status.  Converting the rig to permanent import status would include, among other things, paying the appropriate, and often costly, duties associated with permanent import status.  Failure to export and re-import the rig pursuant to a new TIP, or to convert it to permanent import status, would subject the rig owner to sanctions, including seizure of the rig by the government and forfeiture of the owner's bond.

36.     NCS did not deal directly with rig owners.  It required that companies submit applications and correspondence as to TIPs and extensions through licensed customs agents.

37.     Contrary to Nigerian law, Noble-Nigeria did not export its rigs at the expiration of TIPs and extensions.  Nor did it seek to convert its rigs to permanent import status and pay permanent import duties.  Instead, Ruehlen and other Noble-Nigeria employees, and its customs agent, with Jackson's knowledge and approval, created false documents showing that the rigs moved out of and back into Nigerian waters, when the rigs in fact never moved.  Ruehlen and Noble-Nigeria, through the customs agent, and based at times on Jackson's authorization, paid bribes to Nigerian officials to secure stamps and other illegitimate processing of documents that made it falsely appear as if the rigs were exported and re-imported as required by Nigerian law.

## II.     Noble Paid Bribes to Obtain TIPs and Extensions

38.     To obtain TIPs with false paperwork, Ruehlen sought authorization for, and Jackson authorized, illicit payments to Nigerian government officials.  Typically, the process, from about September 2004 to about May 2007, was that Ruehlen would obtain a price proposal from the customs agent detailing the costs associated with obtaining a new TIP or TIP extension. These proposals would clearly state which charges would not have any supporting backup documentation, such as those labeled as "special handling" or "procurement."

39.     The terms "special handling" and "procurement" denoted unreceipted payments, or bribes, to government officials.  Ruehlen understood that all payments specifically labeled "special handling" or "procurement" without supporting documentation were payments to government officials.  From about September 2004 to about May 2007, Ruehlen generally referred to all unreceipted TIP-related payments to government officials as "special handling," regardless of the label used by the agent.  Because Noble's FCPA policy required all such payments to be pre-approved in writing by the CFO, Ruehlen usually sent an e-mail from his

post in Nigeria to the CFO in Sugar Land, Texas, who at times during the relevant period was Jackson, requesting approval for the "special handling" charges.  Throughout the relevant period, Jackson understood that all requests from Ruehlen to pay "special handling" charges for TIPs and TIP extensions were requests to make unreceipted payments to government officials to secure false paperwork TIPs or discretionary TIP extensions.

40.     Once he received approval, Ruehlen would authorize the agent to proceed with the payments to government officials to ensure the favorable processing and grant of TIPs or TIP extensions.  However, Ruehlen sometimes authorized the agent to pay Nigerian government officials without first obtaining approval from the CFO, in violation of Noble policy.

41.     After the customs agent completed the work and paid the bribes as directed, the agent sent Ruehlen and Noble-Nigeria its invoice.  Ruehlen then would process and approve the invoice for payment, thereby reimbursing the customs agent for the bribes it had paid government officials, in order to obtain TIPs and TIP extensions, and assist Noble to continue doing business under contracts.  Ruehlen would also, at times, sign the check that reimbursed the agent for the bribes paid to government officials at his, Noble's, and Noble-Nigeria's request.

42.     From about January 2003 through about May 2007, Noble and Noble-Nigeria employees, including at times Ruehlen and Jackson, authorized the agent to pay bribes and reimbursed the agent for the bribes paid to Nigerian government officials on their behalf to process eleven illegitimate TIPs with false paperwork.  The NCS actually issued to Noble-Nigeria eight of those eleven illegitimate TIPs.

43.     To obtain the eight false paperwork TIPs, Noble and Noble-Nigeria employees, including at times Ruehlen and Jackson, paid the customs agent at least $79,026, which the agent specifically labeled on its invoice as "special handling" charges.  Jackson and Ruehlen knew that

the "special handling" charges were payments that the customs agent made to government officials, at their, Noble's, and Noble-Nigeria's request, to induce Nigerian officials to process and grant the illicit false paperwork TIPs.

44.    Noble and Noble-Nigeria employees, including at times Ruehlen and Jackson, made additional payments of $180,326, which Defendants understood to be unreceipted payments to Nigerian government officials, or bribes, but which the customs agent invoiced as "procurement of new TIP."  Jackson and Ruehlen knew that the "procurement" charges were payments that the customs agent made to government officials, at their, Noble's, and Noble-Nigeria's request, to induce the officials to process and grant the illicit false paperwork TIPs.

45.    With respect to the three remaining false paperwork TIPs that Noble-Nigeria sought, Noble and Noble-Nigeria officials, including Ruehlen, based on Jackson's previous approvals and other actions, authorized the customs agent to pay bribes to Nigerian officials to secure these three false paperwork TIPs in 2007.  The customs agent then obtained, through bribes paid at Ruehlen's, Noble's, and Noble-Nigeria's request to Nigerian officials, false bond cancellations and other false documents purporting to show the export of the three rigs.  The customs agent then invoiced Noble-Nigeria for reimbursement of the "special handling" charges, or bribes totaling about $50,000.  Because Noble's Audit Committee, in or about May 2007, had begun an internal investigation into payments to government officials in Nigeria for TIPs and TIP extensions, the invoices ultimately were not paid.

46.    In addition to obtaining TIPs with false paperwork, Noble and Noble-Nigeria employees, including at times Ruehlen and Jackson, paid bribes, through the customs agent, to Nigerian government officials to obtain discretionary or unlawful extensions of these TIPs. From January 2003 through May 2007, Noble-Nigeria obtained about thirty-two TIP extensions:

about fifteen first extensions; about twelve second extensions; about four third extensions; and one fourth extension.  The bribes Noble authorized and Noble-Nigeria paid, through the customs agent, after July 2004 for first and second TIP extensions totaled about $231,098.  The bribes for the third extensions totaled about $137,942.  The bribe for the fourth extension totaled about $54,688.

47.     Through their illicit payments to Nigerian government officials, Noble and Noble-Nigeria retained business under lucrative drilling contracts, obtained profits from operating rigs in Nigeria, and avoided paying permanent import duties on its rigs.  Noble also avoided the operational costs of moving its rigs, and avoided possible breaches of drilling contracts.

III.    **Defendants Jackson and Ruehlen Knew Noble-Nigeria Paid Bribes to Obtain Unlawful False Paperwork TIPs and TIP Extensions**

48.     In 2003 and 2004, several events occurred that caused Defendants Jackson and Ruehlen to learn, if they did not already know, that Noble-Nigeria paid bribes to Nigerian government officials through its customs agent to obtain extensions and false paperwork TIPs.

A.     **In 2003, Nigeria Penalized Noble-Nigeria for TIP Violations, Including the Use of False Paperwork**

49.      In or about February 2003, Jackson and others learned from correspondence with a Noble executive that the Nigerian government had assembled a panel to investigate abuses of the TIP regime.  The panel came to be known as the "Panel of Inquiry."

50.     In or about February 2003, Jackson and others also learned from correspondence with a Noble executive that the Panel of Inquiry had found evidence that Noble-Nigeria violated the law by, among other things, preparing false documents showing export and re-import of rigs to obtain new TIPs when the rigs did not actually move.

14

51.     On or about February 24 and 25, 2003, NCS and the Panel of Inquiry demanded Noble-Nigeria pay a penalty of 31,000,000 Naira for its violations.  Jackson and others knew of the assessed penalty and that it related, in part, to the use of false paperwork to obtain TIPs. Jackson also knew that Noble-Nigeria paid the penalty.

**B.**     **In 2004, an Internal FCPA Audit and Review of Payments to Government Officials Revealed Poor Internal Controls and Large Payments for TIPs and TIP Extensions**

52.     In or about January 2004, Noble's internal audit group conducted a company-wide audit of compliance with the Foreign Corrupt Practices Act ("FCPA Audit").  The final FCPA Audit Report was dated January 15, 2004.  Jackson received it and understood its findings.

53.     The FCPA Audit found, among other things, that Noble-Nigeria employees did not fully understand the FCPA, did not comply with Noble's FCPA policies and procedures concerning unreceipted payments to foreign government officials, did not get proper approvals before making unreceipted payments to foreign government officials, and did not properly record such payments in Noble-Nigeria's accounts.

54.     As a result of these findings, Noble-Nigeria reviewed its account relating to unreceipted government payments.  The review revealed that in 2003 Noble-Nigeria made payments to Nigerian government officials totaling about $666,983, of which all were improperly recorded.  Jackson received the results of the review and therefore knew that of the improperly-recorded payments, TIP-related payments accounted for only 4% of the number of payments, but about 82% of the total dollars.  Jackson also understood from the review results that the TIP-related payments were payments made to Nigerian government officials.

55.     At the end of January 2004, Jackson also tasked his Tax Manager with reviewing worldwide customs and tax issues, including issues related to TIPs and TIP extensions for Noble's rigs.  In this context, Jackson learned that TIPs usually last only 18-24 months total, could be "renewed on merit," but that it was "not automatic."  Jackson learned that the Nigerian government had discretion to grant or deny TIPs and TIP extensions because there was no certainty that the government would renew or extend TIPs.  Jackson also learned in this context that the Nigerian government had denied a TIP renewal at least once.

56.     Jackson also learned during the customs and duties review he requested that Noble paid significant "handling fees" to obtain TIPs and TIP extensions, and that Noble was abusing the TIP regime in Nigeria by wrongfully obtaining TIPs and TIP extensions for rigs that were stacked with no specific contract.

57.     Jackson and others knew that the unreceipted TIP payments to government officials – highlighted by the 2004 FCPA Audit, the review of payments made to government officials in 2003, and the Tax Manager's review of customs and duties requested by Jackson – created a risk of FCPA violations.  As a result, Noble and Noble-Nigeria drafted a Service Agreement to be signed by its customs agent requiring all the agents' invoices to clearly (1) indicate the services rendered, (2) distinguish between service fees payable to the agent and any charges, taxes, duties or fees payable to any third party such as the Nigerian Government, and (3) support all charges with adequate backup documentation including third-party invoices.  However, the customs agent refused to sign this Agreement because it made unreceipted payments to government officials and, by definition, could not support each item on its invoices with backup documentation.

58.     To address the customs agent's concern, Noble and Noble-Nigeria revised the Agreement.  The revised Service Agreement provided that the invoices must "clearly distinguish between service fees payable to [the agent] (including any amounts reimbursing [the agent] for the actual amount of any special handling fee payment made by [the agent], provided that [the agent] had sought and obtained Noble-Nigeria's prior written authorization to make any such payment ('Special Handling Fee')) and charges, taxes, duties or fees payable to any third party … on Noble-Nigeria's behalf (such as customs duties or port authority fees)."  The revised Service Agreement still required adequate backup documentation, but provided that the "invoices need not be accompanied by backup documentation supporting a Special Handling Fee authorized in advance in writing by Noble-Nigeria."  Noble-Nigeria and the customs agent executed the revised Service Agreement on July 20, 2004.

59.     Noble's FCPA policy required all payments to government officials to be approved in writing and in advance by Noble's CFO, which was Jackson during much of the relevant time.   Thus, before Noble-Nigeria could provide advance written authorization to the customs agent to make the unreceipted payments to government officials to obtain TIPs and TIP extensions – the "Special Handling" payments defined in the Service Agreement – Noble's CFO had to provide Noble-Nigeria with his prior written approval.

60.     From July 2004 onward, Jackson, Ruehlen, and others understood that "special handling" charges were unreceipted payments to Nigerian government officials – not customs duties or port authority fees or agent service fees under the Service Agreement – that required CFO review and approval in writing.

61.     The 2004 FCPA Audit report also prompted Noble to update its Administrative Policy Manual ("APM") in sections addressing FCPA policy.  An FCPA Audit action item called

for a "dedicated" FCPA section in the manual and for a document entitled "Compliance with the United States Foreign Corrupt Practices Act," in use since 2002, to be incorporated fully into the manual.  Revisions to the manual were completed and published no later than May 2004.

62.     Noble's FCPA policy as set forth in the APM generally defined "facilitating payment" as "a small payment to assure or speed the proper performance of a foreign official's duties that does not involve a discretionary action by such official."  By its terms, the definition excludes large payments, all payments connected with discretionary acts, and all payments to induce foreign officials to process and approve false documents.

63.     The document entitled "Compliance with the United States Foreign Corrupt Practices Act" in the APM set forth that "[o]ne exception applies to payments made to expedite or secure the performance of a routine governmental action …. However, only the following actions that are ordinarily and commonly performed by a foreign official are considered 'routine government actions': · obtaining permits, licenses or other official documents to qualify a person to do business in a foreign country; · processing government papers, such as visas and work orders; · providing police protection, mail pick-up and delivery, or scheduling inspections associated with contract performance or inspections related to transit of goods across the country; · providing phone service, power and water supply, loading and unloading cargo, or protecting perishable products or commodities from deterioration; or · actions of  a similar nature."  It further stated that the "[f]ollowing are warning signs: · Your agent has a questionable reputation or a relationship with the government or a foreign official. · The party with whom you are contracting objects to the language in your contract restricting any illegal payments; … · You are asked to use irregular invoicing procedures;  · You are asked to make significant bonus

payments or the commission demanded is above that which is customary; · The country in question has a reputation for bribes."

64.     Noble's FCPA policy advised all employees having questions about FCPA compliance or needing additional guidance on the issue to contact Jackson.

### C.     In 2004, an Internal Audit of the West Africa Division Revealed the Use of False Paperwork to Obtain an Additional TIP

65.     Shortly after the FCPA Audit and while the review of unreceipted payments to government officials and the review of customs and duties were underway, Noble's internal audit group audited Noble-Nigeria's operations and performed a follow-up check on its FCPA compliance ("2004 West Africa Division Audit").  Ruehlen was on the audit team.  He conducted field work in Nigeria and helped to draft the audit report, a copy of which was provided to Jackson, among others.

66.     In the course of Ruehlen's audit work, on or about February 13, 2004, Ruehlen learned that the West Africa Division in 2003 made a large number of payments to government officials that were not properly reported, most of which related to TIPs.  Ruehlen also learned that payments to obtain new TIPs were large, averaging approximately $75,000 every two years.

67.     In or about February or March 2004, Ruehlen also learned that Noble-Nigeria used a customs agent to secure TIPs and that a TIP was valid for twelve months but could receive up to two six-month extensions.  Ruehlen learned that rigs have to be physically exported after two years.  He also learned that Noble-Nigeria did not physically export its rigs, but instead obtained new TIPs using false paperwork accompanied by payments to government officials.

68.     On or about March 22, 2004, Ruehlen summarized some of his conclusions in an email to the head of internal audit:

"**Finding 10 – Temporary Imports**

The Rigs are temporarily imported into Nigerian waters to work based on the existence of a contract between an Oil company operating in Nigeria and Noble. The temporary import permit is valid for 12 months.  After completion of the 12 month period a request for an extension can be granted for an additional 6 months.  At the end of the first six month extension a second extension can be requested and granted for a total period of 24 months.  After the 24 month period has been completed the rig is required to leave Nigerian waters within 90 days. After review of the paperwork associated with the temporary import process for the Noble Tommy Craighead it was noted that the rigs are being exported on paper but in fact never leave Nigerian waters.  Paperwork is prepared showing that the rig was cleared from a Nigerian Port by the Nigerian Customs Service. As part of the Temporary Import Permit process a bank bond is to be secured for the amount of duties that would be required as payment if the temporary import bond is not executed properly.  This bank bond is only valid for the 24 month period that the rig is allowed in the country.  Once the 24 month period has expired the Import bond is no longer valid.  After approximately a two month period the Operations manager will initiate a request to import the rig back into Nigerian waters.  This request is expedited with the assistance of a Nigerian company that specializes in Temporary Imports.  This company also assists with extensions and export of the rigs when requested by Noble.  The fee for their assistance in securing the temporary import permit is approximately USD 75,000 per rig paid every two years

The rigs are being imported and exported under false pretenses.  The system in place seems unworkable and places Noble at risk of incurring fines for the improper use of the temporary import permit system.  During the audit it was noted that Noble paid a penalty to the Nigerian Customs Service for supplying insufficient documents for four rigs that were temporarily imported into Nigeria during the period between the years 1990 and 1993.  The amount of the fine was a total of Naira 31,000,000 ($225,000 at N135 to USD 1)."

69.     Ruehlen thus described the routine use of false paperwork to obtain TIPs for all of Noble's rigs in Nigeria.  Indeed, in or about January and February 2004, Noble-Nigeria had just obtained two new TIPs using false paperwork.  Noble-Nigeria gave its customs agent 9,975,000 Naira per rig to obtain the illegal TIPs, and received no documentation or support for the payments.  Noble-Nigeria employees understood that a portion of the payments went to Nigerian officials to ensure that the false paperwork was processed and the illegal TIPs granted.

70.     Ruehlen's email also described that Noble-Nigeria was paying about $75,000 every two years to the customs agent for false paperwork TIPs.  Ruehlen knew the penalty Noble-Nigeria paid to NCS in 2003 for improper TIP paperwork and stated that Noble-Nigeria was using "false pretenses" to obtain TIPs and at the risk of additional fines for the improper use of the temporary import permit system.

71.     However, the final 2004 West Africa Division Audit Report, completed by Ruehlen and others on or about April 12, 2004, falsely implied that the use of false paperwork was not a recurring practice, but rather was a one-time occurrence.  The report omitted mention of any payments to government officials, omitted to state that Noble-Nigeria's unreceipted TIP-related payments comprised about 82% of the Division's total government payments in dollars in 2003, but only 4% of the total number of payments, and omitted the fact that Noble-Nigeria had been penalized by the Nigerian government for the use of false paperwork in connection with TIPs.  Jackson and Ruehlen knew these facts, and they knew that the 2004 West Africa Division Audit Report omitted them.

72.     In describing the TIP process in Nigeria, the final 2004 West Africa Division Audit Report did inform: "Noble's rigs are temporarily imported into Nigerian waters based on the existence of a contract.  The Temporary Import Permit is valid for twelve months, after which requests for extensions *may* be granted.  Per the terms of the permit, after a 24 month period has been completed, the rig is required to leave Nigerian waters within 90 days; however information obtained from PricewaterhouseCoopers Lagos, Nigeria's office disclosed that additional renewals of the temporary import license *may* be obtained *as long as the Company can justify continued use of the rigs in Nigeria*." (emphasis added).

73.     Jackson received drafts of the 2004 West Africa Division Audit Report, and the final version.  By no later than April 2004, Jackson and Ruehlen knew that obtaining TIPs through false paperwork and unreceipted payments to foreign officials was wrong, unlawful, and a violation of Noble's policy to comply with all laws and regulations.  They also knew that a TIP extension was granted based on discretion exercised by NCS government officials and that it required convincing those officials that continued use of a rig in Nigeria was justified.

74.     The Audit Committee of Noble's Board of Directors and Noble's independent auditors received the final 2004 West Africa Division Audit Report.  The report highlighted the finding about a false paperwork TIP as a significant area for control and process improvements.

75.     On April 20, 2004, the Audit Committee of Noble's Board of Directors met and considered the 2004 West Africa Division Audit Report.  The Audit Committee made clear that it was concerned about the use of false paperwork and expected no recurrence.  Jackson was present at the meeting.

76.     Jackson and Ruehlen understood that the Audit Committee and the independent auditors incorrectly believed that Noble-Nigeria had used false paperwork to obtain TIPs only once, and that the Committee and auditors had not been told that Noble-Nigeria paid bribes, through its customs agent, to obtain illicit false paperwork TIPs.

77.     Jackson and Ruehlen knew that using false paperwork to obtain TIPs would contravene the expectations and the instructions of the Audit Committee.  At an Audit Committee meeting on or about July 22, 2004, the head of internal audit informed the committee that the TIP issue was resolved because the West Africa Division would no longer use false paperwork, but would physically export and re-import the rigs as necessary and required by Nigerian law.  In recognition of NCS's discretion to deny extensions even if the rig is under

contract, the resolution to the TIP finding stated: "In the future, when the Nigerian Customs Service requests that a new TIP be executed, as opposed to an extension of an existing TIP, the Division has identified a free trade zone whereby export and re-import can be properly and legally performed." Jackson attended the meeting, was aware of the resolution, and knew that false paperwork would no longer be used to obtain TIPs.

### D.   Noble-Nigeria Paid NCS Officials to Grant Discretionary Third Extensions and Sought Alternatives to Exporting and Re-Importing Rigs

78.     In or about late July 2004, Noble-Nigeria began to explore the possibility of obtaining third extensions for two rigs. NCS could grant third extensions at its discretion. Ruehlen began working in Nigeria during the summer of 2004 and participated in seeking the third extensions. As a result of the TIP finding in the 2004 West Africa Division Audit Report and the resolution, Noble and Noble-Nigeria employees, including Ruehlen, understood that such extensions were discretionary.

79.     On or about July 29, 2004, Ruehlen received the customs agent's proposals for obtaining third extensions for two rigs. The proposals stated that third extensions would require 5,000,000 Naira each in "special handling" charges and 350,000 Naira in customs agent fees.

80.     Ruehlen knew that a second extension required a "special handling" charge of only 1,600,000 Naira and thought that the 5,000,000 Naira "special handling" charge for a third extension was excessive. Despite his concern, Ruehlen instructed the agent to get the third extensions for the two rigs.

81.     On or about August 9, 2004, Noble-Nigeria and Ruehlen received the customs agent's invoices for the third extensions. The high cost of the extensions caused Ruehlen to check with another customs agent and to investigate converting the rigs to permanent import status. On or about August 17, 2004, Ruehlen reported to the Vice President of Eastern

Hemisphere Operations that another customs agent confirmed that additional extensions would require "exorbitant amounts" and that exporting and re-importing rigs for new TIPs would entail at least 30 days off production and other difficulties. Ruehlen stated that he was investigating converting the rigs to permanent import status and that the import duties associated with conversion could be less than the "exorbitant" and escalating costs of additional extensions.

82.     In or about August 2004, Noble-Nigeria's Operations Manager told Ruehlen that he did not have a good feeling about the customs agent, who was requiring payment of 5,000,000 Naira in "special handling" for the third extensions, and recommended no further involvement with the agent. The Operations Manager told Ruehlen that "the way the[y] work is not sound and above the table."

83.     Despite concerns over the exorbitant payments to government officials and the integrity of the customs agent, Noble-Nigeria sought Jackson's approval to pay the invoice for the two third extensions. The request for approval dated August 30, 2004 made clear that the 5,000,000 Naira payment per rig was "special handling" to government officials, would have no receipt or backup documentation, and required CFO approval under Noble's FCPA policy. The request also reminded Jackson that "renewals are for six months at a time," that the special handling cost of the third extensions/renewals was so high that they were "driven to investigate the ramifications of simply paying the duty," and that the high 5,000,000 Naira payment was "required to make [the renewal] happen."

84.     Jackson approved payment of the "special handling" charges on or about August 31, 2004.

85.     In or about September 2004, Noble-Nigeria paid the 5,000,000 Naira per rig "special handling" charges and booked them as legitimate operating costs, which they were not.

86.     On or about September 8, 2004, Ruehlen received copies of the two third extensions.  The extensions specifically stated that NCS would grant no more extensions and that the rigs must be exported on or before February 22 or 28, 2005, or be subject to forfeiture.

87.     As of September 8, 2004, Ruehlen knew that NCS required the two rigs to be exported at the conclusion of the extensions or be converted to permanent import status.

88.     From August 2004 to about early February 2005, Ruehlen continued to investigate alternative ways to keep Noble's rigs in Nigeria.  On September 17, 2004, Ruehlen received a written legal opinion on the implications of converting the rigs to permanent import status.  The legal opinion stated that items imported on a temporary basis must be exported at the end of the import period or be subject to fines and forfeiture.  It also stated that the Nigerian Government was concerned about abuses of the temporary import process, noted the earlier Panel of Inquiry, and advised Noble-Nigeria to comply with all temporary import requirements before considering conversion to permanent import status.

89.     In December 2004, Ruehlen had Noble-Nigeria ask its customs agent about getting fourth extensions for two rigs, as well as getting a third extension for another rig.

90.     Ruehlen received the customs agent's response in January 2005.  The customs agent told Ruehlen that the third extension would again cost 5,000,000 Naira in "special handling" charges and 350,000 Naira in customs agent fees.  The customs agent told Ruehlen that authorities at NCS stated that no fourth extensions would be granted.  The customs agent recommended exporting and re-importing the rigs to obtain new TIPs.

91.     In February 2005, Ruehlen learned that NCS would not grant a discretionary third extension because that rig was operating under a different drilling contract than the contract used to get its original TIP, in violation of the TIP's terms.

IV.     **Defendants Jackson and Ruehlen Resumed the Use of False Paperwork and Authorized and Paid Bribes to Obtain New TIPs with False Paperwork**

92.     To retain business under drilling contracts and avoid the loss of profits and other costs associated with moving rigs in and out of Nigeria, Ruehlen decided in February 2005 to resume the use of false paperwork to obtain new TIPs for three rigs and to pay Nigerian government officials through the customs agent to process the false paperwork and grant the TIPs.  Ruehlen did so knowing that obtaining TIPs through false paperwork and making related payments to government officials was prohibited, unlawful, and against Noble policy.  Ruehlen did not seek approval from legal counsel or the Audit Committee before resuming the use of false paperwork or before making the related illicit payments.  He did not inform legal counsel or the Audit Committee about the resumption and payments before May 2007.

93.     On or about February 7, 2005, Ruehlen requested a price proposal to obtain the three new false paperwork TIPs.  The customs agent told Ruehlen that "procurement" of each TIP would cost 5,000,000 Naira and that there would be "special handling" charges of 1,900,000 Naira for each rig associated with showing the outward and inward "movement" of each rig. The agent's price proposal also showed that it would make payments to the Nigerian Port Authority ("NPA") and National Maritime Authority ("NMA") and pay husbandry charges at Cameroon offshore.  Because the rigs would not move or leave Nigerian waters, Ruehlen and others understood that the NPA, NMA and Cameroon offshore charges and receipts would be secured through payment of the "special handling charges," or bribes.  Ruehlen also understood that the 5,000,000 Naira "procurement" charge to procure the TIP for each rig was the equivalent of "special handling" payments to government officials.

94.     Between February 21 and 28, 2005, Ruehlen authorized the customs agent to use false paperwork and make all the payments to government officials outlined in the price proposal

to obtain the TIPs.  Between February 21 and 28, 2005, Ruehlen prepared and signed the TIP applications for the three rigs and arranged to have the customs agent pick up the application materials for submission to NCS.  These TIP applications falsely represented that the rigs were outside of Nigeria awaiting import when they were not.

95.     On or about February 25, 2005, Ruehlen e-mailed the Vice President of Eastern Hemisphere Operations that he had decided to resume the use of false paperwork and related payments to government officials to obtain TIPs.  Ruehlen said that NCS had denied Noble any further extensions for the three rigs and asked Noble-Nigeria to export and re-import the rigs to obtain new TIPs.  Ruehlen said that the customs agent told NCS that the rigs could not be moved because they were still under contract, but that NCS nevertheless denied the requested fourth extensions for two of the rigs.  In addition, Ruehlen said that the other rig could not get a third extension because it was operating under a different contract from the one used to obtain its original TIP.  Ruehlen said that "[t]he sum of all this is that we reexport [sic] the three rigs from Nigeria to Cameroon.  The rigs would than [sic] be reimported [sic] into Nigeria on new Temporary Import Bonds.  The rigs would be shown on paper as leaving Nigeria and than [sic] reimported [sic] 20 to 30 days later."  Ruehlen gave the Vice President the customs agent's price proposal and highlighted that paying "special handling" charges would be necessary.  Ruehlen also said that he had received confirmation from other contractors in Nigeria that fourth TIP extensions are not allowed.

96.      Ruehlen received no written response from the Vice President of Eastern Hemisphere Operations.

97.     The customs agent began the false paperwork for the three rigs in late February 2005.  The customs agent asked NCS to cancel each rig's bond.  NCS granted those requests by

notice dated March 1, 2005.  The "Cancellation of Bond" notice stated that the cancellation was based on "evidence" that the rigs had been exported through the Calabar Port.  Because the rigs did not move and were not exported, the documents presented to NCS were false and were processed illicitly through the payment of bribes.  Ruehlen and Noble-Nigeria authorized the payment of the bribes when they authorized the payment of "special handling" charges.  Ruehlen knew that such charges would be undocumented payments to government officials in connection with false paperwork.  Ruehlen also knew that NCS would not have granted the bond cancellations or processed the false evidence of rig export without payment of these bribes.

98.     By late March 2005, Ruehlen and Noble-Nigeria had for each of the three rigs: (1) authorized the customs agent to secure a TIP with false paperwork and payments to government officials; (2) prepared and submitted the TIP application that falsely represented that the rig was outside of Nigeria awaiting import when it was not; (3) completed the export portion of the false paperwork; and (4) obtained the bond cancellation.

99.      On or about March 30, 2005, Ruehlen informed the head of internal audit that he had resumed the use of false paperwork and payments to government officials to obtain TIPs.  Following this conversation, Ruehlen prepared a memorandum justifying his use of false paperwork.  Ruehlen sent it to the head of internal audit on or about March 31, 2005.  However, Ruehlen backdated the memorandum to February 10, 2005 ("Backdated Memo").  Ruehlen's backdating made it appear that he had notified internal audit before resuming the use of false paperwork, rather than after he had authorized the customs agent to obtain false paperwork TIPs and pay bribes.

100.     In his Backdated Memo, Ruehlen stated that:  (1) NCS had denied Noble-Nigeria's request for a fourth extension, and fourth extensions were not allowed; (2) NCS

required Noble-Nigeria to export and re-import rigs, even if they were still on contract; (3) Noble-Nigeria required a new TIP for rigs that might otherwise be eligible for an extension, if they were under a new contract; (4) exporting and re-importing the rigs would be costly and impractical because the rigs would be off-contract for up to 30 days; and (5) Ruehlen had decided the best way to maintain drilling under contracts was to use false paperwork to obtain the new TIPs.

101.    In his Backdated Memo, Ruehlen also informed the head of internal audit that converting the rigs to permanent import status was "not practical" or economical in part because "all cost implications are not transparent."

102.    In his Backdated Memo, Ruehlen stated that Nigerian law "does not allow for a rig to be on temporary importation in Nigeria for more than two and one-half years at a time and only temporarily imported for one contract period."  Ruehlen stated that the two and one-half year time period directly conflicted with the typical two-to-five year period of a drilling contract. Ruehlen stated, "[t]his situation has been exploited by the customs authority and used to pressure contractors into paying a high price to maintain the rigs in country for contract duration in excess of two and one half years."  Ruehlen said that moving a rig out of Nigeria every two and one half years was "not feasible" because the process would take "four to six weeks at best" and the parties to the drilling contract would not accept a rig being off contract for that long.

103.    In the Backdated Memo, Ruehlen stated that the customs agent required "special handling" charges to obtain false paperwork TIPs, and he attached the price proposal from the customs agent.

104.    On or about April 26, 2005, the customs agent sent Ruehlen the invoices for the three false paperwork TIPs.  Each invoice itemized "special handling" charges in the amount of

1,900,000 Naira that the customs agent had paid to government officials at Ruehlen's and Noble-Nigeria's request and authorization to obtain the false paperwork TIPs. The false documents showed the rig's movement out of and back into Nigerian waters, even though the rig never moved. Attached to the invoice were receipts dated between March 2 and 10, 2005 from the Nigerian Port Authority and the National Maritime Authority evidencing "export" of the rigs through the port of Calabar. Because the rigs never moved, these receipts and other false evidence of "export" were obtained through Noble's and Noble-Nigeria's illicit payments to government officials—the "special handling" charges authorized by Ruehlen.

105.    On May 9, 2005, NCS granted Noble-Nigeria new TIPs for the three rigs procured through false paperwork and payment of "special handling" charges. NCS expressly conditioned the TIPs on eleven action items, which included providing NCS with the date of importation, completing certain government forms including the Form Sale 33 and other documents evidencing importation of the rig and its value, promising not to allow the rig to be sold or kept in Nigeria for hire or reward, obtaining a bank bond for the full value of the duties owed, and exporting the rig within twelve months of importation.

106.    Having received the TIPs and the invoices for the "export" portion of the false paperwork TIPs, Ruehlen sought Jackson's approval on or about May 16, 2005 to pay the "special handling" charges of 1,900,000 Naira for each rig. According to Noble's policies and procedures, Jackson was responsible for reviewing and approving all payments to government officials. Ruehlen had violated policy by failing to obtain Jackson's approval for "special handling" charges before authorizing the customs agent in February 2005 to make the payments.

107.     Jackson responded to Ruehlen's request on or about May 17, 2005, stating that he was "OK with approving," but wanted the head of internal audit to clarify the 2004 West Africa Division Audit's finding concerning a false paperwork TIP and subsequent resolution.

108.     The head of internal audit e-mailed Ruehlen and Jackson on or about May 17, 2005, summarizing the 2004 West Africa Division Audit finding, as well as the resolution presented to the Audit committee, stating that Noble-Nigeria would not use false paperwork and would physically export the rigs to obtain new TIPs.  The head of internal audit told Jackson that "customs has refused to extend the current import permits thus [sic] we are attempting to re-import the rigs under new permits."  The head of internal audit then asked Ruehlen to explain why he had decided to resume the use of false paperwork and payments to government officials in contravention of the resolution.

109.     The same day, Ruehlen sent his explanation to both the head of internal audit and Jackson.  Ruehlen stated that physically exporting and re-importing the rigs was not feasible because the rigs would be off contract for at least four to six weeks, plus tow time.  Ruehlen explained that such a long time off-contract would be costly and might lead to cancellation of contracts.  Ruehlen stated: "The only way to keep the rig working on contract and get the new temporary import document in place is to use the method of exporting and importing the rig on paper while in fact the rig does not leave Nigerian waters."   Ruehlen added that other drilling contractors used the same method.

110.     In late May 2005, Ruehlen and other Noble-Nigeria employees took steps to pay the customs agent's invoices for the three false paperwork TIPs.  Ruehlen signed a check, dated May 18, 2005, paying the invoice, including the "special handling" charges.

111.    In violation of Noble policy, Ruehlen had not received Jackson's approval before he signed the check and processed payment of the "special handling" charges.

112.    On May 25, 2005, Jackson confirmed his approval to the head of internal audit, who conveyed the approval to Ruehlen.  On or about May 25, 2005, Noble-Nigeria, with Ruehlen's and Jackson's knowledge and approval, posted the "special handling" charges to accounts for legitimate operating expenses, causing Noble's books and records to be false.

113.    Jackson approved the "special handling" payments, and Ruehlen reimbursed the agent for the payments, to ensure that Noble and Noble-Nigeria retained business under drilling contracts, even though they knew that using false paperwork to obtain TIPs was wrong, violated Nigerian law, and was against Noble policy.

114.    Neither Jackson nor Ruehlen informed the Audit Committee or any member of the Board of Directors that they had resumed using false paperwork to obtain TIPs or that they made related illicit payments to government officials.

115.    On or about May 25, 2005, Ruehlen and Jackson agreed on a plan to streamline the approval process for Noble-Nigeria's numerous, typically small, and almost daily payments to government officials.  Having centralized all financial responsibility for Noble-Nigeria in his office, Ruehlen knew what Noble-Nigeria was paying to government officials.  Under the plan, Ruehlen would send Jackson a quarterly report detailing the prior quarter's payments to government officials, and also requesting blanket pre-approval of payments in the current quarter under a projected cumulative total.  TIP-related payments were included in the report of prior quarter payments, but would not receive blanket pre-approval.  Jackson and Ruehlen knew that "special handling" charge payments to government officials for TIPs and extensions were large, unusual, non-routine payments that required separate and specific approvals.

116.    In or about September 2005, Ruehlen received the final invoices for the import portion of the three false paperwork TIPs.  These invoices each contained a "procurement" charge in the amount of 5,000,000 Naira.  This "procurement" charge was not supported by documentation, and Ruehlen understood that it was for payments to government officials to obtain false paperwork TIPs, equivalent to "special handling" charges.  Each invoice also contained line-items for port charges in Cameroon, charges for the "certificate of clearance," Nigerian Port Authority "inward charges," National Maritime Authority "inward charges," and Intels royalty charges for the outward and inward "movement" of the rigs.  The customs agent's agency fee was 500,000 Naira and the VAT on the agency fee was 25,000 Naira.  Because the rigs never moved, the receipts and other documents showing "import" were false and obtained through bribes to government officials that Ruehlen authorized in February 2005.

117.    On or about September 16, 2005, Ruehlen asked Jackson to approve payment of the 5,000,000 Naira per rig "procurement" charge.  Ruehlen told Jackson that the 5,000,000 Naira charge per rig was a "special handling" charge and that the total "special handling" charges were about $112,000 for all three rigs together.

118.    Jackson approved payment of the "special handling" or "procurement" charges on September 16, 2005.  Jackson understood that the charges were for payments to government officials to obtain TIPs through false paperwork and to retain drilling contracts.

119.    In late September 2005, Ruehlen signed a check dated September 21, 2005 paying the invoices, including the "procurement" payments to government officials to obtain false paperwork TIPs.  Noble-Nigeria, with Ruehlen's and Jackson's knowledge and approval, improperly booked the payments as legitimate operating expenses, which caused Noble's books and records to be false.

33

**V.    Defendants Jackson and Ruehlen Continued to Authorize and Pay Bribes to Obtain False Paperwork TIPs and TIP Extensions**

120.    On or about May 16, 2005, the customs agent notified Ruehlen that a rig's second TIP extension was about to expire.  The agent sent a price proposal for obtaining a discretionary third TIP extension.  The proposal showed two charges: 5,000,000 Naira in "special handling" charges, and 350,000 Naira in agency fees.  Without CFO pre-approval and in contravention of Noble's policy, Ruehlen told the customs agent to seek the third extension and pay government officials to ensure the favorable processing and grant of the discretionary third extension.  Ruehlen prepared and signed the extension application on or about May 18, 2005.

121.    On June 13, 2005, NCS granted the third TIP extension, which on its face stated that it was the last and final extension.  NCS directed Noble-Nigeria to export the rig or pay permanent duties on or before December 10, 2005, or risk forfeiture of the rig.

122.    Ruehlen received the customs agent's invoice on or about June 22 or 23, 2005 and asked Jackson to approve the 5,000,000 Naira "special handling" charges.  Jackson approved the payment on June 23, 2005.

123.    Ruehlen processed the invoice and signed a check dated June 30, 2005, paying it in full.  Noble-Nigeria, with Ruehlen's and Jackson's knowledge and approval, improperly posted the "special handling" amount to accounts for legitimate operating expenses, which caused Noble's books and records to be false.

124.    On or about June 27, 2005, Ruehlen sent Jackson his quarterly request for blanket pre-approval of up to $45,000 for small, routine payments to government officials in the current quarter.  Ruehlen's request included detailed payments for the prior two quarters, including TIP-related payments.  The report showed that the TIP-related payments for the three false paperwork TIPs that Jackson had approved in May 2005 almost equaled the total amount of all other

payments to government officials requested for the current quarter. On or about July 8, 2005, Jackson approved the blanket pre-approval request for non-TIP related payments.

125.    Jackson became COO in March 2005, but continued to act as the CFO until a replacement was found in October 2005. As COO, Jackson was responsible for Noble's world-wide operations. After the Vice President of Eastern Hemisphere Operations left in early May 2005, Jackson also had direct supervisory responsibility for Noble-Nigeria and had regular contact with Ruehlen. Even after the new CFO was hired in October 2005, Jackson continued to know the status of rigs in Nigeria, and he knew from May 2005 through May 2007 that Noble-Nigeria sought discretionary TIP extensions and new false paperwork TIPs through illicit payments to foreign officials.

126.    In or about October and November 2005, Ruehlen requested and the new CFO approved a quarterly blanket pre-approval of non-TIP related payments to government officials up to a cumulative ceiling of $45,000 for the fourth quarter. Ruehlen's request reported that TIP-related payments for the three false paperwork TIPs, which Jackson had approved in September, alone totaled about $112,000, and all other prior quarter payments totaled less than $45,000. Ruehlen told the CFO that Jackson had approved the $45,000 level for the prior quarter. On November 17, 2005, the CFO approved Ruehlen's request, stating that his approval was based on prior spending levels.

127.    On or about November 24, 2005, the customs agent told Ruehlen that a rig's third and last extension would expire on December 10, 2005 and asked for instructions. Ruehlen told the agent to submit a price proposal for obtaining a new TIP using false paperwork. The agent's proposal included "special handling" charges of 2,200,000 Naira for the false export, and included "procurement" charges of 5,000,000 Naira for the false re-import and new TIP. On or

about December 12, 2005, Ruehlen asked the new CFO to approve the "special handling" and "procurement" charges totaling approximately $55,384.  Ruehlen told the CFO that "[t]hese payments are the same as we have paid in the past for this process."

128.    The new CFO approved the payments on or about December 12 or 13, 2005.   He based his approval in part on the fact that Jackson had previously reviewed and approved similar payments as CFO.  Neither Jackson nor Ruehlen told the new CFO that the payments were for processing false paperwork or that they violated Noble policy and Nigerian law, and were contrary to representations made to the Audit Committee in 2004.

129.    In or about December 2005, Ruehlen authorized the customs agent to obtain the false paperwork TIP and pay the proposed "special handling" or "procurement" charges. Ruehlen prepared and signed the written application for the TIP, dated December 28, 2005, which falsely represented that the rig was outside Nigeria awaiting import when, in truth, the rig was in Nigeria.

130.    In or about January 2006, Ruehlen and Noble-Nigeria received the "Cancellation of Bond" for the rig from NCS, dated January 16, 2006.  The NCS cancelled the bond based on documentary "evidence of re-exportation of the vessel" as of about December 14, 2005.   On January 24, 2006, the NCS approved Ruehlen's false TIP application dated December 28, 2005 and granted a new TIP.  As with all TIPs Noble-Nigeria had obtained, the new TIP was conditioned on several items, including completion of documents evidencing importation of the rig and the exportation of the rig within twelve months of import, and the submission of a bank bond covering the full amount of duties.   Noble-Nigeria, with the assistance of its customs agent, obtained false documents as evidence of importation and secured the bond.  Because the rig never left Nigerian waters, all evidence of export and re-import was false and obtained

36

through payment of bribes to government officials authorized and approved by Ruehlen, Noble and Noble-Nigeria.

131.     In or about January 2006, Ruehlen took steps to obtain a false paperwork TIP for another rig.  Ruehlen obtained price proposals for the "import" and "export" portions of the false paperwork from the customs agent.  These proposals included "procurement" and "special handling" charges to be paid to government officials totaling 7,200,000 Naira, or about $55,384.  On or about January 18, 2006, Ruehlen asked the CFO to approve the 7,200,000 Naira in "special handling" payments to government officials.  Ruehlen told the CFO that "[t]hese payments are the same as we have paid in the past for this process."  The CFO approved the payments on or about January 18, 2006.  The CFO based his approval in part on the fact that Jackson had previously reviewed and approved similar payments while he was CFO.  Neither Jackson nor Ruehlen told the CFO what the payments were for or that they violated Noble policy, Nigerian law, and were contrary to representations made to the Audit Committee in 2004.

132.     In or about late January or early February, Ruehlen authorized the customs agent to obtain the false paperwork TIP, including making payments to Nigerian officials to secure the illicit TIP.  He also prepared and signed the TIP application representing that the rig was outside Nigeria awaiting import, when he knew the rig was in Nigeria.

133.     On February 10, 2006, NCS issued a "Cancellation of Bond" based on false evidence of the rig's export.  On March 7, 2006, NCS granted the new TIP based on the false paperwork.  As with all TIPs Noble-Nigeria had obtained, the new TIP was conditioned on several items, including completion of documents evidencing importation of the rig and the exportation of the rig within twelve months of import, and the submission of a bank bond covering the full amount of duties.  Noble-Nigeria, with the assistance of its customs agent, then

obtained on or about May 11, 2006 the false evidence of importation and completion of the Form Sale 33.  Noble-Nigeria, with the assistance of its customs agent, also secured the bond.  Because the rig never left Nigerian waters, all "evidence" of export and re-import was false and obtained through payment of bribes to government officials authorized and approved by Ruehlen, Noble, and Noble-Nigeria.

134.    On or about May 2, 2006, Ruehlen received the customs agent's invoices for the export portion of the two false paperwork TIPs.  The invoices listed charges for "Nigeria Ports Authority" outwards, "NMA charges outwards," "Intels outwards and inwards royalty charges," and charges for preparing documents showing outward movement of the rigs.  "[S]pecial handling charges outwards/inwards" were listed on the invoice in the amount of 2,200,000 Naira for each rig.  The customs agent's fee for "clearing/shipping (outwards)" was 500,000 Naira. The VAT on the agent's fee was 25,000 Naira.  Because the rigs never left Nigerian waters, all charges, receipts, and documents evidencing their "export" were false and obtained by paying government officials bribes authorized and approved by Ruehlen, Noble, and Noble-Nigeria.

135.    On or about May 8, 2006, Ruehlen approved payment of the two invoices containing the "special handling" charges and signed the check.  On or about May 10, 2006, the check was processed by Noble-Nigeria's bank.  On or about May 19, 2006, Noble-Nigeria, with Ruehlen's knowledge and approval, improperly posted the payments to legitimate operating expense accounts, causing Noble's books and records to be false.

136.    On or about June 7, 2006, Ruehlen and Noble-Nigeria received the customs agent's invoices for the import portion of the two false paperwork TIPs.  The invoices contained charges and receipts for "towing" the rigs outward and inward, port charges during export in Cameroon, and charges for "inwards" processing by the Nigerian Ports Authority and National

Maritime Authority. The invoices also listed charges for "logistics for physical examination by all agencies." The "procurement of new Temporary Importation Permit" charge for each rig was 5,000,000 Naira and lacked any support or documentation. The agency fees for "inwards clearing" and "shipping" were 500,000 Naira, and the VAT on the agency fee was 25,000 Naira. Because the rigs never left Nigerian waters, all charges, receipts, and documents evidencing the "import" of the rigs were false and were obtained by paying government officials bribes authorized and approved by Ruehlen, Noble, and Noble-Nigeria.

137.    On or about June 20, 2006, Ruehlen approved payment of the two invoices, including the two "procurement" payments of 5,000,000 Naira. Ruehlen and Noble and Noble-Nigeria employees understood that the "procurement" charges were "special handling" payments to government officials to obtain favorable action on false paperwork. Nevertheless, Ruehlen signed the check paying the invoices on or about June 23, 2006. Between about June 27 and 29, 2006, Noble-Nigeria, with Ruehlen's knowledge and approval, improperly posted the payments to accounts for legitimate operating expenses, causing Noble's books and records to be false.

138.    In or about March 2006, the new Noble CFO resigned, and Jackson again became acting CFO with direct responsibility for reviewing and approving payments to foreign officials.

139.    On or about May 16, 2006, Jackson approved 3,000,000 Naira, or about $23,256, in payments to government officials to obtain a second TIP extension on a rig. Jackson knew when he approved the payments that they would go to government officials, would lack any documentation or receipts, and would ensure favorable NCS action on Noble-Nigeria's application for the second TIP extension. Ruehlen and other Noble-Nigeria employees paid the customs agent's invoice, including the 3,000,000 Naira in "special handling" charges. Ruehlen and Jackson knew that the 3,000,000 Naira was paid to government officials to ensure the

favorable action on the second extension.  Nevertheless, Noble-Nigeria, with Ruehlen's and Jackson's knowledge and approval, improperly posted the payments to accounts for legitimate operating expenses, which caused Noble's books and records to be false.

140.    In mid or late July 2006, Jackson received Ruehlen's quarterly request for blanket pre-approval of non-TIP related payments to government officials.  This request was for a cumulative quarterly ceiling of $50,000.  Ruehlen's request included information about all second quarter payments to government officials, including TIP-related payments.  It included the May and June 2006 payments for two false paperwork TIPs, as well as a number of other TIP-related payments from other quarters that had been amortized.  The total of TIP-related payments to government officials booked in the second quarter was approximately 12,046,673 Naira or about $93,876.  Jackson did not immediately respond to Ruehlen's request, despite his responsibility as CFO to review and to approve or deny.  In or about September 2006, Jackson permitted another Noble executive to approve Ruehlen's request.

141.    In or about August 2006, NCS granted Noble-Nigeria first TIP extensions for three rigs, and the customs agent sent Ruehlen and Noble-Nigeria its invoices.  The invoices each contained charges of 1,600,000 Naira to procure the extensions, which charges Ruehlen had previously obtained approval for, as "special handling."  Ruehlen approved payment of the invoices and signed the check dated August 25, 2006, paying the customs agent.  Ruehlen allowed Noble-Nigeria to improperly post the 1,600,000 Naira special handling payment for each of the three rigs to accounts for legitimate operating expenses, causing Noble's books and records to be false.

142.    On or about October 19, 2006, Ruehlen received a price proposal from the customs agent including "special handling" charges of 1,750,000 Naira to obtain a discretionary

third TIP extension.  The other charges on the proposal were the agent's fee of 250,000 Naira and the VAT on the agency fee of 12,500 Naira.  Ruehlen understood that the "special handling" charges were payments to government officials that would lack support or documentation. Instead of sending the price proposal to Jackson for pre-approval, Ruehlen sent it to the Noble executive who had approved Ruehlen's last quarterly blanket pre-approval request.  Ruehlen asked the executive to approve the "special handling" charge, stating that it "is in line with payments made in the past for the handling of temporary imports for this unit."  Soon thereafter, Ruehlen learned that the "special handling" charges for the third extension had been increased to 3,000,000 Naira.  Ruehlen asked the executive to approve the revised "special handling" charges, which Ruehlen estimated to equal about $23,438.  The executive did not respond to Ruehlen and did not approve the payment.

143.    Ruehlen, in contravention of Noble policy, told the customs agent to secure the discretionary third TIP extension and make the related payments to foreign officials.  On October 30, 2006, the NCS granted the discretionary third TIP extension for the rig.  The grant papers stated that this was the last and final extension and directed Noble-Nigeria to export the rig on or before May 2, 2007, or risk forfeiting the rig.

144.    On or about November 1, 2006, Ruehlen received an invoice for the discretionary third TIP extension listing three charges: (1) 3,000,000 Naira for "temporary import extension approval"; (2) 500,000 Naira for agency fee; and (3) 25,000 Naira in VAT on the agency fee.  Ruehlen still lacked approval from the CFO or any senior executive.  In contravention of Noble policy, he had Noble-Nigeria process and pay the invoice, including the 3,000,000 Naira in payments to government officials.  Payment of the invoice was posted in Noble-Nigeria's books on or about November 3, 2006.  Ruehlen understood that the 3,000,000

Naira in payments was to obtain favorable government action on Noble-Nigeria's application for a third extension.  Despite this fact, Ruehlen allowed Noble-Nigeria to improperly post the 3,000,000 Naira to accounts for legitimate operating expenses, causing Noble's books and records to be false.

145.    Noble hired a new CFO in early November 2006.  On or about November 13, 2006, Ruehlen sent the new CFO two TIP-related requests to approve payments to government officials.  One request asked the CFO to approve "special handling" charges to obtain second extensions for three rigs, which charges equaled 1,600,000 Naira, or $12,500, per rig, or a total of about $37,500 for all three rigs.  Ruehlen's request stated that the payments were the same as what had been paid in the past.  Thereafter, Ruehlen authorized the customs agent to make the payments and obtain the extensions.  Ruehlen also approved payment of the resulting invoices and allowed Noble-Nigeria to book the "special handling" payments into legitimate operating expense accounts, causing Noble's books and records to be false.

146.    Ruehlen's second TIP-related request asked the CFO to approve payment of "special handling" charges for the discretionary third extension that Ruehlen had initiated in October without pre-authorization.  However, Ruehlen stated that the "special handling" charges were only 1,750,000 Naira, not the 3,000,000 Naira that Ruehlen had previously authorized the customs agent to pay to government officials.  Ruehlen did not tell the CFO that he had unilaterally authorized and paid the "special handling" charges.

147.    After receiving these requests from Ruehlen, the new CFO raised concerns about his qualifications to approve these payments.  In or about November 2006, the CFO communicated his concerns to Jackson, who was then Noble's CEO, President and COO, a

member of the Board of Directors, and Noble's former CFO.  The new CFO continued to raise concerns about the approval process for several months.

148.    In or about November 2006, Jackson told the new CFO to rely on the advice of Noble's then-Controller, who had been the head of internal audit until September 2005.  Jackson told the CFO to approve the TIP-related payments to government officials if the Controller also approved.  Jackson knew, but did not tell the new CFO, that the then-Controller and former head of internal audit knew that Noble-Nigeria used false paperwork and large, unreceipted payments to government officials to obtain TIPs and extensions, and that he had approved such payments in the past.  Jackson took no further action on the new CFO's concerns.

149.    As a result of Jackson's instruction, the new CFO relied on the Controller's initial approval to give his own approval of Ruehlen's requests to authorize and make "special handling" charge payments.  The Controller approved Ruehlen's two November 2006 TIP-related requests, as did the CFO.

150.    In or about late January or early February 2007,[1] Ruehlen requested and received approval to pay "special handling" charges of 1,600,000 Naira, or about $12,500, for each of two first TIP extensions on different rigs.   As a result of Jackson's instruction, the new CFO approved the payments on or about February 5, 2007.  Thereafter, Ruehlen authorized the customs agent to make the payments and obtain the extensions.  Ruehlen also approved payment of the resulting invoices and allowed Noble-Nigeria to book the "special handling" charges into legitimate operating expense accounts, causing Noble's books and records to be false.

---

[1]  By the end of January 2007, the Controller had returned to his duties as the head of internal audit, but continued to give prior approvals of "special handling" charges for the new CFO.  He was the head of internal audit from January 2007 to about January 2008.

151.    In or about February 2007, Ruehlen decided to seek a fourth extension for a rig. Ruehlen knew that NCS did not grant fourth extensions, that Noble-Nigeria and others had previously been denied fourth extensions, and that the terms of the rig's third extension required Noble-Nigeria to export the rig on or before May 2, 2007.  Ruehlen hired a new customs agent to handle the fourth extension application and gave the new agent relevant documents.  The new customs agent told Ruehlen that the fourth extension would require payment of 7,000,000 Naira in "procurement" charges and an agency fee of 500,000 Naira.  Ruehlen understood that the "procurement" charges were undocumented payments to foreign officials to induce them to grant the illicit extension.

152.    On or about April 11, 2007, Ruehlen asked Noble's CFO to approve the "procurement" charges of 7,000,000 Naira, or about $54,687, for payments to government officials to obtain the fourth extension.  Ruehlen stated that Noble-Nigeria had never received a fourth extension so he had no historical cost comparison, but that the 7,000,000 Naira was similar to the cost "to renew a Temporary Import for one of the rigs."  As a result of Jackson's prior instructions, the CFO approved payment on April 11, 2007.

153.    Ruehlen was deceptive in his request for approval in that he compared the "special handling" cost of the fourth extension to the high cost of obtaining false paperwork TIPs, not to the much lower cost of obtaining extensions.  Ruehlen also omitted to tell the CFO that NCS did not grant fourth extensions as a matter of policy, that Noble and other contractors had been denied fourth extensions, and that the terms of the third extension for this rig specifically required Noble-Nigeria to export the rig on or before May 2, 2007.

154.     Following the CFO's approval, Ruehlen authorized the customs agent to get the fourth extension and make the "procurement" payments to government officials.  NCS granted the fourth extension on April 30, 2007.

155.     On or about May 22, 2007, the customs agent gave Noble-Nigeria its invoice for the fourth extension, seeking reimbursement of 7,000,000 Naira in payments to government officials, which were listed as unspecified fourth extension fees, and payment of 500,000 Naira in agency fees, and 25,000 Naira in VAT on the agency fees.  Because Noble's Audit Committee, in or about May 2007, had begun an internal investigation into payments to government officials for TIPs and TIP extensions, the invoice ultimately was not paid.

156.     In or about April 2007, Ruehlen received a price proposal from the customs agent to procure a first TIP extension for a rig.  The proposal indicated that procuring the extension would require payment of 1,600,000 in "special handling."  Ruehlen authorized the customs agent to proceed with obtaining the extension and making the related special handling payments, knowing that the payments would be made to Nigerian government officials and would be unreceipted.  NCS granted the extension on or about May 10, 2007.  The customs agent issued Noble-Nigeria its invoice dated May 22, 2007, seeking reimbursement of 1,600,000 Naira in payments to government officials.  Because Noble's Audit Committee, in or about May 2007, had begun an internal investigation into payments to government officials for TIPs and TIP extensions, the invoice ultimately was not paid.

157.     Beginning in March 2007, Ruehlen took steps to obtain false paperwork TIPs for three rigs with second extensions due to expire in May.  Ruehlen prepared and signed TIP applications for the three rigs, falsely representing that the three rigs were not in Nigeria, and he requested price proposals from the customs agent.

158.     Between about April 11 and April 16, 2007, the customs agent sent Ruehlen its price proposals, stating that there would be "special handling" charges of 2,200,000 Naira per rig for the outwards and inwards movements, and "procurement" charges of 5,000,000 Naira per rig. Ruehlen understood that the "special handling" and "procurement" charges would be undocumented and unreceipted payments to Nigerian officials to induce them to grant the improper false paperwork TIPs.

159.     On or about April 16, 2007, Ruehlen requested approval to pay 7,200,000 Naira per rig, or about $117,189 total for all three rigs, in "special handling" charges for the three false paperwork TIPs.   Ruehlen knew that these charges were for undocumented payments to Nigerian officials to induce them to grant the improper TIPs.

160.     Also in April 2007, Ruehlen authorized the customs agent to obtain the three false paperwork TIPs, and to pay government officials to process false paperwork and grant the illicit TIPs.  Ruehlen helped prepare the false paperwork.

161.     On April 25, 2007, NCS issued "Cancellation of Temporary Importation Bond" notices based on "evidence" of the three rigs being exported through Calabar port.  Because the three rigs never actually left Nigerian waters, the evidence of "export" was false, and had been obtained through bribes, authorized and approved by Ruehlen, Noble, and Noble-Nigeria.

162.     On May 4, 2007, the customs agent sent Ruehlen invoices for the export portion of the false paperwork TIPs for the three rigs.  The invoices contained charges for "NMA charges outward," "Intels royalty charges outwards," and other charges for preparing false documents showing export of the rigs.  The "special handling outwards/inwards" charges totaled 2,200,000 Naira for each rig.  The customs agent's fee for "outwards (clearing/shipping)" was 500,000 Naira per rig, and the VAT on the agent's fee was 25,000 Naira per rig.  Because the

three rigs never actually left Nigerian waters, all charges, receipts, and documents relating to their "export" were false and obtained through bribes, authorized and approved by Ruehlen, Noble, and Noble-Nigeria.

163.    Because Noble's Audit Committee, in or about May 2007, had begun an internal investigation into payments to Nigerian officials for TIPs and TIP extensions, the invoices for the export portion of the three false paperwork TIPs ultimately went unpaid.

**VI.    Defendant Ruehlen Falsified FCPA Compliance Certifications and Lied in Internal Representation Letters**

164.    In February 2007, Ruehlen received an e-mail from the head of internal audit containing a news report about prosecutions of other oil companies for violating the FCPA by paying Nigerian officials for fast customs clearance.  The head of internal audit told Ruehlen that the Audit Committee would want an FCPA update each quarter, and that he was concerned that the 2004 West Africa Division Audit resolution concerning a false paperwork TIP had not been recently reviewed.  He asked Ruehlen if the customs agent had signed an agreement to comply with the FCPA and granted Noble-Nigeria audit rights.

165.    Ruehlen looked for the agreement with the customs agent but could not find it. He obtained a draft, unexecuted copy from Noble's corporate offices.  Although the agreement required the customs agent to sign annual certifications of compliance with the FCPA, Ruehlen never obtained them.

166.    In February 2007, Ruehlen sent the customs agent a copy of the annual certification form from the draft agreement and asked the customs agent to sign certifications for 2004 and 2005.  On or about February 22, 2007, Ruehlen received the signed customs agent's certifications, which were backdated to July 13, 2005 and July 20, 2006.  Ruehlen did not tell

anyone that the certifications were backdated and passed them off as signed on the date indicated.

167.     Ruehlen also repeatedly prepared and signed quarterly representation letters to Noble's upper management falsely stating that Noble-Nigeria had: (1) complied with all Internal Audit action items and resolutions; (2) complied with Noble's Code of Business Conduct; (3) not violated any laws or regulations; and (4) not violated the Foreign Corrupt Practices Act.  Ruehlen made these representations in each quarterly letter dated from April 13, 2005 through May 3, 2007, including letters dated on April 13, 2005, July 11, 2005, October 4, 2005, January 12, 2006, April 6, 2006, July 14, 2006, October 12, 2006, January 12, 2007, May 3, 2007.  Contrary to his representations, Ruehlen knew that Noble-Nigeria kept rigs on contract by using false paperwork and paying bribes to government officials to obtain illicit TIPs and extensions in violation of an Internal Audit resolution, Noble's Code of Business Conduct, Noble's Administrative Policy Manual, and Nigerian law.

**VII.    Jackson Concealed the Use of False Paperwork and Bribes From Noble's Audit Committee and External Auditors and Signed False Certifications**

168.     Jackson knew that the use of false paperwork and bribes to obtain TIPs and extensions violated Noble policy, Nigerian law, and the resolution presented to the Audit Committee concerning the TIP finding of the 2004 West Africa Division Audit.

169.     Although Jackson had regular contact with the Audit Committee and the Board of Directors, he did not inform the Audit Committee or any board member before May 2007 that he had authorized the use of false paperwork and authorized payments to government officials to obtain illicit TIPs and extensions.

170.     From about May 2007 through June 2008, the Audit Committee conducted an internal investigation into Noble-Nigeria's operations and payments to government officials for

48

TIPs and TIP extensions.  Jackson refused to give information to investigators and resigned from the company while the investigation was ongoing.

171.    Jackson signed false annual and quarterly management representation letters to Noble's independent auditors, including on August 5, 2005, November 9, 2005, March 13, 2006, May 9, 2006, August 8, 2006, November 8, 2006, February 27, 2007, and May 9, 2007.  In these letters, Jackson falsely stated that: (1) he was unaware of any FCPA violations by Noble or its subsidiaries; (2) he was unaware of any other violations of law; (3) he had maintained effective internal controls; (4) there were no material weaknesses in internal control over financial reporting; and (5) he was unaware of any fraud or suspected fraud affecting Noble, among other things.  Contrary to his representations, Jackson knew that: (1) he had authorized the use of false paperwork and payments to government officials to obtain TIPs; (2) using false paperwork and bribes violated Nigerian law, the 2004 West Africa Division Audit resolution about TIPs presented to the Audit Committee, and Noble policies; and (3) the bribes were improperly recorded as legitimate operating expenses.

172.    From 2005 through February 2007, Jackson also signed false personal certifications as CFO and as CEO that were attached to Noble's public quarterly and annual filings, including certifications dated on August 8, 2005, May 9, 2006, August 8, 2006, November 8, 2006, February 28, 2007, and May 9, 2007.  These personal certifications falsely stated that he had disclosed to Noble's auditors and Audit Committee all significant deficiencies and material weaknesses in the design or operation of internal controls and any fraud, among other things.  In truth, he had not disclosed the use of false paperwork and bribes to obtain illicit TIPs and extensions to keep rigs on contract and retain business, or the improper booking of bribes as legitimate business expenses.

**VIII.   Defendants Jackson and Ruehlen Improperly Recorded Bribes as Legitimate Operating Expenses**

173.    Noble-Nigeria improperly recorded its payments to Nigerian government officials to obtain illicit TIPs and extensions in legitimate operating expense accounts.  These accounts consolidated into Noble's Statement of Income as legitimate operating expenses.

174.    Jackson and Ruehlen knew of and approved the improper recording of bribes as legitimate operating expenses.

175.    By causing bribes to be improperly recorded as legitimate operating expenses, Jackson and Ruehlen knowingly circumvented Noble's internal controls, knowingly created false books and records, and caused Noble's financial statements to be inaccurate.

## COMMENCEMENT OF THE ACTION AND TOLLING AGREEMENTS

176.    On or about June 1, 2007, Noble disclosed to the Commission and to the United States Department of Justice ("DOJ") that it was conducting an internal investigation into potential FCPA violations arising out of its payments for TIPs and TIP extensions.  Before June 1, 2007, the Commission was unaware of any potential FCPA violations by Noble.  The Commission thereafter commenced an investigation into potential FCPA violations by Noble and certain individuals.  The Commission commenced this action on February 24, 2012 – within five years of June 1, 2007 and within the period during which the running of any applicable statute of limitation was tolled by agreement, as set forth below.

177.    Defendant Ruehlen signed three tolling agreements entered into with the Commission, dated on or about January 6, 2011, July 15, 2011, and January 27, 2012. Defendant Jackson signed three tolling agreements entered into with the Commission, dated on or about January 7, 2011, July 12, 2011, and January 28, 2012.

178.    Each tolling agreement specifies a period of time (a "tolling period") in which

"the running of any statute of limitations applicable to any action or proceeding against

defendants authorized, instituted, or brought by … the Commission … arising out of the

[Commission's investigation of defendant's conduct], including any sanctions or relief that may

be imposed therein, is tolled and suspended."  Each tolling agreement further provides that the

defendant and any of his agents or attorneys "shall not include the tolling period in the

calculation of the running of any statute of limitations or for any other time-related defense

applicable to any proceeding, including any sanctions or relief that may be imposed therein, in

asserting or relying upon any such time-related defenses."

179.    Collectively, these agreements tolled the running of any limitations period or any

other time-related defenses alleged in this Complaint for a period of at least 290 days.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**[Jackson and Ruehlen Violated Section 30A of the Exchange Act]**

180.    Paragraphs 1 through 179 are re-alleged and incorporated by reference.

181.    By engaging in the conduct described above, Jackson and Ruehlen, who were

officers, directors, employees, or agents of Noble, a United States issuer, made use of the mails

or other means or instrumentalities of interstate commerce corruptly in furtherance of an offer,

payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to

give, or authorization of the giving of anything of value to one or more persons, while knowing

that all or a portion of those payments would be offered, given, or promised, directly or

indirectly, to foreign officials for the purposes of influencing their acts or decisions in their

official capacity, inducing them to do or omit to do any action in violation of their lawful duties,

securing an improper advantage, or inducing such foreign officials to use their influence with foreign governments or instrumentalities thereof to affect or influence any act or decision of such government or instrumentality in order to assist Noble to obtain or retain business under drilling contracts or obtain or retain business for or with, or direct business to, another.

182.    By reason of the foregoing, Jackson and Ruehlen violated, and unless enjoined will continue to violate, Section 30A of the Exchange Act [15 U.S.C. §78dd-1].

## SECOND CLAIM

### [Jackson and Ruehlen Aided and Abetted the Violation of Section 30A of the Exchange Act]

183.    Paragraphs 1 through 182 are re-alleged and incorporated by reference.

184.    Noble violated Section 30A of the Exchange Act when it authorized illicit payments to Nigerian government officials and Noble-Nigeria made the payments, through the customs agent, in order to influence or induce them to process and grant false paperwork TIPs and favorably exercise or abuse their discretion in granting extensions, in order to assist Noble to obtain or retain business under drilling contracts or obtain or retain business for or with, or direct business to, another.

185.    By engaging in the conduct described above, Jackson and Ruehlen knowingly provided substantial assistance to Noble in its violations of Section 30A of the Exchange Act.

186.    By reason of the foregoing, Jackson and Ruehlen violated, and unless enjoined will continue to violate, Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)] by aiding and abetting violations of Section 30A of the Exchange Act.

## THIRD CLAIM

### [Jackson and Ruehlen Aided and Abetted Noble's Violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B)]

187.    Paragraphs 1 through 186 are re-alleged and incorporated by reference.

188.    Section 13(b)(2)(A) of the Exchange Act requires issuers to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of their assets.

189.    Noble violated Section 13(b)(2)(A) of the Exchange Act by failing to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.

190.    Section 13(b)(2)(B) of the Exchange Act requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that a) transactions are executed in accordance with management's general or specific authorization, and b) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such payments, and to maintain accountability for assets.

191.    Noble violated Section 13(b)(2)(B) of the Exchange Act by failing to devise and maintain a system of internal accounting controls required by Section 13(b)(2)(B).

192.    By engaging in the conduct described above, Jackson and Ruehlen knowingly provided substantial assistance to Noble in its violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B).

193.    By reason of the foregoing, Jackson and Ruehlen violated, and unless enjoined will continue to violate, Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)] by aiding and

abetting violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§78m(b)(2)(A) and (B)].

## FOURTH CLAIM

### [Jackson and Ruehlen Violated Section 13(b)(5) of the Exchange Act and Exchange Act Rule 13b2-1]

194.    Paragraphs 1 through 193 are re-alleged and incorporated by reference.

195.    By engaging in the conduct described above, Jackson and Ruehlen knowingly circumvented Noble's internal accounting controls or knowingly failed to implement a system of internal accounting controls.

196.    As described above, Jackson and Ruehlen directly or indirectly falsified, or caused to be falsified, books, records, or accounts of Noble, an issuer subject to Section 13(b)(2) of the Exchange Act [15 U.S.C. §78m(b)(2)].

197.    By reason of the foregoing, Jackson and Ruehlen violated, and unless enjoined will continue to violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. §78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. §240.13b2-1].

## FIFTH CLAIM

### [Jackson Violated Exchange Act Rule 13b2-2]

198.    Paragraphs 1 through 197 are re-alleged and incorporated herein by reference.

199.    By engaging in the conduct described above, Jackson, an officer or director of Noble, violated Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2] by directly or indirectly making, or causing to be made, materially false or misleading statements, or omitting to state, or causing another person to omit to state, material facts necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with an audit, review, or examination of Noble's

financial statements required to be made by the Exchange Act or in connection with the preparation or filing of a document or report required to be filed with the Commission.

200.     By reason of the foregoing, Jackson violated, and unless enjoined will continue to violate, Exchange Act Rule 13b2-2 [17 C.F.R. §240.13b2-2].

## SIXTH CLAIM

### [Jackson Violated Exchange Act Rule 13a-14]

201.     Paragraphs 1 through 200 are re-alleged and incorporated by reference.

202.     As described above, Jackson signed false personal certifications required by the Sarbanes-Oxley Act of 2002 that were attached to annual and quarterly Noble public filings.

203.     By reason of the foregoing, Jackson violated, and unless enjoined will continue to violate, Exchange Act Rule 13a-14 [17 C.F.R. §240.13a-14].

## SEVENTH CLAIM

### [Jackson Violated Sections 30A, 13(b)(2)(A), and 13(b)(2)(B) as a Control Person]

204.     Paragraphs 1 through 203 are re-alleged and incorporated by reference.

205.     As described above, through the actions of Ruehlen, Jackson, and others, Noble violated Sections 30A, 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §78dd-1, 15 U.S.C. §§78m(b)(2)(A) and (B)], during which time Jackson directly or indirectly controlled Noble.  As described above, Ruehlen also violated Sections 30A, 13(b)(2)(A), and 13(b)(2)(B), during which time Jackson also directly or indirectly controlled Ruehlen.

206.     As described above, Jackson was an officer and director of Noble throughout the period of its violations.  Jackson attended board meetings, reported to the Audit Committee, and had power over the management and policies of Noble.  At relevant times, including as CFO, Jackson was responsible for Noble's compliance with the FCPA, for reviewing and approving all

payments to government officials in Nigeria, and for the accuracy and legitimacy of Noble's books and records and internal controls.  At relevant times, including as CFO, Jackson directly supervised and controlled Ruehlen.  As COO, Jackson was responsible for Noble's Nigeria operations and continued to directly supervise Ruehlen.  When Jackson was the President and CEO of Noble, Jackson was responsible for Noble's operations world-wide, including in Nigeria.

207.    As described above, Jackson also directly or indirectly controlled Noble in his control, power and influence over employees of Noble, including Ruehlen and including but not limited to the head of internal audit of Noble, the Controller of Noble, and the various CFOs of Noble (when Jackson himself otherwise was not the CFO of Noble).

208.    As described above, Jackson further directly or indirectly induced Noble's and Ruehlen's actions constituting violations of Sections 30A, 13(b)(2)(A), and (b)(2)(B), and did not act in good faith.

209.    By reason of the foregoing, Jackson, as a control person under Section 20(a) of the Exchange Act [15 U.S.C. §78t(a)], is liable for each of Noble's and Ruehlen's violations.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests entry of a final judgment:

A.    Permanently restraining and enjoining Jackson from violating Exchange Act Sections 30A and 13(b)(5) and Rules 13a-14, 13b2-1, and 13b2-2 thereunder [15 U.S.C. §§ 78dd-1 and 78m(b)(5), and 17 C.F.R. §§ 240.13a-14, 240.13b2-1, and 240.13b2-2], and from aiding and abetting violations of Exchange Act Sections 30A, 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78dd-1, 78m(b)(2)(A) and 78m(b)(2)(B)].

B.    Ordering Jackson to pay civil penalties pursuant to Exchange Act Sections 21(d)(3) [15 U.S.C. §§ 78u(d)(3)], including as a control person, and 32(c)(2)(B) [78ff(c)(2)(B)],

for (i) any and all of Jackson's violations of Exchange Act Section 30A, the "knowingly circumvent" and/or "knowingly falsify" clauses of Section 13(b)(5), Rule 13a-14, Rule 13b2-1, and/or Rule 13b2-2 that accrued on or after May 10, 2006; (ii) any and all of Jackson's Exchange Act Section 20(e) [15 U.S.C. §78t(e)] violations for aiding and abetting violations of Section 30A and/or Section 13(b)(2)(A) that accrued on or after May 10, 2006; (iii) any and all of Noble's or Ruehlen's violations of Section 30A and/or Section 13(b)(2)(A) that accrued on or after May 10, 2006 for which Jackson is found to be a control person pursuant to Exchange Act Section 20(a) [15 U.S.C. §78t(a)]; (iv) any and all of Jackson's violations of the "knowingly fail to implement" clause of Exchange Act Section 13(b)(5); (v) any and all of Jackson's Exchange Act Section 20(e) violations for aiding and abetting violations of Section 13(b)(2)(B); and (vi) any and all of Noble's and/or Ruehlen's violations of Section 13(b)(2)(B) for which Jackson is found to be a control person pursuant to Section 20(a).

C.    Permanently restraining and enjoining Ruehlen from violating Exchange Act Sections 30A and 13(b)(5) and Rule 13b2-1 thereunder [15 U.S.C. §§ 78dd-1 and 78m(b)(5), and 17 C.F.R. §240.13b2-1], and from aiding and abetting violations of Exchange Act Sections 30A, 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78dd-1, 78m(b)(2)(A) and 78m(b)(2)(B)];

D.    Ordering Ruehlen to pay civil penalties pursuant to Exchange Act Sections 21(d)(3) and 32(c)(2)(B) for (i) any and all of Ruehlen's violations of Exchange Act Section 30A, the "knowingly circumvent" and/or "knowingly falsify" clauses of Section 13(b)(5), and/or Rule 13b2-1 that accrued on or after May 10, 2006; (ii) any and all of Ruehlen's Exchange Act Section 20(e) violations for aiding and abetting violations of Section 30A and/or Section 13(b)(2)(A) that accrued on or after May 10, 2006; (iii) any and all of Ruehlen's violations of the "knowingly fail to implement" clause of Exchange Act Section 13(b)(5); and (iv) any and all of

Ruehlen's Exchange Act Section 20(e) violations for aiding and abetting violations of Section 13(b)(2)(B);

      E.      Granting such other and further relief as the Court may deem just and appropriate.

Dated: March 25, 2013                    Respectfully submitted,

                                        */s/ Kenneth W. Donnelly*

                                    _____
                                    KENNETH W. DONNELLY
                                    D.C. Bar No. 462996
                                    ALFRED A. DAY
                                    MA Bar No. 654436
                                    SHARAN K.S. CUSTER
                                    D.C. Bar No. 464495
                                    Securities and Exchange Commission
                                    100 F Street, NE
                                    Washington, DC 20549-5949
                                    Telephone: (202) 551-4946
                                    Facsimile: (202) 772-9292

Of Counsel:

Gerald W. Hodgkins
Moira T. Roberts
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-6010

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 25, 2013, I electronically filed the foregoing Second Amended Complaint with the Clerk of the Court for the Southern District of Texas, Houston Division, by using the CM/ECF system, which will send a notice of filing to all CM/ECF participants for this matter.

*/s/Kenneth W. Donnelly*
Kenneth W. Donnelly
