UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) |
| Plaintiff, | ) Case No. 4:12-cv-00563 ) |
| v. | ) Hon. Keith P. Ellison ) |
| MARK A. JACKSON and JAMES J. RUEHLEN, | ) ) ) |
| Defendants. | ) ) ) |

**SEC'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE THE OPINION
TESTIMONY OF FORMER AMB. JOHN CAMPBELL**

Defendant James Ruehlen's ("Ruehlen's") explanation of the purported relevance of former Ambassador John Campbell's ("Campbell's") testimony highlights and confirms the reasons his testimony should be excluded. In his opposition brief, Ruehlen contends Campbell's testimony is relevant because "Nigeria's conventions and norms of governance" will be "counterintuitive" to a U.S. jury. (Br. at 1.) Thus, according to Ruehlen, Campbell should be permitted to testify, among other things, that:

- Although "[l]aw certainly exists at a general level in Nigeria, ... actual governance in Nigeria" is based on "informal governance policies," including "patronage relationships" (Br. at 4, 6);

- Written laws and legal institutions in Nigeria are merely "aspirational" (Br. at 5);

- "'[B]ribes' are, *from a Nigerian perspective*, perfectly legitimate payments" (Br. at 7 (emphasis added)); and,

- "[F]rom the Nigerian government's point of view" the submission of false paperwork to procure temporary import permits ("TIPs") was "entirely typical, logical and *necessary*" (Br. at 11 (emphasis in original)).

But Ruehlen isn't alleged to have violated Nigerian "norms of governance," whatever those may be. He is alleged to have violated the Foreign Corrupt Practices Act ("FCPA"). And under the FCPA, it is no defense to assert that bribing or lying to foreign government officials is "legitimate" in that country.

In offering this testimony (and that of another purported Nigeria expert, Aaron Sayne), Ruehlen seeks to create an entirely new "rampant corruption" exception to liability under the FCPA. Ruehlen wishes to "educate" the jury that bribery, disregard of the written law, and use of false paperwork to secure government benefits are, "from the Nigerian perspective, perfectly legitimate," and just how business is done in Nigeria. From this testimony, the jury is to infer Ruehlen's "behavior [wa]s congruent with the way business is done in Nigeria," Campbell Dep. [Dkt. No. 137-2] at 115, and he thus could not have acted with corrupt intent when he authorized

1

use of false paperwork and bribes to procure TIPs.  Such an inference is not only improper, it would, if allowed, eviscerate the prohibitions contained in the FCPA wherever rampant corruption exists.

Campbell's opinion that it was "reasonable" for Ruehlen to believe that it is legitimate to bribe and lie to government officials to obtain government benefits is also inadmissible because Campbell merely tells the jury what result to reach as to the ultimate issue: whether Ruehlen acted with corrupt intent.

Finally, as Ruehlen's opposition confirms, many of Campbell's "opinions" are nothing more than argument and recitations of (helpful) testimony.  However, it is well-settled that an expert may not—as Campbell attempts to do here—cherry pick evidence and serve as a mouthpiece for the defense.

For these reasons, and for the reasons set forth in the SEC's opening brief, the SEC respectfully requests that Ruehlen be precluded from offering Campbell's opinions at trial.

**I.      Campbell's Opinions Are Not Relevant to Any Disputed Issue or Defense.**

**A.     Campbell's opinions are not relevant to any cognizable defense under the FCPA.**

Ruehlen claims that Campbell will "educate[]" the jury on "Nigeria's conventions and norms of governance."  (Br. at 1.)  These "norms," according to Campbell, include "informal governance" or "patronage relationships" that render Nigeria's written law and legal institutions "aspirational."  (Br. at 4-6.)  These "norms of governance" in Nigeria mean that: (1) "'bribes' are, from a Nigerian perspective, perfectly legitimate payments," Br. at 7, and (2) submitting false paperwork to procure TIPs was "entirely typical, logical and *necessary*."  (Br. at 11 (emphasis in original).)  Campbell is thus to "educate[]" the jury that Ruehlen could not have acted with corrupt intent because Ruehlen was just doing what is normal or accepted in Nigeria.

2

Indeed, as Campbell himself explained during his deposition, Ruehlen's conduct "[wa]s congruent with the way business is done in Nigeria." (Campbell Dep. [Dkt. No. 137-2] at 115.)

But it is not a defense to a bribery claim under the FCPA that the law in a foreign country is merely "aspirational" or that bribery is "perfectly legitimate," especially when, as here, clear and undisputed Nigerian law ***prohibits*** bribery and submitting false information to procure TIPs. (*See* Dkt. No. 138 at 7-10.) Indeed, the implications of admitting such testimony to FCPA enforcement cannot be understated. If testimony regarding alleged foreign corruption or selective enforcement, or the allegedly "aspirational" nature, of the law was probative of a defendant's subjective intent (or lack thereof) to cause a foreign official to misuse his position, corrupt intent under the FCPA would be eviscerated wherever corruption or bribery is alleged to be wide-spread or prevalent—precisely the context in which the FCPA is most applicable.

Nor is such testimony circumstantial evidence of Ruehlen's state of mind. As Ruehlen's opposition brief highlights, Campbell purports to opine on the "Nigerian perspective" and the "the Nigerian government's point of view." (Br. at 7, 11.) Whatever the "Nigerian perspective" may be on the receipt of bribes, it says nothing about Ruehlen's state of mind when ***he paid*** bribes. Likewise, Campbell's speculative opinion concerning the "Nigerian government's point of view" as to the receipt of false information from someone soliciting a government benefit is not probative of Ruehlen's state of mind when ***he submitted*** false information to government officials, especially when, as here, there is no evidence Ruehlen was aware of or influenced by the purported "Nigerian government's point of view."[1] To the contrary, the evidence shows that Nigerian law prohibits the use of false paperwork and that Ruehlen himself understood that the

---

[1] Moreover, corrupt intent is the "wrongful purpose of influencing a foreign official to misuse his position." (Dkt. No. 87 at 37.) Testimony that bribery or the submission of false paper work to obtain government benefits was "perfectly legitimate" or "typical, logical, and necessary" (although prohibited under Nigerian law), is only evidence that government officials are ***more likely*** to misuse their position. Thus, Ruehlen's rationale for admitting Campbell's opinions is itself self-contradictory.

practice was improper. (*See*, *e.g*., Dkt. No. 160 at 3-4.)

In sum, through Campbell (and Aaron Sayne) Ruehlen hopes to engraft an exception to the FCPA that cannot be reconciled with the statute or the policies underlying its enactment. Campbell's opinions concerning so-called "Nigerian norms of governance" are therefore irrelevant and highly prejudicial.

**B.     Campbell's opinions are not the proper subject of expert testimony.**

Ruehlen claims that expert testimony on "cultural norms, politics, [and] history [] are in the heartland of proper expert testimony." (Br. at 14.) While Campbell may describe his opinions in terms of "norms of governance" or as providing cultural "context," they are in fact opinions that bribery and submission of false information to obtain government benefits are "legitimate." This can hardly be characterized as the "heartland" of expert testimony. Rather, it is testimony that purports "to define the legal parameters within which the jury must exercise its fact-finding function" and therefore it is improper. *Specht v. Jensen*, 853 F.2d 805, 809-10 (10th Cir. 1988). It is also highly prejudicial because it invites the jury to infer (improperly) that if Ruehlen's conduct was "legitimate" in Nigeria, then it must also have been "legitimate" under the FCPA.

But even if Campbell's opinions did in fact concern "cultural norms, politics, [and] history" (which they do not), such testimony is only admissible if relevant. *See*, *e.g*., *Vang v. Toyed*, 944 F.2d 476, 481 (9th Cir. 1991) (Rule 702 permits "expert testimony on issues of culture ... when relevant and not unfairly prejudicial.") And nowhere does Ruehlen explain how "Nigeria's conventions and norms of governance" relate to any disputed issue in this case. For this reason, each of the cases Ruehlen cites in his brief is inapposite.

4

For example, in *Bowoto v. Chevron Corp.*, No. C-99-02506 SI, 2006 WL 2604592, at *3 (N.D. Cal. Aug. 23, 2006), a case in which Nigerian plaintiffs alleged violations of the Alien Tort Statute, expert testimony concerning Nigerian culture and history was admissible to explain who the plaintiffs were and the characteristics of the region in which they lived. Similar testimony concerning Hmong culture was admitted in *Vang v. Toyed* to "explain to the trier of fact who" the plaintiffs were, "where they came from, and why" the plaintiffs (Hmong women) continued to have contact with the man they alleged raped them. *Vang*, 944 F.2d at 481. Unlike these cases, here, the jury needs no understanding of Nigerian "norms of governance" to determine whether Ruehlen violated the FCPA by, among other things, authorizing payments ranging from $12,000 to $56,000 to Nigerian officials.[2]

At bottom, Campbell's opinions amount to a critique of Nigeria as a corrupt nation that abjures written law in favor of "patronage" or payoffs. As the Ninth Circuit observed, such offensive cultural stereotyping is improper and "should not [be] dignified as expert opinion." *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1006 (9th Cir. 2001) (it was an abuse of discretion to permit "expert" testimony concerning prevalence of corruption and fraud in Korean business community); *United States v. Verduzco*, 373 F.3d 1022, 1034 (9th Cir. 2004) (affirming exclusion of expert testimony that purported to establish the defendant's mental state "by the application of generic cultural and ethnic stereotypes and data"); *also United States v. Ramirez*, 383 F. Supp. 2d 1179, 1180 (D. Neb. 2005) (expert testimony on "Hispanic immigrant culture"

---

[2] *United States v. Onumonu*, 967 F.2d 782, 785-788 (2d Cir. 1992), and *United States v. Zakaria*, No. WDQ-10-0043, 2010 WL 3895383 (D. Md. Oct. 1, 2010), are also inapposite. In *Onumonu*, the question before the court was whether the defendant could be convicted of knowingly importing heroin where he testified that he believed he was smuggling diamonds. Thus, expert testimony that defendant's conduct was consistent with diamond smuggling practices was probative of the defendant's intent to smuggle diamonds, not heroin. Similarly, in *Zakaria* expert testimony concerning "Ghanaian cultural norms" was probative of whether the defendant (or others in the household) had placed drugs in the defendant's luggage. Here, however, there is no connection between Nigerian "norms of governance" and Ruehlen's decision to authorize large payments to Nigerian officials.

offered to show the defendant lacked intent "amounts to little more than a recitation of ethnic or cultural stereotypes, [and] has the real potential to prejudice, mislead or confuse the jury.").

Because Campbell's "[g]eneralizations about [Nigerian] business practices ... are not relevant" and "improperly divert the jury's attention," they should be excluded. *Sunstar, Inc. v. Alberto-Culver Co., Inc.*, No. 01 C 0736, 2004 WL 1899927, at *26, *28 (N.D. Ill. Aug. 23, 2004) (excluding evidence regarding Japanese business practices because it "could lead the jury to decide the issue of what the parties intended ... by improper reference to ethnic stereotypes.").

### C. Campbell's testimony is not relevant to the jury's fact finding.

Ruehlen claims that Campbell's testimony is necessary to "ensure that the jury is not affirmatively misinformed by the SEC." (Br. at 18.) In particular, Ruehlen claims the SEC "wishes to portray Nigeria as a Western-style democracy with well-functioning formal government institutions." (*Id.*) This straw man is easily dispatched by the facts.

Nowhere has the SEC attempted to "portray" or characterize Nigeria or its institutions in *any* manner. In fact, whether Nigeria had "well-functioning formal government institutions" or not is entirely irrelevant to any claim or defense and is simply a distraction from the central issue in this case: whether the Defendants acted with corrupt intent.[3]

And Ruehlen himself explains that Campbell's testimony is not actually offered to rebut alleged mischaracterizations of Nigerian society by the SEC, but is in fact intended to educate the jury "***why Noble and Ruehlen*** continued both" paying bribes and submitting false paper work to procure TIPs. (Br. at 18 (emphasis added); *also* 19 ("Ruehlen understood [the false paper process] 'to be an alternative to physical exportation/re-importation that was used by

---

[3] Ruehlen contends that the SEC's Motion for a Determination of Foreign Law Pursuant to Fed. R. Civ. P. 44.1 [Dkt. No. 138] demonstrates that the SEC intends to "affirmatively misinform[]" the jury. But, as the SEC's motion makes clear, issues of foreign law are for the Court, not the jury.

6

NCS...'").)  But "why" Ruehlen engaged in this conduct is strictly a matter for him to explain to the jury, not a purported expert.  *See Cunningham v. Bienfang*, No. Civ.A.3:00-CV-0448-L, 2002 WL 31553976, at *3 (N.D. Tex. Nov. 15, 2002) ("Attorneys will have an opportunity to address the parties' intent with fact witnesses, but expert testimony on this issue is inadmissible."); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (holding that expert may not opine on a party's subjective intent, state of mind, and knowledge).  Simply put, Campbell's opinions rationalizing bribery and the submission of false paperwork to Nigerian government officials are not only irrelevant, they are also an improper attempt to offer opinion testimony on "why" Ruehlen made payments and submitted false paperwork to government officials.[4]

## II. Campbell's Opinion Concerning the "Reasonableness" of Ruehlen's Conduct Is Improper and Unduly Prejudicial.

Campbell intends to testify that Ruehlen "could have reasonably concluded" that submitting false paperwork and making large payments to government officials to procure TIPs was "legitimate."  (Dkt. No. 137-1 (Campbell Rpt.) ¶¶ 11-12, 110, 112.)  Ruehlen contends that this testimony is proper because an expert may testify as to matters that "embrace[] an ultimate issue."  (Br. at 21 (quoting Fed. R. Evid. 704(a).)  But Campbell's opinion does not just "embrace" the ultimate issue in this case, his opinion *consumes* the ultimate issue:  whether Ruehlen acted with corrupt intent.

The jury must determine whether Ruehlen "reasonably" believed the payments were non-discretionary and "legitimate" or whether he acted with corrupt intent.  No semantic difference can mask the fact that when Campbell opines that Ruehlen "reasonably" believed the payments

---

[4] As Ruehlen concedes in his brief, Campbell "has no specific familiarity with temporary import permits [TIPs]." (Br. at 20.)  Thus, Campbell is not qualified to testify regarding TIP "rules" or "policies." (Dkt. No. 137 at 14-16.) Indeed, although opining on what is permissible or "legitimate" in Nigeria, Campbell concedes that he is not an expert on Nigerian law.  (Dkt. No. 137-2 at 45.)

7

were "legitimate" he is opining that Ruehlen did not act corruptly. No case—and Ruehlen cites none—stands for the proposition that an expert may opine that a defendant lacked a culpable state of mind. *Cf. Salas v. Carpenter* 980 F.2d 299, 305 (5th Cir. 1992) (expert's "assertions regarding [defendant's] state of mind would not be helpful to a jury," and "were not admissible"). Yet, that is precisely what Campbell attempts to do here.[5]

Nor may Campbell opine on matters concerning Ruehlen's knowledge or belief. *See*, *e.g.*, *Highland Capital Mgmt., L.P.*, 379 F. Supp. 2d at 469. But as Ruehlen explains in his brief that is precisely what he expects Campbell to do at trial. (*See* Br. at 22 (Campbell "provides further context to the facts of the case, and in particular, ***what Noble and Ruehlen believed*** with respect to the paper process and the payments" to government officials) (emphasis added).)

Indeed, Campbell testified that he derived "Mr. Ruehlen's understanding" "from the text of his deposition" and concluded that it "is one which is absolutely reasonable ... , given Nigerian realities." (Dkt. No. 137-2 (Campbell Dep.) at 100-01.) Because Campbell's opinions concerning "what Noble and Ruehlen believed" merely attempt to bolster Ruehlen's credibility they are inadmissible. *See Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 618

---

[5] Ruehlen contends that "expert opinions regarding whether certain beliefs or actions are 'reasonable' are entirely proper." (Br. at 22.) However, none of the cases he cites support his assertion. For example, in *Amco Ukrservice & Prompriladamco v. Am. Meter Co.*, No. Civ. A 00-2638, 2005 WL 1541029 (E.D. Pa. Jun. 29, 2005), the court excluded testimony that the defendant "acted reasonably." *Id*. at *3. Further, the court only admitted expert testimony as to the whether it was "reasonable" to accept certain credit risks with a foreign counterparty because it "bears on whether the parties formed binding contracts or instead non-binding statements of intent." *Id*. at *5. As the court explained, "[i]f it would have been ludicrous for a sophisticated company like [the defendant] to accept the credit terms it allegedly accepted, there is a higher likelihood that [the defendant] did not agree to those terms." *Id*. Thus, the testimony embraced the ultimate issue of whether a contract was formed but did not, as Campbell does here, opine on the ultimate issue.

The remaining cases cited by Ruehlen have no nothing to do with whether an expert can opine on matters of subjective intent or the reasonableness of a defendant's conduct. In *Spreadsheet Automation Corp. v. Microsoft Corp.*, 587 F. Supp. 2d 794, 797-98 (E.D. Tex. 2007), the defendant was accused of willful infringement of plaintiff's patent. Plaintiff's expert was permitted to testify as to what information the defendant possessed about the plaintiff's patent because it was relevant in assessing whether willful infringement occurred. Likewise, in *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc*., 608 F.3d 871, 895 (D.C. Cir. 2010), the government alleged the defendants participated in a bid-rigging cartel and the government's expert witness was permitted to testify regarding how such cartels allocate bidding and operate.

(5th Cir. 1999) (stating that credibility determinations are within province of the jury); *Sharkey v. J.P. Morgan Chase & Co.*, No. 10 Civ. 3824, 2013 WL 5693846, at *3 (S.D.N.Y. Oct. 9, 2013) ("Defendants are correct that [an expert] may not testify as to whether (1) Plaintiff had a "reasonable belief" that Client A was engaging in money laundering and violating the statutes enumerated in SOX or (2) whether Plaintiff's recommendation to terminate Client A was "reasonable." Nor may [an expert] merely bolster Plaintiff's testimony as to the internal processes of JPMC of which she has no personal knowledge.").

### III. Campbell Inappropriately Attempts to Act as a Mouthpiece for the Defense.

As the SEC demonstrated in its opening brief, Campbell intends to offer a number of "opinions" that are little more than argument (based on his resolution of disputed facts) or a narrative recitation of the Defendants' view of the evidence, neither of which is proper expert testimony. (Dkt. No. 137 at 18-20.) Ruehlen now contends that these "opinions" are in fact the "basis and reasons for" Campbell's opinions that are required to be disclosed under Rule 26(a)(2). (Br. at 23.)

But—again—Ruehlen's own opposition brief undermines his claim. As Ruehlen explains, the factual narrative that Campbell intends to present to the jury concerning, for example, Noble's purported consultation with a Nigerian lawyer concerning the false paper process, is "***consistent with*** Ambassador Campbell's opinion that such consultations were typical and overall necessary for Westerners to navigate" Nigeria's regulatory environment. (Br. at 24 (emphasis added).) Thus, Campbell's recitation of Ruehlen's self-serving testimony that he consulted a Nigerian lawyer concerning the false paper process does not form the basis of Campbell's opinion, it is merely "consistent" with his opinion. Campbell therefore does not intend to testify as to facts that led him to his conclusions; he intends to recite facts helpful to Ruehlen's defense that are "consistent with" his conclusions. This is the type of narrative

9

testimony that courts uniformly exclude as improper. *See*, *e.g.*, *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) (expert may not serve as "the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion."); *Ridge Clearing & Outsourcing Solutions, Inc. v. Khashoggi*, No. 07 Civ. 6611(RJH), 2011 WL 3586468, at *2 (S.D.N.Y. Aug. 12, 2011) ("Simply rehashing evidence about which an expert has no personal knowledge is impermissible under Rule 702."); *see also United States v. Tucker*, 345 F.3d 320, 330 (5th Cir. 2003) (affirming exclusion of proffered expert testimony that was based on expert's "understanding from the facts that [defendant] believed, and relied upon, advice from counsel and others that the trust certificates involved were not securities").

Thus, Campbell's "opinions" concerning legal advice Mr. Ruehlen purportedly received and other factual assertions based on his recitation of testimony and documents are proper expert opinion and are inadmissible.[6]

## CONCLUSION

For the foregoing reasons, and for the reasons stated in the SEC's opening brief, the SEC respectfully requests that the Court issue an order excluding the testimony of John Campbell in its entirety.

---

[6] In his brief, Ruehlen states: "Finally, Ruehlen's observation in 2005 that Noble's Nigerian government partners would not favor an interruption in oil production is entirely consistent with the Ambassador's opinion regarding the primacy of the Nigerian national policy of uninterrupted oil production." (Br. at 24.) However, "Ruehlen's observation" appears nowhere in Campbell's report and appears nowhere in the record—there is zero evidence connecting Ruehlen's decision-making during the relevant period to "oil policy" or Noble's so-called "Nigerian government partners," which do not exist. (*Cf*. Dkt. No. 168 at 8 ("Noble, as a drilling contractor, operates much like a car rental company" and "'rents the rigs out on a daily basis.'") Ruehlen's unsupported contention to the contrary is thus an effort to provide some factual predicate, where none exists, for his purported Nigeria experts' testimony.

Dated: May 16, 2014                    Respectfully submitted,


                                       */s/ Patrick M. Bryan*
                                       PATRICK M. BRYAN
                                       D.C. Bar No. 490177
                                       ALFRED A. DAY
                                       MA Bar No. 654436
                                       SHARAN K.S. CUSTER
                                       D.C. Bar No. 464495
                                       NICOLAS A. BRADY
                                       DC 484612
                                       S.D. Tex. ID No. 27124
                                       Securities and Exchange Commission
                                       100 F Street, NE
                                       Washington, DC 20549-5949
                                       Telephone: (202) 551-4420
                                       Facsimile: (202) 772-9292

                                       *Counsel for Plaintiff SEC*

**CERTIFICATE OF SERVICE**

I certify that on May 16, 2014, I electronically filed the foregoing SEC'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE THE OPINION TESTIMONY OF FORMER AMB. JOHN CAMPBELL with the Clerk of the Court for the Southern District of Texas, Houston Division, by using the CM/ECF system, which will send a notice of filing to all CM/ECF participants for this matter.

/s/ *Patrick M. Bryan*
Patrick M. Bryan